1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


UNITED STATES OF AMERICA         )
                                   )
      vs.                   )
                                   )         CASE NOS.
PABLO RANGEL-RUBIO,           )  4:18-CR-00274-LGW-BWC-1
JUAN RANGEL-RUBIO,             )  4:18-CR-00274-LGW-BWC-2
HIGINIO PEREZ-BRAVO,          )  4:18-CR-00274-LGW-BWC-3
                                   )
                   Defendants.        )


CONTINUATION OF MOTIONS HEARING
BEFORE THE HONORABLE BENJAMIN W. CHEESBRO
June 25, 2021; 10:27 a.m.
Savannah, Georgia

APPEARANCES:

For the Government:         TANIA D. GROOVER, Esq.
                             CHRISTOPHER HOWARD, Esq.
                             U. S. Attorney's Office
                             P. O. Box 8970
                             Savannah, Georgia  31412
                             (912) 201-2552
                             tania.groover@usdoj.gov
                             christopher.howard@usdoj.gov


For the Defendant          JEFFREY L. ERTEL, Esq.
Pablo Rangel-Rubio:         Federal Defender Program, Inc.
                             100 Peachtree Street
                             Suite 1700
                             Atlanta, Georgia  30303
                             (404) 688-7530
                             jeff_ertel@fd.org


                             WILLIAM DOW BONDS, Esq.
                             The Bonds Law Firm
                             33 Bull Street
                             Suite 540
                             Savannah, Georgia 31401
                             (912) 335-3220
                             dowbonds@yahoo.com

2

For the Defendant          MARK EVAN OLIVE, Esq.
Juan Rangel-Rubio:         Law Offices of Mark E. Olive, PA
                           320 West Jefferson Street
                           Tallahassee, Florida   32301
                           (850) 224-0004
                           meolive@aol.com

                           GEORGE R. ASINC, Esq.
                           Asinc & Associates
                           445 Goshen Road
                           Rincon, Georgia 31326
                           (912) 484-7437
                           geo6152@comcast.net

For the Defendant          JOHN R. MARTIN, Esq.
Higinio Perez-Bravo:       Martin Brothers, PC
                           1099 St. Louis Place
                           Atlanta, Georgia   30306
                           (404) 433-7446
                           jack@martinbroslaw.com

                           ROBERT PAUL PHILLIPS, III, Esq.
                           Phillips, Carson & Phillips
                           420 West Broughton Street
                           2nd Floor
                           Savannah, Georgia 31401
                           (912) 232-0081
                           bplaw@msn.com

Reported by:               Debbie Gilbert, RPR, CCR
                           Official Court Reporter
                           801 Gloucester Street
                           Post Office Box 1894
                           Brunswick, GA 31521-1894
                           (912) 262-2608 or (912) 266-6006
                           debra_gilbert@gas.uscourts.gov


                                - - -

3

I N D E X

PAGE

OPENING STATEMENTS

DEFENDANT PEREZ-BRAVO WITNESS

DR. ROBERT LEONARD

       Direct Examination By Mr. Martin        7
       Cross-Examination By Mr. Howard       43
       Redirect Examination By Mr. Martin    60

GOVERNMENT WITNESS

SERGEANT ROBERTO RODRIGUEZ

       Direct Examination By Ms. Groover    76
       Cross-Examination By Mr. Ertel     147
       Redirect Examination By Ms. Groover  176
       Re-Cross-Examination By Mr. Ertel   178

4

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 5 | Recording of Joel Reyes Interview | 101 | 102 |
| No. 6 | Transcript of Joel Reyes Interview | 102 | 103 |
| No. 7 | Search Warrant | 128 | 128 |
| No. 12 | Packet of Letters | 105 | 106 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. Pablo Rangel-Rubio 5 | Hearing Transcript, US v. Martinez | 148 | 153 |
| No. Pablo Rangel-Rubio 6 | Stipulation | 159 | 160 |
| No. Perez-Bravo 6 | Dr. Leonard's Report | 13 | 9 |
| No. Pablo Rangel-Rubio 7 | Police Report, Refugio Ramirez | 175 | 176 |
| No. Perez-Bravo 7 | Curriculum Vitae of Dr. Leonard | 12 | 9 |
| No. Pablo Rangel-Rubio 9 | Warrant for Failure to Appear, Refugio Ramirez | 152 | 154 |

25

5

```
 1                    P R O C E E D I N G S
 2              (Call to order at 10:37 a.m.)
 3         THE COURT:  Ms. Mixon, please call the next case.
 4         THE CLERK:  Case Number 4:18-CR-274, United States of
 5    America versus Pablo Rangel-Rubio, Juan Rangel-Rubio, Higinio
 6    Perez-Bravo, Tania Groover for the Government, Chris Howard for
 7    the Government, Jeffrey Ertel, Dow Bonds, George Asinc, Mark
 8    Olive, and Robert Paul Phillips for Defense and we have Michelle
 9    Gonzales and Julia Davis as our interpreters today.
10         THE COURT:  Thank you, Ms. Mixon.  If you would please
11    go ahead and administer the oaths.
12         THE CLERK:  Please raise your right hand to be sworn.
13         (Interpreters sworn.)
14         INTERPRETER GONZALES:  I swear.
15         INTERPRETER DAVIS:  I do.
16         THE COURT:  Please state your full name and spell your
17    last name for the record.
18         INTERPRETER GONZALES:  Michelle Gonzales,
19    G-o-n-z-a-l-e-s.
20         INTERPRETER DAVIS:  Julia Davis D-a-v-i-s.
21         THE CLERK:  Thank you.
22         THE COURT:  Well, Ms. Davis, Ms. Gonzales, thank you
23    again for your service.  I will ask that you please speak up and
24    let me know if you need a break, if you need anyone to repeat
25    themselves or to clarify anything that a witness said.
```

6

1            Can you do that for me, please?

2            INTERPRETER DAVIS:  Yes, Your Honor.

3            INTERPRETER GONZALES:  Yes, Your Honor.

4            THE COURT:  Thank you, and everyone who is presenting

5     here today, I will also encourage you to remain conscientious of

6     the interpreters who are serving here today and our court

7     reporter and the fact that we have some participants joining by

8     video.  All of that requires you to speak slowly, clearly and to

9     not talk over one another.

10            Ms. Groover, ready to proceed.

11            MS. GROOVER:  Yes, Your Honor.

12            THE COURT:  Counsel for defendants, we had to continue

13     this hearing due to the newly enacted federal holiday that

14     occurred last Thursday when we were in the midst of this

15     proceeding.

16            Based on my recollection and review of my notes, we were

17     in the midst of the evidentiary presentations related to

18     defendant's motions regarding the admissibility of certain

19     custodial statements, and as I understood it, Mr. Martin, you

20     have one additional witness that you intended to present and

21     that would be Dr. Leonard; is that correct?

22            MR. MARTIN:  That's correct, Your Honor.

23            THE COURT:  Are you prepared to proceed with Dr. Leonard

24     at this time?

25            MR. MARTIN:  Yes, Your Honor.

7

1          THE COURT:  Go ahead.

2          MR. MARTIN:  We call Dr. Robert Leonard.  He is on the

3    virtual screen, Your Honor.

4          THE CLERK:  Mr. Leonard, can you hear me?

5          THE WITNESS:  I can.

6          THE CLERK:  If you will please raise your right hand to

7    be sworn.

8                          DR. ROBERT LEONARD,

9    having been first duly sworn, was examined and testified as

10   follows:

11         THE CLERK:  Thank you.  Please state your full name and

12   spell your last name for the record.

13         THE WITNESS:  Robert Leonard, L-e-o-n-a-r-d.

14         THE CLERK:  Thank you.

15         MR. MARTIN:  Your Honor, I have turned this podium a

16   little sideways if that's all right with you.

17         THE COURT:  That will be fine.

18                          DIRECT EXAMINATION

19   BY MR. MARTIN:

20   Q.   Dr. Leonard, what is your profession?

21   A.   I'm a professor of linguistics and the director of the

22   graduate program in linguistics for forensic linguistics at

23   Hofstra University in New York.

24   Q.   And what is linguistics simply, sir, and by the way, if

25   you can't hear me at any time, please tell us know.

8

1    A.    I can hear you.  Linguistics is the science that analyzes

2    language, usually human language, and like any science, what it

3    does is construct theories to explain the non-random

4    distribution of the data.

5         Excuse me, I'm seeing someone -- are you interpreting?

6    Q.    Yes, there's a woman standing there who is interpreting.

7    A.    Should I be seeing you instead, Mr. Martin?

8    Q.    I don't know if they can arrange that or not.

9    A.    It's fine with me.  I just wanted, before we started, to

10   have everything accurate.

11        THE COURT:  Dr. Leonard, unfortunately it's difficult

12   for the camera angle to pick up the entire courtroom.  Mr.

13   Martin is here in front of the screen that you are appearing on

14   and he is just off camera from the vantage point that you have.

15   If we need to reorient that, we will.

16        THE WITNESS:  That's fine, Your Honor.  Thank you very

17   much.  I just wanted to make sure things were right.  So I

18   can --

19   Q.    (By Mr. Martin)  Go ahead.

20   A.    Pardon?

21   Q.    I can see you fine but apparently I can see what the

22   screen says.

23   A.    So in English we have two main meanings for the word

24   "linguist."  One is someone who, for example, like our

25   translators or interpreters, is good at several languages and

1    then there are linguists that are academic scientific

2    linguistics who analyze language, and linguistics, although for

3    some reason it's not very well-known, it's recognized as a

4    science in virtually any university.  There will be a dean of

5    linguistics and most universities have majors and minors in

6    linguistic-related field.

7         Their academic association scores are in peer-reviewed

8    journals, and forensic linguistics is the application of that

9    science to issues of the law that deal with language.

10   Q.   Now, how long have you taught linguistics at Hofstra

11   University?

12   A.   Since 1990.

13   Q.   And does Hofstra University have a doctorate program in

14   linguistics and forensic linguistics?

15   A.   No.  We have a master's program and we have a BA, MA and

16   we have an MA-JD where people get their master's and their law

17   degree, working at...

18   Q.   Tell us briefly a little bit about your educational

19   background.

20   A.   I have a bachelor in sociology from Columbia College and

21   from Columbia graduate school I have a master of arts, a master

22   of philosophy and a doctorate in linguistics from there.

23   Q.   By the way, just as an aside, how did you finance your way

24   through Columbia College?

25   A.   My day job was as a singer in a band, and that was a very

10

1    interesting extracurricular activity and, for example, I, as you

2    and I discussed just before, I actually opened for Jimmy Hendrix

3    at the original Woodstock.

4    Q.    And that would be 19 --

5    A.    And I --

6    Q.    Go ahead.

7    A.    Then I went back -- sorry.  Then I went, I was offered a

8    full fellowship at Columbia through to the PhD, so I quit music

9    and went back to school and actually got my doctorate at

10   Columbia.

11   Q.    My recollection, Woodstock was 1969, so that would be,

12   gosh, more than 40, more than 50 years ago?

13   A.    Correct.

14   Q.    Tell us a little bit more about the type of honors you've

15   received over the years.

16   A.    I graduated with honors.  I also received a Fulbright

17   Scholarship to do my doctoral dissertation, research abroad.  I

18   am the only non-jurist to have been asked to be a member of the

19   Capital Case Oversight Committee during working group for the

20   State of Arizona who they asked me on there as the only

21   non-judge or lawyer, and that's a committee that, among other

22   things, attempts to rework the death penalty pattern jury

23   instructions so that they are most understandable to the average

24   juror.  I'm also on the editorial board of Oxford University

25   Press book series *Language and the Law*.

11

1    Q.    Have you published in your area?

2    A.    Yes, I have.  Two recent publications might be of note, a

3    *Law Journal* article on forensic linguistics and the different

4    types of cases that it is applicable to, and I also wrote the

5    forensic linguistic chapter to the *Handbook of Behavioral*

6    *Criminology*.

7    Q.    Are you on the editorial board of any publications?

8    A.    Yes.  As I was saying before, I am on the editorial board

9    of the Oxford University Press series *Language and the Law*.

10   Q.    Over the years, have you assisted law enforcement, FBI in

11   particular, and maybe Homeland Security, regarding forensic

12   issues?

13   A.    Yes.  I was recruited to help train FBI Behavioral

14   Analysis Unit agents at Quantico and then with them train agents

15   from quite a variety of other US agencies and allied agencies.

16   I just recently trained all the behavioral unit agents who deal

17   with language data.

18         I'm hearing noise.  I was wondering.

19         And over the past, say, 18 years, I've worked for the

20   Joint Terrorist Task Force, Department of Justice, Department of

21   Homeland Security, the DEA, FBI, as I said, and I've also been

22   employed by the British Government in their intelligence

23   agencies and a variety of the European countries.

24   Q.    Have you been qualified as an expert in forensic

25   linguistics in state and federal courts?

1   A.    Yes, about 28 or 29 times and in 15 state courts.  That is

2   courts in 14 states and seven federal districts.

3   Q.    Have you testified in any international settings?

4   A.    Yes.  I testified before the World Bank, the tribunals...

5   Q.    And did you provide to me a --

6         THE COURT:  Mr. Martin, just a moment.

7         THE REPORTER:  He keeps cutting in and out.

8         THE WITNESS:  If there are other folks who have their

9   microphones on, that might be the answer to why it's cutting in

10  and out because I'm in a very, very silent room.

11        THE COURT:  Let's move a little bit more slowly, Mr.

12  Martin.  It sounds like there's a good connection although once

13  you get to going a little faster, it seems to cut in and out, so

14  let's just take our time.

15        MR. MARTIN:  You heard that, Dr. Leonard.  Let's go as

16  slow as possible.

17  Q.    (By Mr. Martin)  Did you provide to me prior to today an

18  accurate, current CV for you?

19  A.    Yes, I did.

20        MR. MARTIN:  Your Honor, I would offer Defendants'

21  Exhibit 7.  I've given a copy of it to counsel.

22        THE COURT:  Any objection?

23        MR. HOWARD:  Your Honor, we have no objection both to

24  the CV and to the report which I think counsel is about to admit

25  as well.

13

1      THE COURT:  That's correct.

2  Q.    (By Mr. Martin) Dr. Leonard, did you prepare a report for

3  me summarizing your background and your conclusions regarding

4  this case?

5  A.    Yes.

6      MR. MARTIN:  I would also offer Defendants' Exhibit 6

7  which is that report which was previously filed with our motion.

8      THE COURT:  Exhibit 6 and Exhibit 7 are admitted.

9  Q.    (By Mr. Martin) We talked a little bit about linguistics

10 earlier.  Can you expand a little bit about the science of

11 linguistics that you're an expert in?

12     MR. MARTIN:  Your Honor, by the way, I should do this.

13 I would like to offer Dr. Leonard as an expert in linguistics

14 and in particular forensic linguistics.

15     THE COURT:  Any objection?

16     MR. HOWARD:  No, Your Honor.

17     THE COURT:  He is admitted as an expert in forensic

18 linguistics.

19 Q.    (By Mr. Martin) Dr. Leonard, I will try to go slowly.  We

20 talked a little bit about linguistics before.  Tell us a little

21 bit more about the science of linguistics and in particular

22 forensic linguistics?

23 A.    Well, especially, related to the present case, we, as

24 linguists, analyze not only language and structures, but we also

25 analyze communicative competence, that is, not just the ability

14

1  to form sentences but to use them and understand them in context

2  and how speakers and writers are communicating or not

3  communicating using language in specific social contexts to

4  specific audiences because, while we may be able to communicate

5  in one context, we may not be able to communicate in others.

6      So a first procedure in trying to assay communication is

7  to determine the linguistic content, which means the linguistic

8  ability demanded of the hearers, so to do that, we look at

9  vocabulary, syntax, semantics and the jargon, the complexity or

10 simplicity of sentences and so on.

11     Everyone uses a different set of their linguistic ability

12 to different audiences, so a mother may speak one way to her

13 six-year-old but she will certainly speak a different way to her

14 colleagues at work, and plumbers have their own internal jargon,

15 which is very useful among plumbers, lawyers do, linguists do.

16     But when we try to use this vocabulary set outside of our

17 own group, sometimes there's a lot of miscommunication.  For

18 example, if I were writing a report, the one that you just

19 submitted, to other linguists and not to, say, The Court, I

20 would be using terms like "discourse," "sequencing," "the

21 well-formedness of perlocutionary speech acts," which

22 unfortunately will be very difficult for someone to translate,

23 and "discourse structures," "morphology," et cetera.

24     So we are very aware of what we call register, and a

25 register is a variety of language that is used by a specific

15

1    group in a specific context.

2    Q.    Does the science of linguistics, forensic linguistics, in

3    particular follow -- excuse me.

4          INTERPRETER DAVIS:  Excuse me, Your Honor.

5          MR. MARTIN:  We're having a little trouble with the

6    interpreter a second.

7          THE COURT:  I will note for the record it appears to be

8    an issue with the hardware that may be a problem.

9          Ms. Davis, Ms. Gonzales, is that an issue with the

10   headsets?

11         INTERPRETER DAVIS:  The person using the headset thought

12   that it had to be with our transmitters, yes, Your Honor.  I

13   have not been able to verify because by the time I got over

14   there it was working again, but it's possible.

15         THE COURT:  If you would please inform the defendants

16   who are benefiting from the aid of those headsets to raise their

17   hands if they have any further difficulty with those pieces of

18   technology.

19         INTERPRETER DAVIS:  I believe they were just so informed

20   by you, Your Honor.

21         THE COURT:  Thank you.

22         You can proceed, Mr. Martin.

23   Q.    (By Mr. Martin)  Does the science of forensic linguistics

24   and linguistics in general follow scientific principles?

25   A.    Yes, absolutely.

1    Q.    Explain that to us, please.

2    A.    Well, one looked for the, as all scientists, we attempt to

3    explain the non-randomness of the data, and to do this, we

4    establish theories, overarching theories, and then test

5    hypotheses within those theories to see which hypothesis best

6    explains or even predicts the non-randomness of the distribution

7    of the data.

8    Q.    Let me ask you -- I may have mis -- go ahead.

9    A.    So here, for example, since the research question was --

10   excuse me -- Mr. Perez-Bravo's ability to understand the Miranda

11   warning and the interaction, I and my Mexican Latin expert

12   compared the types of speech that were used in his interview and

13   interrogation with the types of registers that he would, from

14   demographic information, likely to have access.

15   Q.    Just to remind us, "register" means like different levels

16   of education, socioeconomic background, job experience and so

17   forth?

18   A.    Yes.  Register means the type of language that a specific

19   group of people use in a situation, so, for example, a plumber

20   speaking to another plumber will likely not be totally

21   understood by me and similarly we have this hidden in the

22   profession of linguists, et cetera.

23   Q.    I probably didn't ask you this before but let me do it

24   now.  You have your Hofstra University has been approved by the

25   New York Regents for an advanced degree in forensic linguistics;

17

1    correct?

2    A.    Yes.  We are empowered by the Regents of the State of New

3    York to grant degrees in linguistics.

4    Q.    And the journals which you've published and written in are

5    recognized journals in the field of linguistics and they are

6    peer-reviewed articles; is that correct?

7    A.    That's correct.

8    Q.    Meaning they would have to be reviewed by your peers

9    before they would be published; correct?

10    A.    Correct.

11    Q.    Now, I think you mentioned it, but what did I ask you to

12    do in connection with Mr. Perez-Bravo's case?

13    A.    I was asked to review Mr. Perez-Bravo's interrogation and

14    especially analyze the likelihood of his ability to understand

15    his Miranda rights.

16    Q.    And what materials were available to you?  What did I

17    provide you?

18    A.    The video and transcript of his interrogation.

19    Q.    And those were the sole materials that you reviewed using

20    your scientific principles to analyze; is that correct?

21    A.    That's correct.

22    Q.    And did you have also available to you various different

23    resources to assist you, the recognized resources to assist you

24    in analyzing that material?

25    A.    Yes.  Among other things, I researched in the *Dictionary*

18

1    *of the Royal Spanish Academy*, the *Panhispanic Spanish Legal*

2    *Dictionary*, *A Frequency Dictionary of Spanish* -- that's the

3    title of it -- *A Frequency Dictionary*.

4    Q.    What does that mean?  What does that dictionary tell us?

5    A.    In addition to the other few sources that I was about to

6    talk about are scientific analyses of Spanish according to what

7    groups used what words, what are the most frequent words used in

8    Spanish, what are the least frequent, what are the more

9    technical and least technical.

10          This is something that linguists and lexicographers,

11    dictionary makers, and corpus linguists, linguists who construct

12    database and corpora, plural of corpus, for specific purposes,

13    research and construct, so that we have actual data, what's

14    called authentic data, that comes from people's keyboards, pens

15    and mouths of what their actual use is in any particular

16    language and in any particular register.

17    Q.    Okay, now, did you also consult with -- did I cut you off?

18    Were there other --

19    A.    Yes, let me -- yes, if you wouldn't mind, I will enumerate

20    the other sources.

21    Q.    Please do.

22    A.    The -- the *CREA*, C-R-E-A, *Oral Corpus of Spanish*, the

23    *CORPES* C-O-R-P-E-S, *of 221st Century Spanish*, the

24    *Sociolinguistic Corpus of Mexico City Spanish*, the *Wordreference*

25    synonyms dictionary and the Google Ngram synonym comparison

1    across current and recent generations.

2    Q.    Did you also consult with experts in your field that, on

3    these issues, especially the Spanish language issues?

4    A.    Yes.  I consulted a former student of mine who now has her

5    PhD from Indiana University in both linguistics and Spanish

6    linguistics and who is an expert in Mexican and Central American

7    dialects.  She resides in Mexico City now.

8    Q.    Is that something that experts in your field do, they

9    consult other experts in coming to a conclusion?

10    A.    Yes, routinely, especially when we need specific language

11    or specific areas of the language.

12    Q.    Excuse me, it's cutting off.  Can you hear him?  I was

13    talking to the interpreter.  Maybe I should address The Court.

14          INTERPRETER GONZALES:  The interpreter is interpreting

15    the words that she does hear.

16    Q.    (By Mr. Martin)  So tell us generally how you went

17    about -- I think you gave us some information already and how

18    you went about analyzing scientifically the forensic issues in

19    this case, specifically the quality of the Miranda warnings and

20    the ability of Mr. Perez-Bravo to understand them.

21    A.    Well, we looked at the conversational back and forth of

22    the interview, and the first thing we looked at was the

23    vocabulary used in the Miranda warning and the complexity of the

24    language used in the Miranda warning, and before I get to the

25    Spanish, I want to mention that Miranda warnings have been

20

1    studied very intensively.

2        There's quite a literature on the Miranda warnings in

3    English, for example, and the same principles apply to Spanish,

4    so, for example, a bar to understanding is syntax and

5    complexity, for example, having sentences that are composed not

6    of simple sentences but of multiple clauses, and one example in

7    this as an analog typical to the Miranda that was administered

8    to Mr. Perez-Bravo, we have six layers of imbedding in the

9    English sentence.  "If you cannot afford to hire a lawyer then

10   one will be appointed to represent you before any questioning if

11   you would want."  That is an extremely complicated sentence,

12   and, as I say, there's been a lot of research on the

13   understandability of Miranda both in English and in Spanish.

14       And when we remember that 37 percent of the adult inmates

15   in the United States function at or below a sixth grade reading

16   level, it is not surprising that the simpler the sentence --

17   that is not that sentence -- is most well understood.

18       So, for example, in the *Journal of Human Behavior*,

19   research was done and the -- excuse me -- Roger, et al., found

20   that a defendant with more than... did not comprehend the

21   Miranda better than those with brief criminal histories and in

22   English.

23            THE COURT:  Dr. Leonard.

24            MR. MARTIN:  Excuse me, stop a second.

25            THE COURT:  Ms. Gilbert, are you having trouble?

21

1          THE REPORTER:  Yeah, he's cutting out.

2          THE CLERK:  Your Honor, we have someone coming from DCS

3    to see if they can get some better audio for the witness.

4          THE COURT:  Everyone, we are going to stay in session.

5    Just bear with me for a couple of moments.  We're going to see

6    if we can try to establish a bit more reliable connection with

7    Dr. Leonard.

8          MR. PHILLIPS:  Is it possible that Dr. Leonard rocking

9    back and forth, that might be --

10         THE COURT:  Thank you, Mr. Phillips.

11         Dr. Leonard, the comment was made that, as you move a

12   lot in the video, that may require increased bandwidth which can

13   reduce the audio quality, and so to the extent that you're able,

14   if you can try to limit that, that may help.

15         THE WITNESS:  Yes, Your Honor.

16         MR. MARTIN:  Ms. Groover suggested the possibility of

17   getting a phone connection.  I don't know if that's possible.

18         THE COURT:  Before we explore that, Dr. Leonard, do you

19   happen to have any sort of headset that you could use while

20   you're participating in the hearing?

21         THE WITNESS:  Yes.  We also, Your Honor, if I may

22   suggest, we could turn off my video.

23         THE COURT:  Let's try the headset first, and if that

24   doesn't resolve it, then we may pursue that as well.

25         THE WITNESS:  Let me try to...

22

1    THE COURT:  As you held up your microphone, the quality

2    was better.

3    THE WITNESS:  Let me try to lean into the computer for a

4    second.

5    THE COURT:  Go ahead, Mr. Martin.

6    Q.   (By Mr. Martin)  Dr. Leonard.

7    A.   Yes.  I was saying that the study in England who has their

8    own version of what we would call Miranda, 97 percent of

9    detainees claimed to understand their warnings but very few

10   could demonstrate comprehension, and that's a very important

11   term, "demonstrate comprehension."

12       The least effective way of assessing comprehension is to

13   ask someone "Do you understand?"  Imagine if we granted licenses

14   to practice law or driving or getting out of sixth grade by

15   simply asking the subject, "Do you understand the material" and

16   then accepting when they say yes.

17       Clearly the only way to assess understanding is to have

18   the person demonstrate understanding by questioning and having

19   them explain whatever the area, absolutely the area there.  It

20   is important, except Miranda, sometimes.  There are many people

21   who do do that.

22   Q.   Dr. Leonard, while you mentioned it, let me back up one

23   second.  I also provided you a copy...

24       THE COURT:  One moment, Mr. Martin.

25       THE WITNESS:  How about if I try here testing 1, 2, 3.

23

1          THE COURT:  Hold on one moment, Dr. Leonard.

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  Dr. Leonard, you had a headset on

4   previously, if you could try to utilize that again.

5          THE WITNESS:  I'm getting a telephone call.  Is that

6   from you folks?

7          THE COURT:  No, Dr. Leonard.

8          THE WITNESS:  Very good.  Okay, now I have my headset

9   on.

10         THE COURT:  And you had held that microphone a bit

11  closer, and it appeared to pick you up better previously.

12         THE WITNESS:  All right.  How is that, is it any better?

13         THE COURT:  Unfortunately, that's not resolving the

14  issue.

15         Mr. Martin any objections to Dr. Leonard participating

16  by phone and not dialing in by video?

17         MR. MARTIN:  No, if it's clearer.  Anything that will

18  help us because the subject is complicated, and I want to make

19  sure everybody can hear it.

20         THE COURT:  Any objection, Ms. Groover?

21         MS. GROOVER:  No, Your Honor.

22         THE COURT:  I'm going to take a short recess rather than

23  conducting all this on the record.

24         Dr. Leonard, if you will just stay on and we have an

25  individual here from our court's IT staff who may be able to

24

```
1    help you with trying to establish a better audio connection.
2    Ideally I would prefer you would conduct this by audio and
3    video, but if during the recess, we identify that only audio
4    will work reliably, that will be a suitable alternative.  We
5    will wait to restart until you've evaluated what the best option
6    is of conducting the hearing.
7              THE WITNESS:  As you wish.  Your Honor, but may I
8    suggest that I've been teaching using this kind of media over a
9    year and a half and what we sometimes do as I think was
10   suggested have the audio on the phone and then the video with no
11   sound and that way we get both audio and video.
12             THE COURT:  You all explore that during the recess, all
13   right, Dr. Leonard.
14             THE WITNESS:  Very good, thank you.
15             THE COURT:  We will be in recess.
16             (Recess from 11:06 a.m. to 11:13 a.m.)
17             THE COURT:  I understand we have reconfigured Dr.
18   Leonard's connection and we think that we have a reliable audio
19   connection now, so Mr. Martin, you can proceed with your
20   questioning.
21   Q.    (By Mr. Martin)  Dr. Leonard, were you provided -- can you
22   hear me?
23   A.    I'm having trouble hearing you now, so if we can confirm
24   with the headset, see if that will work because then I can hear
25   you-all.  Ten, nine, eight, seven, six, five, four, three, two,
```

25

1    one.

2          MR. MARTIN:  I can hear you.  Can you hear me?

3          THE WITNESS:  I can hear you fine now.  Is the same for

4    the court reporter, you can hear me better than before?

5    Q.   (By Mr. Martin) She says yes.

6    A.   So I can begin.

7    Q.   You trailed off a little bit in the last answer.  Let me

8    bring you back.  Maybe we can get you where we are.  One of the

9    things that we were, one of the documents that I provided you

10   was a Spanish language translation of the Miranda warnings; is

11   that correct?

12   A.   Yes.

13   Q.   You said yes?

14   A.   I did say -- I did say yes.  Mr. Martin, I was in the

15   middle of another answer.

16   Q.   Yeah, I think we were talking about the multiple clauses.

17   A.   Yes.  Oh, shall we revisit that now?

18   Q.   Well, let me ask you a question and direct your attention.

19   The transcript indicates that the Agent Miranda read to him, to

20   Mr. Perez-Bravo, in Spanish.  This is what the English

21   translation said, "If you can't pay an attorney one will be

22   provided before we ask you anything if you wish."  Does that

23   sentence have three different clauses?

24   A.   Yeah.  It does and the -- that's quite a complicated

25   sentence in Spanish, "si no puedo pagar un abo gado, se le

26

1   proporcionar uno antes de que le hagamos cualquier p regunta, si

2   ud lo desea."

3       So if you can't pay an attorney, one will be

4   "proporcionar," "provided," for you before the occasion of being

5   asked, we ask any questions if you want it, "si ud lo desea."

6   Q.    And you talked about register a little earlier.  Someone

7   like Mr. Perez-Bravo is tested at 75 IQ and comes from a low

8   education background in a rural area of Mexico.  Is that a type

9   of sentence that would be complicated for him to understand?

10  A.    Yes, and what I was saying before about the research done

11  on English speakers, for example, we ended with my saying that a

12  2007 study of British detainees had 97 percent of them claiming

13  that understand but very few could actually demonstrate

14  comprehension, and a study in 2016 in the United States of 80

15  pretrial detainees 48.7 percent did not consider the long-term

16  consequences of waiving the Miranda rights and 43.8 percent

17  could not generate a single long-term reason for exercising

18  their right, and the reverse, of course, the more vulnerable

19  population, which have been much studied, juveniles, people with

20  mental health problems, cognitive deficits, and IQ scores below

21  75, so that from the study, so, yeah, carry on.

22  Q.    So let's talk now about the Miranda warnings that was read

23  to Mr. Perez-Bravo in Spanish.

24      Did you and people you consulted with and the books you

25  consulted and the individuals you consulted, were there

27

1  particular problems with particular words in that Miranda

2  warning in Spanish?

3  A.   Yes.  For example, in addition to syntactic complexity, in

4  terms "tribunal," which is a cognitive of English "tribunal" and

5  "proporcionar," which is a...

6         THE REPORTER:  I don't understand what he's saying.

7         MR. MARTIN:  The court reporter is not getting you

8  understandably.  Your Honor, what do you want to do?

9         THE COURT:  Dr. Leonard, try to repeat that answer,

10 please.

11        THE WITNESS:  Yes.  Two terms that we noticed in

12 addition to the syntactic complexity are the Spanish word,

13 "tribunal" -- that's "tribunal" -- and the word is the

14 translation of "provide," the Spanish word "proporcionar."  Is

15 that all right?  I'm asking the court reporter.

16        MR. MARTIN:  She says yes.

17        THE WITNESS:  So these are terms that are in a register

18 not likely to be understood by Mr. Perez-Bravo.

19 Q.   (By Mr. Martin) So what would be a word -- let's say with

20 "tribunal," which is, is that a word that -- is there a

21 different word that may have been understandable to him in

22 Spanish?

23 A.   Yes.  Hold on one second, please.  I'm looking for my

24 notes.  Yes, so alternatives, according to research, that would

25 be more likely to be understood would be instead of the

1    "tribunal" would be "corte" and instead of "proporcionar" we

2    could have perhaps have had (unintelligible) which means...

3            THE COURT:  Dr. Leonard, you need to hold your

4    microphone up the way that you were before.  That was the only

5    way we had a good audio for you.

6            THE WITNESS:  Will do.  Should I repeat that?

7            THE REPORTER:  Yes.

8    Q.    (By Mr. Martin) Dr. Leonard, when you use these words in

9    Spanish, why don't you spell them for the court reporter, so

10   she will know exactly what you're meaning.

11   A.    Very good.  So instead of the word t-r-i-b-u-n-a-l, which

12   the translation of the English word "court," the word c-o-r-t-e,

13   research would show, would be a better understood alternative

14   because the first word, the word that's actually used, is very

15   specific legal term characterized by high formalities and high

16   education necessary for use in oral speech.

17       It's absent in the oral speech of lower economic class

18   Spanish speakers in Mexico.  And that's why the term c-o-r-t-e

19   would likely be a better alternative.

20       Then the other p-r-o-p-o-r-i-o-n-a-r, which is the

21   translation for "provide," is a frequent term in written

22   material, especially outside of the legal language, but it's

23   also characterized by high education and high formality.  It's

24   not common in oral speech, and in the study of lower economic

25   classes of in Mexico, it was absent.  It did not appear.  It's

1    much more frequent synonyms, o-f-r-e-c-e-r, "ofrecere," or even

2    f-a-c-i-l-i-t-a-r, Spanish, "facilitar," would be better

3    understood alternative.

4    Q.    Now, given those word problems and the fact that the

5    sentence includes several clauses, would that be something that

6    would be extremely difficult for Mr. Perez-Bravo given his

7    background to understand?

8    A.    I would say so because here we have several features

9    coming together all of which prevent comprehension, and let me

10   point out that comprehending a sentence is a complex job, and

11   one must comprehend it in its entirety, and if one is

12   interrupted in one's understanding it is like a car going off

13   the rails.  You don't just jump back on after the word that

14   gives you problems.

15        I studied reading intensively for years at a local

16   community college and syntactic complexity plus vocabulary that

17   is not familiar or totally absent in one's own language is a

18   very bad mixture if you want to be comprehensible.

19   Q.    If Mr. Perez-Bravo has explained to a neuropsychologist

20   who has already testified that he did not understand that he

21   could get a lawyer for free, what does the forensic linguistic

22   science tell us about that sentence and whether that's an

23   accurate conclusion?

24   A.    Right.  Well, I can't know exactly what another human

25   being is understanding or not, but I can certainly analyze the

30

1    language and compare it to scientific studies that have mapped

2    out what people of a certain demographic actually use and

3    actually understand, and one thing I can say is that the Spanish

4    terms certainly do not in and of themselves include what we call

5    entailing any free provision.

6        So there's nothing in the Spanish content of those two

7    words, of the words that is the translation of "provide," I

8    mean, that would suggest it would have no cost.

9    Q.    Now, you mentioned this earlier but let's repeat it.

10   According to the transcript -- and you've reviewed that -- the

11   only time that Mr. Perez-Bravo is told his Miranda rights is on

12   Page 10 when he is read that Spanish language translation we

13   talked about.

14       Afterwards, Mr. Perez-Bravo is repeatedly asked by the

15   agents in good faith, "Do you understand your rights?"  Tell us

16   what you can make of that, to which he responds yes?

17   A.    Right.  Well, also the -- he does not get to answer the

18   question about whether he is willing to speak to them now

19   without a lawyer, as I -- earlier testimony pointed out, because

20   two officers, who again appear to be acting in absolute good

21   faith, interrupt and not give him an opportunity to say that.

22       Would you ask me that question again?  I think I lost the

23   thread.

24   Q.    Well, what do we make of the fact that after he is read

25   his Miranda rights only one time, he is asked repeatedly, "Do

1   you understand your rights," to which he responds yes.  Is that

2   reliable information that he -- from your review of the record

3   that he actually understood his rights?

4   A.    No.

5   Q.    All of his rights?

6   A.    For many reasons.  Several that I have already mentioned.

7   Asking someone if they understand is one of the least effective

8   ways of finding out if they do understand, plus whenever you're

9   in a situation, any conversation, we have what's called

10  preferred and dispreferred responses, which are a matter of

11  politeness, communication and interaction.

12        So the answer yes is going to be much more preferred, and

13  especially if you have a power differential, it is clear that

14  the expected and desired answer is yes.

15        So all of these things combined show that asking someone

16  "yes or no, do you understand" is not useful.

17  Q.    Is not what was the word you said, "is not"?

18  A.    "Useful."

19  Q.    What would be a better question?

20  A.    "Explain what you understand your rights to be."  Indeed

21  when he -- when Mr. Perez-Bravo asked, "What are my options,"

22  one of the options that are not explained is that you can decide

23  to speak to us with an attorney present, but that is not said.

24        And as a matter of fact, people have been missing the fact

25  that Mr. Perez-Bravo said, "What if I don't want to speak to you

32

1   a-h-o-r-a," "now," and that's not in the translation.

2   Q.   So, for example, on Page 14 of the transcript, he's asked

3   one more time, "Are you willing to answer" and Mr. -- Agent

4   Snipes says, "He understands his rights" and he -- Mr. Miranda

5   says, "And you do understand your rights" in Spanish and his

6   response is "Yes, yes, as far as the questions you're going to

7   ask I'm not -- I'm not offended or anything; I don't -- I

8   haven't done anything."  What do you make of that?

9   A.   Well, I think that the language evidence shows that he

10  understood his ability to not answer any questions, but remember

11  that one of his main motivations is that he, of course, to him

12  gets to ask, "Why am I here?"

13        And also it's a very odd thing to say in terms of Miranda

14  that "You can ask me any questions you want and I will not be

15  offended."  It does not seem to be an answer to understanding

16  Miranda rights.

17  Q.   So also, just so we will know in the transcript, on Page

18  12 of the transcript --

19  A.   Yes.  I've got it.

20  Q.   Let me get it.  "If I don't want to talk to you guys, what

21  other option do I have?"  And Agent Miranda says, "What do you

22  mean by other options?  Well, you will be -- we will get an

23  arrest warrant and the arrest will be" -- and the transcript it

24  says "stammer," so he's stammering -- "is still there so if you

25  don't want to talk to us, you will just go to jail."

33

1    Is that a response to really understand, what he
2  understood his rights to be?
3  A.    I didn't hear the last part of your question.  Was that a
4  response what?
5  Q.    What do you make of that interchange?
6  A.    Oh.  Well, it clearly does not outline the option to have
7  an attorney present at this time and clearly does not remind him
8  or state that he can have an attorney at no cost to himself.
9    Instead he said, "If you don't need" -- the officer says,
10  "If you don't talk to us, you will still go to jail," and on a
11  global view, Mr. Perez-Bravo is actually very, very surprised to
12  find at the end that he cannot go home.
13    He actually says, "So I can go now" and this is after this
14  entire conversation.  This is also undermining my confidence
15  that he totally understood what was happening in this
16  interaction, which, of course, begins with Miranda.
17  Q.    Based upon everything you know about this case, including
18  the transcript, the recording, the Spanish language translation
19  of the Miranda rights, the references that you've consulted, the
20  other experts you consulted, and the language that was used,
21  looking at it as a forensic scientist, do you believe that the
22  Government could carry a burden to prove that Mr. Perez-Bravo
23  understood he had a right to an attorney at no cost?
24  A.    The evidence points against it.  The Warren Court said
25  that, in their decision about Miranda v. Arizona, the person in

34

1    custody must --

2              MR. HOWARD:  Your Honor, I'm going to object.

3              THE WITNESS:  -- prior to --

4              MR. MARTIN:  Excuse me, Dr. Leonard.

5              MR. HOWARD:  I'm going to object to the witness reading

6    court opinions.  He answered the question, although it called

7    for a legal conclusion and now he's reading verbatim from court

8    opinions he's cited.  He's not testifying about what -- the

9    whole purpose of him being is to opine.  He's not opining.  He's

10   just reading.  That's an objection as to relevance.

11   Q.   (By Mr. Martin)  Well, Dr. Leonard, this is your -- I'm

12   asking you your opinion as a forensic scientist in linguistics.

13   I'm not asking you for a legal opinion.

14   A.   Yes.

15   Q.   What is your --

16   A.   No, of course not.

17   Q.   Go ahead.

18   A.   The reason I was going to -- the reason I was going to

19   read this short paragraph was to show what I was actually

20   looking at.

21   Q.   Yes.

22   A.   And an assay.

23   Q.   And what is that you were looking at?

24   A.   May I continue or not?

25             MR. MARTIN:  Your Honor, can he continue?

35

1     THE COURT:  Dr. Leonard, if you will just answer what it

2  is you were looking at in terms of the substance.

3     THE WITNESS:  Certainly.  I couldn't hear much of the

4  objection, by the way.  I'm looking at an article that is

5  discussing Miranda, and there is a paragraph from Miranda v.

6  Arizona, 1966, Page 437.

7     THE COURT:  I understand, Dr. Leonard.  If you will just

8  answer in terms of your area of expertise.  You were answering

9  what it is you looked at to evaluate I believe whether he

10  understood his rights and you were going to say where your --

11     THE WITNESS:  The rights, the right of silence, that

12  things could be used against him in court.  I don't have to read

13  it.  I can just speak through that if that's preferable.

14  Q.   (By Mr. Martin) That is.  Go ahead.

15  A.   Okay.  So I would be assaying whether he would have

16  understood that he had the right to remain silent, which I think

17  he did.  I don't know if he had a true understanding of what the

18  consequences might have been, that he -- anything that he said

19  could be used against him, that he had the right to talk to an

20  attorney, have the attorney with him, that the attorney would be

21  free, I don't think he understood that.

22  Q.   Based on what you can see in the actual language being

23  used?

24  A.   Absolutely.  That's all I'm working on.  I'm not a mind-

25  reader.  I'm just looking at the demographics of Mr.

36

1    Perez-Bravo, the scientific research that has studied the
2    language ability, vocabulary, et cetera, all of the research on
3    the problems of it, of multi-clausal sentences, the problems and
4    reports on how little detainees actually understand when they
5    are asked to demonstrate understanding and then the very normal
6    and again in total good faith, I'm sure, by the officers simple
7    "do you understand," "yes," which is not adequate in the least
8    in assaying understanding.
9    Q.    Agent Miranda and other agents testified, Agent Snipes, I
10   think, Agent Rodriguez that they have used a similar form
11   numerous times over the years and haven't had a problem with it.
12   What do you make of that?
13   A.    Well, I'm sure they did not experience problems with it.
14   I'm sure that they are telling us the absolute truth.  The
15   problem is what does that mean in terms of the adequacy of the
16   warning, and some of the research that I was just citing would
17   show that many people think they understand it and they do not
18   and many people think they do not and yet say that they do, so
19   that statistic is, in terms of really assaying understanding,
20   not significant.
21   Q.    If this transcript showed that the normal procedure of, at
22   least in this context, of Agent Miranda and Agent Snipes was to
23   read the rights and then ask "do you understand your rights" and
24   the person says yes, is that an adequate way to really
25   understand what the person's -- whether the person really

37

1   understood all of his rights?

2   A.    No --

3   Q.    And --

4   A.    -- it is not.

5   Q.    And especially if they didn't know he had a lower IQ of 75

6   and other issues in his life?

7   A.    That exacerbates things, of course.

8        MR. MARTIN:  Just one second, Judge.

9        Your Honor, that's all I have.

10       THE COURT:  All right.  Mr. Howard, before you begin

11   your cross-examination, Dr. Leonard, I do have a couple of

12   questions for you based on Mr. Martin's direct examination.  Are

13   you able to hear me all right, Dr. Leonard?

14       THE WITNESS:  Yes, based on Mr. Martin's what?

15       THE COURT:  His direct examination, I have a few

16   questions.

17       You often referred to -- one moment, is there an issue

18   with the translation?

19       MR. ASINC:  He was having problems hearing and I was

20   trying to get their attention.

21       THE COURT:  Dr. Leonard, you referred to differences in

22   registers frequently.  Am I correct in my understanding that

23   those are not rigid demarcations.  It's a continuum of higher or

24   lower; correct?

25       THE WITNESS:  Yes and no, Your Honor.  In terms of

38

1    formality, it is a continuous -- so, for example, in New York

2    dialect, the more formal the register the more likely we are to

3    pronounce the sound "R" after vowels, so in other words, to say

4    lower register would be "New Yawk," Y-a-w-k.  Higher register

5    would be "New York" and there are various markers of formality

6    that are like that that shade into one or another, so that's a

7    continuum, but when we look at vocabulary, so I guess you could

8    say it's a continuum because most of the words are going to be

9    shared if it's the same language, so we have the same words for

10   one, two, three and four, but not the same words for "provide"

11   or "court" and/or other things.

12          Going back to my plumbing example, the parts of a sink

13   or something are going to be vaguely understood by me but

14   there's a lot that won't, so, Your Honor, you're a hundred

15   percent correct that register is not a thing that exists in the

16   real world.  It's a useful concept to organize data sets.

17          THE COURT:  And in terms of an individual's speaking

18   register or comprehension register, I believe I understood your

19   testimony to indicate that that would be influenced by a whole

20   host of factors, education level, family, socioeconomic status,

21   location geographically, intelligence, all of those different

22   factors; is that correct?

23          THE WITNESS:  That's correct.

24          THE COURT:  So if you were to identify an individual's

25   comprehension register as, let's just say, low, medium or high,

1    you would have a general sense of whether they would be able to

2    understand communications in a higher register or not; correct?

3            THE WITNESS:  Yes, if I understand you correctly, Your

4    Honor.

5            THE COURT:  Well, and what I'm really focused on here is

6    that there may be someone who has a lower comprehension register

7    but still nonetheless is able to understand communications that

8    are delivered in higher register from time to time; is that

9    correct?  It's not a categorical difference?

10           THE WITNESS:  Yes, that's always possible.  It's just

11   there were so many factors happening all at the same time that

12   it's hard to give a categorical answer to that question.

13           THE COURT:  Well, and one thought here with regards to

14   Miranda warnings.  If you had someone who had a low

15   comprehension register but had had multiple interactions with

16   law enforcement and the criminal justice system, they may be

17   able to understand Miranda warnings given at a higher register

18   given that experience.  Is that a fair general observation?

19           THE WITNESS:  Well, one would think so, but the research

20   says no, and that was one of the studies that I was citing

21   earlier.  When they took people who had been arrested more than

22   five times compared to 40 interactions, they found no real

23   difference and that is a surprising fact.

24           THE COURT:  I understand.

25           THE WITNESS:  Even the...

1    THE COURT:  In the dispute that's now before The Court

2    there are sort of two sides to the coin.  There is Mr.

3    Perez-Bravo's comprehension register both in terms of the spoken

4    word and potentially the written word and then on the other side

5    of the coin is the provision of Miranda rights and the register

6    at which those are communicated both orally and in writing.

7        In terms of your field of expertise, do you come to any

8    sort of conclusion about, for example, a percentage likelihood

9    that someone with Mr. Perez-Bravo's background would understand

10   the communications at the register that were given here?

11   THE WITNESS:  Not really, Your Honor.  That's why I

12   focused my testimony on those two words that I have hard data

13   on, that one of those words has not been recorded in the speech

14   of folks like Mr. Perez-Bravo.  That would militate against it

15   being understood because, if you don't have an active knowledge,

16   it's unlikely you will have a passive knowledge, although it's

17   possible.

18       Another thing, you were talking about reading, I saw the

19   other testimony the other day, and while it certainly looks like

20   that Mr. Perez-Bravo is reading, I've spoken to people who could

21   not read and they very often, especially because it is

22   societally bad to be illiterate, would make believe that they

23   read things and they will stare at paper.  They can handle it

24   and they will put it down and people would think that they had

25   read it, but I knew very well from testing them that they could

41

1    not read, that they were totally illiterate.  So I have no idea,

2    if Mr. Perez-Bravo, as acting in the video, was actually reading

3    or not.  I'm just saying the mere fact that he appears to be

4    should not be categorical evidence that he was.

5            THE COURT:  I understand that point, Dr. Leonard.

6    Regarding those two words that you focused on, I'm going to

7    endeavor to ask a specific question, but there may be a

8    vernacular in your field that addresses this better than the

9    term that I use.

10           It's not uncommon, I think, even in common understanding

11   of speaking and reading comprehension that if an individual

12   encounters a word that they are not familiar with or they don't

13   understand that they may still derive some notion of what it

14   means by context clues or the circumstances in which they are in

15   or even surroundings verbiage in the same sentence, and so

16   focusing on one of the two words that you referenced, the

17   "proporcionar" word, what, in your expertise, would you expect

18   someone with Mr. Perez-Bravo's comprehension register to do with

19   that word if they were to not understand it outright, and by

20   that I mean, would they simply shut down and not understand

21   anything around it or fill in with another word that's perhaps a

22   mistaken definition or try to bridge the gap by looking at other

23   words in the sentence or other words that were communicated to

24   them?

25           THE WITNESS:  All those things are possible that happen

42

1  when people read.  What is militating against understanding

2  here, and, again, Your Honor, I don't know what Mr. Perez-Bravo

3  understood and what he did not understand.

4       All I can do is look at the data and say, "This is

5  certainly weighing against understanding."  He reads Spanish.

6  This word "proporcionar" p-r-o-p-o-r-c-i-o-n-a-r, could have

7  derailed the analogy and especially in these long multi-clausal

8  sentences.  If you look at even the English, it's quite long and

9  it ends with "if you want" and one must put all of the pieces

10 together to totally understand.  Your Honor is hundred percent

11 correct that that fluent readers ...

12       THE COURT:  One moment, Dr. Leonard, I know it's maybe a

13 bit uncomfortable or awkward, but if you could pick that

14 microphone back up again.  We were getting much better audio

15 when you did.

16       THE WITNESS:  Neither...  I'm sorry, Your Honor, I just

17 forgot.

18       So what fluent readers do is they jump over words that

19 they do not understand and then perform all of the acts, let's

20 say, that you were talking about, which is you look at context,

21 et cetera.  You don't want to stop and focus in on a word that

22 you don't understand.

23       So, for example, in an old case of my mentor, there was

24 a ransom note and it said, "Leave a certain amount of money in a

25 diaper bag on the devil strip on the corner of 6th and Main,"

43

1    and "devil strip" is a term used only in one city, and it means

2    the strip of grass in between the road and the sidewalk, and I

3    have used that in presentations hundreds of times, and most

4    fluent readers jump right over that word "devil strip" because

5    it's meaningless to them.  And I ask, "Do you see anything here

6    that you don't understand," and they don't see it because they

7    are fluent readers and they are trying to get everything else

8    and they got enough information that they are supposed to put

9    money in the diaper bag, et cetera, so that's what happens.

10           But non-fluent readers and non-fluent listeners get

11   stuck on words that they don't know, and terrible readers

12   actually forget what happened in the beginning of a sentence by

13   the time they get to the end.  It's an extremely complex

14   process, so I don't know exactly what happened here, but I can

15   point to using these unfamiliar, high formality, high education

16   words as perhaps militating against understanding.

17           THE COURT:  Thank you.  That's helpful, Dr. Leonard.

18           Mr. Howard.

19           THE WITNESS:  Thank you, Your Honor.

20                          CROSS-EXAMINATION

21   BY MR. HOWARD:

22   Q.   Good afternoon, Dr. Leonard.  Can you hear me okay?

23   A.   Yes, I can.  Thank you.

24   Q.   In preparing your report, did you speak with Higinio

25   Perez-Bravo?

44

1   A.   No.

2   Q.   Did you interview his family or his friends?

3   A.   Did I speak with his family or friends?

4   Q.   The question is did you interview his family or friends?

5   A.   No.

6   Q.   Did you speak --

7   A.   I had no contact with anyone but Mr. Martin.

8   Q.   Did you speak with the people that Mr. Perez-Bravo worked

9   with?

10  A.   No.  I only had contact with Mr. Martin.

11  Q.   Do you know what Higinio Perez-Bravo did for a living?

12  A.   What he did for a living?

13  Q.   Yes.

14  A.   I read the materials.

15  Q.   The question is:  Do you know what he did for a living?

16  A.   He was involved in construction.

17  Q.   You describe him as "poorly-educated Perez"; correct?

18  A.   I understand that he went to a village school and didn't

19  get past I believe it was the eighth grade, so that's fairly

20  poorly because in the studies that I cite they are talking about

21  very well educated people versus lower economic and less

22  educated.

23  Q.   I appreciate that.  My question was:  You described him as

24  "poorly-educated Perez"; correct?

25  A.   Yes, I believe so.

45

1    Q.    Do you know how long he had been in the United States?

2    A.    Quite a while.

3    Q.    Do you know precisely how many years he had been in the

4    United States?

5    A.    No, but I don't think he went to school in the United

6    States.

7    Q.    Do you know how long he had worked in construction in the

8    United States?

9    A.    20 years, something like that.

10   Q.    Did you know that he was also involved in plumbing and

11   electrical and -- I'm sorry, plumbing and carpentry work as

12   well?

13   A.    I seem to remember that.

14   Q.    Do you know about any of his prior interactions with law

15   enforcement?

16   A.    I listened to the testimony the other day and there were

17   two prior interactions, but I believe they were dealing with

18   traffic or DUI's.

19   Q.    At the time that you wrote your report that's dated

20   January 15th, 2020, did you know about any of his prior

21   interactions with law enforcement?

22   A.    No.

23   Q.    You mentioned on direct the reading level of certain

24   prisoners.  Doctor, what reading level is Mr. Perez-Bravo at?

25   A.    I don't know.

46

1    Q.    Are you a native Spanish speaker?

2    A.    I would imagine he had an eighth grade education.  I'm

3    sorry.

4    Q.    I'm not asking what you imagine.  Just the answer.

5          Are you a native Spanish speaker?

6    A.    No.  Spanish is my second language.  I was born into a

7    Spanish-speaking neighborhood.

8    Q.    Have you lived in Mexico?

9    A.    No.  I visited, though.

10   Q.    Have you spent much time with lower economic class Spanish

11   speakers in Mexico?

12   A.    Not in Mexico.

13   Q.    You mentioned --

14   A.    I ran a bakery in Puerto Rico.

15   Q.    You mentioned --

16   A.    But then again that's Puerto Rican.

17         MR. MARTIN:  Let him finish.

18   Q.    (By Mr. Howard)  I appreciate that, but my question was

19   dealing specifically with Spanish speakers in Mexico.  Did you

20   understand my question?

21   A.    Yes.

22   Q.    You mentioned on direct a 2007 study of British detainees.

23   Do you recall mentioning that?

24   A.    Yes.

25   Q.    And you also mentioned various data.  Do you recall using

47

1    the word "data"?

2    A.    Yes.

3    Q.    And that data and that 2007 study of British detainees,

4    was that important in forming the opinion for which you

5    testified today?

6    A.    I did not rely on that when I wrote my report, but this is

7    very generally well understood in the field of linguistics and

8    especially forensic linguistics when anybody deals with Miranda

9    rights and comprehension in general.  I'm just trying to give

10   you a complete answer.

11   Q.    Indeed, would you agree that nowhere in your report do you

12   mention that 2007 study of British detainees?

13   A.    That's correct.

14   Q.    In fact, nowhere in your report do you mention any

15   statistics or percentages?

16   A.    That's correct.

17   Q.    Turning back now to the lower economic class Spanish

18   speakers in Mexico that I asked about, you claim in your report

19   that the words "tribunal" and "proporcionar" are, according to

20   you, absent in the oral speech of lower economic class Spanish

21   speakers in Mexico; is that right?

22   A.    No.

23   Q.    I would refer your attention to Page 6 of your report.

24   A.    I am not saying in my opinion.  I'm reporting scientific

25   studies.

48

1   Q.    Turn to --

2   A.    You asked me my opinion.  I don't have an opinion on it.

3   I am reporting scientific studies.

4   Q.    And yet you do not cite those scientific studies anywhere

5   in your report; correct?

6   A.    I don't recall.  I have them in front of me.

7   Q.    Take as much time as you need.

8   A.    Oh, no, I do.  Of course, I did.  I read the *Dictionary of*

9   *the Royal Spanish Academy*, *Panhispanic Spanish Legal Dictionary*,

10  *A Frequency Dictionary of Spanish*, *CREA Oral Corpus of Spanish*,

11  the *Corpus of 21st Century Spanish*.  Shall I go on?

12  Q.    I understand those are the sources you relied upon, but

13  you mentioned a study, so tell me following that sentence that I

14  quoted from on Page 6 of what study are you citing there?

15  A.    The study that created all of these corpora and

16  dictionaries.

17  Q.    How do you define the term "lower economic class"?

18  A.    I don't.  I took the scientists who created those studies'

19  characterization.

20  Q.    Well, what do you understand the phrase "lower economic

21  class" to mean, as you used it?

22  A.    People who make relatively less money than other people.

23  Q.    Do you know how much money Perez-Bravo was making leading

24  up to his arrest?

25  A.    Are we talking about in the United States or Mexico?

49

1   Q.    I'm asking you:  Do you know how much money Perez-Bravo

2   was making leading up to his arrest?

3   A.    And I asked you, are we talking about Mexico or the United

4   States?

5   Q.    I don't understand your question.  My question is:  How

6   much money, if you know, was this individual making?

7   A.    I don't know.

8   Q.    Okay.  Do you know how many vehicles he owned?

9   A.    I believe there was testimony the other day that he owned

10  three vehicles.

11  Q.    I'm not asking about testimony of others.  I'm asking

12  about your knowledge as you are here testifying and rendering an

13  opinion, so I will repeat the question.

14  A.    My testimony is based on what I heard the other day.

15        THE COURT:  Gentlemen, I'm going to ask both of you to

16  try to avoid speaking over one another.  Dr. Leonard, make sure

17  that the question is complete before you begin answering it.

18  That is for the benefit of --

19        THE WITNESS:  Yes, Your Honor.

20        THE COURT:  -- the interpreters and the court reporter.

21  I know it's challenging with the video connection and the audio

22  connection but please endeavor to do so.

23        THE WITNESS:  Yes, Your Honor.

24  Q.    (By Mr. Howard)  Doctor, is it fair to say your

25  understanding of how many vehicles he owned is entirely

50

1   dependent on the testimony you've heard elsewhere?

2   A.    Yes.  That's what I was trying to say.

3   Q.    Would you agree that speech patterns can differ based on

4   various regions within a country?

5   A.    Yes.

6   Q.    And indeed in the United States, there's different

7   regional dialects; correct?

8   A.    Of course.

9   Q.    And are you familiar with the different dialects and

10  regional differences in the manner of speech in Mexico?

11  A.    Could you repeat that?

12  Q.    I'm sorry?

13  A.    Would you repeat that?

14  Q.    Yes, absolutely.  Are you familiar with the different

15  dialects and regional differences in the manner of speech in

16  Mexico?

17  A.    Only in the most general terms.

18  Q.    Do you know where in Mexico Perez-Bravo is from?

19  A.    Yes, I think Chiapas.

20  Q.    When was the last time you were in Chiapas?

21  A.    A couple of years ago.

22  Q.    How many times have you visited Chiapas?

23  A.    Actually I might not have been to Chiapas a couple of

24  years ago.  Obviously I don't set myself up as an expert in the

25  dialect of Chiapas.  That's why I rely on sources who are.

51

1   Q.   The question was:  When was the last time you were in

2   Chiapas?

3   A.   I don't recall if I was ever there, come to think of it.

4   Q.   How many lower income people from Chiapas have you

5   studied?

6   A.   Personally none.

7   Q.   Would you agree that speech patterns can differ between

8   Spanish speakers in Mexico and Spanish speakers in the United

9   States?

10  A.   From Mexico to Spanish speakers in the United States who

11  are from Mexico?  What do you mean?

12  Q.   Well, the question was:  Would you agree that speech

13  patterns can differ between Spanish speakers in Mexico and

14  Spanish speakers in the United States?

15  A.   Right, and I heard the question and I was asking what it

16  meant so I could fully answer it.

17  Q.   Imagine there are Spanish speakers in Mexico.  Is that

18  fair to imagine?

19  A.   Yes.

20  Q.   And there are Spanish speakers in the United States;

21  correct?

22  A.   And some are from Mexico, and are we talking about them or

23  just some general undifferentiated Spanish speakers?

24  Q.   How about we imagine somebody who has lived in the United

25  States for two decades and speaks Spanish?

52

1    A.    Okay.

2    Q.    And I want you to imagine somebody who has lived in Mexico

3    their entire life and speaks Spanish, okay?

4    A.    Okay.

5    Q.    Would you agree that speech patterns will differ in the

6    Spanish language between speakers in Mexico and Spanish speakers

7    in the United States?

8    A.    Yes, of course.  It's very important what groups you stay

9    with.  If you all of a sudden live with Puerto Ricans, the

10   Spanish is going to change far more than if you stay only with

11   people from your home area of Mexico, for example.

12   Q.    You understand that Perez-Bravo was in the United States

13   for 20 years before his interview with law enforcement?

14   A.    Correct.

15   Q.    And even though he's been in the United States for two

16   decades, your report refers to Spanish speakers in Mexico, not

17   Spanish speakers in the United States; correct?

18   A.    Yes.

19   Q.    And you would agree that it's likely that someone is going

20   to learn some new words spending 20 years in the United States;

21   correct?

22   A.    Like "proporcionar"?

23   Q.    I didn't ask about "proporcionar."  My question is whether

24   would agree that it's likely that someone who spends 20 years in

25   the United States is likely to learn some new words in those 20

53

1   years; correct?

2   A.    Absolutely.

3   Q.    How old is Higinio Perez-Bravo?

4   A.    I don't recall, about 40 or 50.

5   Q.    Wouldn't you think it relevant to know his age since

6   you're opining on whether he understood something?

7   A.    Say that again.  I couldn't hear you, sorry.

8   Q.    Wouldn't you think it's relevant to know his age since

9   you're opining on whether he understood something?

10  A.    The difference between 40 and 50 isn't going to make much

11  of a difference.  If he were ten, it would make a big

12  difference, but 40 or 50 I don't think is going to make much

13  difference, in my opinion.

14  Q.    But indeed, you don't know his age; correct?

15  A.    I did at one point.  I don't recall.

16  Q.    The word "tribunal" is a synonym of "corte"; correct?

17  A.    In Spanish, yes.

18  Q.    You claim that you've been employed by the FBI to work on

19  specific cases and train their agents; right?

20  A.    I claim that?

21  Q.    Well, is that true?

22  A.    I state that, yes.

23  Q.    And you trained them on assessing and analyzing

24  communications; correct?

25  A.    Yes.

54

1    Q.    Would it surprise you then that the FBI's Spanish Miranda

2    advisement form uses the word "tribunal" and not "corte"?

3    A.    No, it wouldn't surprise me at all.  I don't train the --

4    the translators and the interpreters.

5    Q.    And indeed, have you reviewed the FBI's Spanish Miranda

6    advisement form?

7    A.    Not recently.

8    Q.    Have you ever?

9    A.    I've never had a case with it.

10   Q.    Staying on --

11   A.    I'm sorry, I spoke over you again.

12   Q.    It's okay.  Just to be clear, your testimony was you never

13   had a case with it; correct?

14   A.    I never had a case that I can remember that used the FBI's

15   Miranda warnings.

16   Q.    Staying on Page 6 of your report, you recognize that the

17   word "proporcionar" is, according to you, a very frequent term

18   in written materials; correct?

19   A.    Yes.

20   Q.    Do you know what written materials Perez-Bravo read?

21   A.    No.

22   Q.    Which television shows he watched?

23   A.    I couldn't hear the end of that.

24   Q.    Do you know which television shows that he watched?

25   A.    No.

55

1   Q.   You opine that there are better understood alternatives to

2   "proporcionar"; is that right?

3   A.   Correct.

4   Q.   And you mention "ofrecer" and "facilitar"; is that right?

5   A.   Yes.

6   Q.   And "facilitar" means "to facilitate"; isn't that correct?

7   A.   No, it means "facilitar."

8   Q.   The translation of "facilitar" --

9   A.   It --

10  Q.   -- is roughly "to facilitate"; correct?

11  A.   It's a cognate of it, but just to be clear, I offered

12  those simply as examples.  I'm not saying that that's what the

13  Miranda should contains.  If I were tasked with redoing the

14  Miranda, we would have to redo it from the ground up.

15       But these are specific examples.

16  Q.   And those examples are the ones that I'm asking you about.

17  Isn't it true that you testified on direct that the word

18  "facilitar" translates to "facilitate"?

19  A.   It's the cognate of it.  It's hard to know -- it doesn't

20  particularly a hundred percent match "facilitate."

21  Q.   What's the translation of "facilitar"?

22  A.   It's close to "facilitate" but you can -- translation is a

23  very difficult thing, as our interpreters know.  I was the court

24  interpreter for the State of New Jersey criminal system, and

25  interpretation is very, very difficult.  There is no one-to-one

56

1   translation from language to another language.

2   Q.    So you think it would be more understandable to tell

3   someone that "If you cannot afford an attorney one will be

4   facilitated for you" rather than "one will be provided for you";

5   is that right?

6   A.    Well, no.  As I keep saying, "facilitate" is, of course, a

7   higher register word in English than a lot of other words, and I

8   think that may be what you're getting at, and again, if I were

9   going to redo the Spanish Miranda, I would redo it from the

10  ground up.

11  Q.    You claim that the rights given to Perez-Bravo do not

12  imply the free nature of the offer of an attorney; is that

13  right?

14  A.    Well, the officer says, "If you cannot afford an

15  attorney," but I don't think they get to the end of that.  The

16  words themselves, "proporcionar" don't -- do not entail that is

17  what I actually wrote in my report, if I remember correctly.

18  Q.    Well, Page 6 of the report, you used the words which I

19  just questioned you on, which is "the free nature of the offer."

20  Do you see that?

21  A.    No.  Hold on, please.  Page 6?

22  Q.    Yes.

23  A.    And where are you starting?  You were directing me to

24  something on Page 6?

25  Q.    "The free nature of the offer."

57

1    A.    Yes, neither of this implies the free nature of the offer,

2    the cost of...

3    Q.    You would agree that when discussing that offer of an

4    attorney it's preceded by a condition; correct?

5    A.    Yes.

6    Q.    That condition being that "if you cannot afford an

7    attorney"; is that right?

8    A.    Yes.

9    Q.    And you don't have any complaint, from a linguistic view,

10   of initial clause of that sentence where it says so "no puede

11   pagar un abo gado"; right?

12   A.    Yes, but, of course, that's an if/then clause, and the

13   "then" is a very important part of it.  And if the "then" is not

14   understood correctly, then "if you cannot afford an attorney"

15   what?  It could be a universe of choices.

16   Q.    You're aware that Mr. Perez-Bravo did not express any

17   confusion in his interview about the words "tribunal" or

18   "proporcionar"; right?

19   A.    When they asked if he understood, he said yes.

20   Q.    And indeed he said yes multiple times, didn't he?

21   A.    He said -- definitely did.

22   Q.    You write at the top of Page 7 of your report that, quote,

23   there is no indication that Perez understood the content or the

24   purpose of the Miranda rights.  Do you see that?

25   A.    No.

58

```
 1   Q.    It's the very first sentence at the very top paragraph on
 2   Page 7.
 3   A.    I believe you.  I'm looking for the sheet of paper.  I
 4   can't find the paper, but I certainly believe that everything
 5   you're reading is correct.
 6   Q.    You have no reason to doubt that; correct?  Can you hear
 7   me?
 8   A.    I can hear you.
 9         Say what you were saying again.
10   Q.    I will repeat the quote from the first sentence.
11   A.    Okay.
12   Q.    In the first paragraph on Page 7, where you write, "There
13   is no indication that Perez understood the content or the
14   purpose of the Miranda rights" -- do you recall writing that?
15   A.    Yes.
16   Q.    And do you stand by the fact that there is no indication
17   that he understood the content of those Miranda rights?
18   A.    Other than him saying yes, that's correct.  He certainly
19   did not explain it.  He was not quizzed on it.  He did not
20   explain it himself.
21   Q.    Well, you testified on direct --
22   A.    And there were words used -- I'm sorry.  I wasn't
23   finished.
24   Q.    Go ahead.
25   A.    Certainly.  I paused too long.
```

1    And as I have testified, there are words in there that do

2  not belong to the register that he would have spoken growing up

3  in Mexico and later presumably.

4  Q.   You testified on direct that he understood his right to

5  remain silent; correct?

6  A.   He seems to have, but it's the whole -- the whole concept

7  of Miranda that is -- it's all the pieces should fit together,

8  and I testified the fact that he thought he was going to go home

9  if he cooperated and spoke to the officers, and also his comment

10  that he was not offended belies a true understanding of what it

11  means to remain silent and not remain silent.

12    He understood that if he wanted to, he could stop

13  speaking, but all these other things were going to happen.  He

14  was going to be put back in jail, and that obviously -- there

15  was no evidence that he understood where that fit into the

16  entirety of the Miranda warning.

17  Q.   So going back to my question about you writing that there

18  is no indication that he understood the content of his Miranda

19  rights, again, you would agree that he understood his right to

20  remain silent?

21  A.   Correct.

22  Q.   And that when asked repeatedly if he understood his rights

23  he said yes; correct?

24  A.   Correct.

25  Q.   And I'm not a linguistics expert, so I'll ask you:  When

60

1    he orally confirms time after time that he understood his rights

2    that were read to him from that Miranda waiver, that's an

3    indication, isn't it, that he understood the content of his

4    Miranda rights?

5    A.    Well, as I testified at great length, apparently it is

6    not.

7    Q.    Is this one of those instances that you describe in which

8    people may think they understand but in reality they do not?

9    A.    It's possible.  I don't know what Mr. Perez-Bravo

10   understood.  I can only go by what I see there on the page and

11   in the video and the reaction.

12        MR. HOWARD:  I have no further questions for this

13   witness, Your Honor.

14        THE WITNESS:  I'm sorry, what was that?

15        THE COURT:  Dr. Leonard, Mr. Howard has concluded his

16   questions.  Mr. Martin, I believe, has some redirect for you at

17   this time.

18                    REDIRECT EXAMINATION

19   BY MR. MARTIN:

20   Q.    Mr. Howard asked you a number of questions about what you

21   knew about Mr. Perez-Bravo.  You had an opportunity to review

22   his entire transcript of his interview, did you not?

23   A.    The question is did I have the opportunity to review the

24   entire transcript and video?

25   Q.    Yes, sir.

61

1   A.    Yes, I did.

2   Q.    And in there, it describes a lot of his background, does

3   it not?

4   A.    Yes.

5   Q.    He asked you whether or not you had --

6   A.    I said --

7   Q.    Go ahead.

8   A.    -- that I was aware of it when I was writing my report,

9   but now it's quite a while later.

10  Q.    When you wrote your report, that was not the sum of all

11  the knowledge that you have about this case that you have

12  today; correct?

13  A.    I'm sorry, I didn't understand that.

14  Q.    Well, when you wrote your report back a long time ago -- I

15  forget exactly when -- that was a summary of your investigation

16  and conclusions, but it did not mean your investigation and

17  research in this area stopped then, did it?

18  A.    Yes, that's correct.

19  Q.    So you've continued to look and work with me about your

20  conclusions regarding this case; correct?

21  A.    Yes, and I tried hard to explain many more concepts and

22  principles to you so that we would have as clear an

23  understanding as possible.

24  Q.    Counsel asked you about the fact that Mr. Perez-Bravo has

25  some experience with plumbing and carpentry work.  Does that

62

1    mean that he can understand the type of questions or

2    sophisticated questions involved in Miranda rights in this case?

3    A.    No.  For example, it doesn't mean that he can necessarily

4    speak English even though that's the dominant language in the

5    United States.  I actually couldn't figure out what the import

6    in terms of his understanding formal Spanish was that he owned

7    three cars either.

8    Q.    Mr. Howard asked you about whether or not Mr. Perez-Bravo

9    expressed any confusion about his rights.  Would you expect him

10   necessarily to have expressed that or would he -- explain what

11   your answer would be regarding that.

12   A.    People routinely overagree and also there's a place where

13   it seems that Mr. Perez-Bravo, who is waiting for his turn -- I

14   think everybody who has ever studied conversation analysis and

15   has had a conversation knows that very often people are just

16   waiting for you to stop talking so they can say what they want

17   to, and Mr. Perez-Bravo was very interested in getting the

18   answers to his questions, and that again, as I was trying to

19   explain in my cross, it's the entirety of the understanding of

20   the pitfalls, and do they truly understand what rights people

21   are waiving, and if they say yes, that's hardly an indication.

22   Q.    Now, in the report you mentioned, Mr. Howard asked you

23   about, you know, whether he understood all of his Miranda

24   rights.  He understood some of them, did he not?

25   A.    I didn't hear that well, I'm sorry.  Can you repeat?

63

1    Q.    Well, there is a sentence taken out of context --

2          THE COURT:  Mr. Martin, make sure you stay at the

3    microphone.

4          MR. MARTIN:  Yes, sir, I forgot.

5    Q.    (By Mr. Martin) He asked you about a particular sentence

6    in your report.  "There is no indication" -- I will read it to

7    you.  "There is no indication that Mr. Perez understood the

8    content or purpose of the Miranda rights."  Let me ask you this.

9    You understood and I think you answered that he understood he

10   had a right to silence, to stop talking?

11   A.    Yes.

12   Q.    But the key to this case is whether or not he understood

13   that if he had the right to an attorney at no cost to assist

14   him; is that correct?

15   A.    That's correct, and especially even during that

16   interrogation.

17   Q.    Not necessarily at court or any time else, but during the

18   interrogation; correct?

19   A.    That's right.

20   Q.    That's the crux of your opinion; correct?

21   A.    Yes.  That's another problem that we find with

22   translations of Miranda into other languages.  For example, in

23   Vietnamese law, one does not typically have an attorney until

24   one is actually in court, and it's very hard for mono-language

25   Vietnamese immigrants to understand that apparently, that they

64

 1   can have an attorney right then because it just doesn't make

 2   sense to them.  There's so much involved in communicative

 3   competence, not merely the words.  The interpreters understand

 4   this very, very well.

 5   Q.    The Court asked you some questions about the register,

 6   whether it's a continuum or whether there's certain markers.

 7         Based on everything that you know about Mr. Perez-Bravo

 8   from the reports that you -- the information you had, the

 9   information that Dr. Flores had, the -- all the information that

10   you've collected over the time in this matter, is there any

11   doubt in your mind that he is of a low register in the Mexican

12   community?

13   A.    He certainly is not of the ability, from my understanding,

14   and high formality, high education...

15         THE COURT:  Dr. Leonard, would you repeat that answer,

16   please?  It was difficult to hear you.

17         THE WITNESS:  Sorry, one second.

18   Q.    (By Mr. Martin)  Hold your microphone up.

19   A.    Could you ask the question again, Mr. Martin?

20   Q.    Well, I was asking you basically about we mentioned The

21   Court asked you some questions about the register and whether

22   Mr. Perez-Bravo is in the low register, from what you

23   understand, based upon everything you know about this case

24   including what you had in the transcript and other information

25   that's collected over the years including Dr. Flores' report and

65

1    so forth.  Is there any doubt in your mind that he generally

2    fits into the lower classification register among Mexican

3    speakers?

4    A.    Yes.

5    Q.    Also counsel asked you some questions about your language

6    ability.  You are fluent in Spanish but you've never lived in

7    Mexico; correct?

8    A.    Yes, and I'm not even sure I'm still fluent in Spanish,

9    but I ran a business in Puerto Rico totally in Spanish, and I

10   was born into a Spanish-speaking neighborhood in Brooklyn.

11   Q.    But you consulted with other people who are specialists in

12   the Spanish language, especially the Spanish language in Mexico;

13   correct?

14   A.    Precisely.  We don't rely on our intuition in any event.

15   We go to the data and we -- I didn't think we had to ask someone

16   "What is your opinion of this word?"  There are very, very well

17   researched professional studies by professional lexicographers,

18   professional corpus linguists, professional sociolinguists and

19   sociologists that study exactly what kind of language is used by

20   all sorts of different demographics in Mexico and other

21   countries, too.  That's what I relied on.

22   Q.    And as a scientist involved with forensic linguistics,

23   that is something that regularly scientists do, consult with

24   others in trying to understand a problem; correct?

25   A.    Absolutely.

66

1          MR. MARTIN:  Just a second.

2          THE WITNESS:  That's how science works.

3   Q.    (By Mr. Martin) I may not have asked my question

4   correctly.  Is there any doubt in your mind that Mr.

5   Perez-Bravo fits into the lower register with regards to

6   Spanish speakers from Mexico?

7   A.    All indication of all demographics he does, yes.

8          MR. MARTIN:  Yes.  Correct.  Thank you.  That's all I

9   have, Your Honor.

10          THE COURT:  Thank you, Mr. Martin.  Mr. Martin, do you

11   have any other witnesses?

12          MR. MARTIN:  No, sir.

13          THE COURT:  Any other evidence?

14          MR. MARTIN:  No, sir.

15          THE COURT:  Ms. Groover, Mr. Howard, anything else with

16   relation to the motion regarding admissibility of the

17   statements.

18          MS. GROOVER:  No additional evidence, Your Honor, just

19   argument at the appropriate time.  There is a correction,

20   though, we would like to make.  I've spoken with defense counsel

21   about this and would like to bring this to The Court's

22   attention.

23          Specifically, during Agent Miranda's testimony,

24   something that he brought to our attention to correct, during

25   the direct examination, they were referring to a document.  It

67

1    was referred to as a state warrant by questioning for him to

2    review if the information was accurate and direct The Court's

3    attention, this portion of interview is documented at the bottom

4    of Page 9 of --

5         INTERPRETER DAVIS:  I'm sorry, the interpreter can't

6    keep up.

7         MS. GROOVER:  Sorry about that.  This discussion is

8    documented on Page 9 of the transcript, which is Government's

9    Exhibit 2, and at the approximate mark of 41 minutes and 8

10   seconds into Exhibit 1 of the audio.

11        After his testimony, he wanted to ensure that the record

12   was correct.  He was not referring to the state arrest warrant

13   but rather it was a booking form with biological information to

14   review.

15        I discussed this with defense counsel and agree that for

16   today's purposes it's not material and no need to recall the

17   witness to correct and clarify the statement, but I wanted to

18   make sure The Court was aware, correct the record and also let

19   Your Honor know that Special Agent Miranda is present if you

20   would like him to testify to clarify that issue.

21        THE COURT:  All right, I have a copy of that transcript

22   here in front of me.  Let me make sure that I fully understand

23   the correction.  There is a portion of the English language

24   translation of the transcript where it appears that Agent Snipes

25   is saying, "Show him the (unintelligible) arrest, make sure it's

1    all the same," and then Agent Miranda says, "It's all that --

2    it's the same, question mark, this information, question mark,"

3    that is the document that you're referencing?

4            MS. GROOVER:  That is correct, Your Honor.

5            THE COURT:  And that is not an arrest warrant but rather

6    an information sheet related to Mr. Perez-Bravo; correct?

7            MS. GROOVER:  That is correct.

8            THE COURT:  Mr. Martin, any disagreement with any of

9    that?

10            MR. MARTIN:  No, that's correct.

11            THE COURT:  Well, regarding argument -- and let me be

12    clear, Dr. Leonard, you are now excused.  You are welcome to

13    drop off of the videoconference at this time.

14            THE WITNESS:  Thank you, Your Honor.

15            THE COURT:  Thank you.

16            Regarding argument, I will note that this motion is

17    fully briefed and supported by ample legal citations.  I will

18    take argument at this time, though, but I just encourage you to

19    understand I've read the briefs.  I'm very familiar with them.

20    There's no need to sort of reiterate all the points that are

21    laid out in the briefs but I certainly welcome any arguments

22    you'd like to make on these motions.

23            MR. MARTIN:  Your Honor, I don't know, when we talked

24    about argument, I would actually request that The Court allow us

25    to brief this.  There is a lengthy -- a transcript.  I've talked

1    to the court reporter briefly.  She says she thinks she could

2    get us a transcript together, depending on grandchildren

3    problems, by the end or middle of next week.

4         I would prefer -- and I think it would be helpful to The

5    Court and to me -- to be able to have a transcript and to be

6    able to cite for The Court specific references from the

7    transcript in a post-hearing brief instead of trying to go --

8    slide through all this this morning.  That's what I would

9    prefer.

10        THE COURT:  Ms. Groover, do you care to comment on that?

11        MS. GROOVER:  I don't believe supplemental briefing is

12   necessary, Your Honor.  I do believe it's been fully briefed.

13   We've had a day and a half now testimony on that that you're

14   familiar with.  We're prepared to go forward with an argument,

15   Your Honor.

16        THE COURT:  Well, I'm going to grant the request for an

17   opportunity to submit supplemental briefing.  We are here and

18   convened.  I'm not going to conduct another in-person hearing

19   for taking any additional oral argument but I will give defense

20   counsel an opportunity to submit a supplemental brief once a

21   transcript is available of all the evidentiary presentations,

22   and counsel for the Government will also have an opportunity,

23   not required to, but you're welcome to submit a supplemental

24   brief responding to the supplemental brief of defense counsel.

25        I will set a schedule for that briefing based on the --

1  once the transcript is made available setting out the deadlines

2  and the length of any supplemental briefs on these topics, Mr.

3  Martin.

4        MR. MARTIN:  That's correct, Your Honor, and I would

5  think that -- I'm not asking for oral argument at a later time.

6  I just want to rely on briefs.

7        THE COURT:  That will be fine.  I don't want to

8  foreclose the opportunity for oral argument, though.  Ms.

9  Groover, Mr. Howard, do you care to present any oral argument

10  today?

11        MS. GROOVER:  No, Your Honor.

12        THE COURT:  Before we move on entirely, I will note that

13  there are two sets of motions here that are somewhat

14  interrelated.  There is a set of motions for a hearing regarding

15  the admissibility of the custodial statement.  Those are

16  identified as Document Numbers 328 and 403 and then all the

17  associated briefing with those two motions.

18        There's a separate motion that defendants have filed

19  related to a motion to exclude confession or sever.  That is

20  Document Number 355, which also relates to the same Perez-Bravo

21  statement.

22        While I've not reached any conclusions on that first set

23  of motions, I do have one question for the Government with

24  relation to the second motion, and that specifically is that the

25  Government has argued that the statement from Mr. Perez-Bravo,

71

1    the transcript that we've referenced numerous times, can be

2    utilized at trial without causing any sort of Brewton issues

3    with sufficient redactions and limiting instructions.

4         My question or questions is first:  Does the Government

5    intend to utilize the video and audio portion of that statement,

6    and, if so, how do you address any redaction or limiting

7    instructions with regard to audio or video and then, second, if

8    the answer is -- regardless of the answer to that question -- if

9    you intend to use the written transcript, is the Government

10   prepared to submit a proposed sometimes referred to as a Brewton

11   statement that provides all those redactions so The Court can

12   assess the appropriateness of that?

13        MR. HOWARD:  Your Honor, I certainly don't want to rule

14   out our ability to use the video and the audio.  I think the

15   solution to that would be we can modify the audio to either have

16   a beep or some other -- you know, you can certainly edit an

17   video in a way that the words and the identifiers of individuals

18   do not come out.  Is it optimal?  No, but I think it is feasible

19   and workable, and again you pair that with a limiting

20   instruction, I think it would be appropriate.

21        Going to the second question of whether we can submit

22   something that has the redactions, has the gender neutral

23   pronouns, we're happy to send that to The Court.  We will

24   certainly send a copy.  We will file that as a sort of proposal

25   to see if that can be run up the flag pole to see if it flies.

72

1          THE COURT:  Well, none of this presupposes a ruling on

2     the admissibility of the statement generally, but in order for

3     The Court to fully assess the Government's response with regard

4     to that second set of motions, I'm going to require submission

5     of that.

6          I will issue a written order setting out the schedule

7     for the submission of that Brewton statement for consideration.

8     To the extent that you need to provide any additional statement

9     regarding audio and video, you can provide that in the briefing

10    associated with that statement that's provided there.

11         All right, Mr. Howard?

12         MR. HOWARD:  Yes.

13         THE COURT:  Well, that should conclude everything

14    related to the custodial statements and the motion to exclude or

15    sever, although, Mr. Martin, counsel for the defendants, I

16    addressed those questions to the Government.  It is based solely

17    on their responsive briefing.

18         However, I believe that you-all declined to present any

19    additional oral argument on those issues.  You can certainly

20    address that motion in your supplemental brief as well, but let

21    me make that I don't foreclose your opportunity today to present

22    any additional oral argument on that Document 355.  Mr. Martin?

23         MR. MARTIN:  Well, Your Honor, it's difficult for us to

24    give any oral argument because we don't know exactly what the

25    redactions are.  I will suggest it is problem if the redactions

73

1    sort of make my client sort of appear to be not being

2    forthcoming and, you know, sort of hedging or something because

3    I think he was forthcoming during that, and that's something the

4    jury should understand, but that's just a concern because we

5    don't know what their redaction are and how they are going to do

6    it, but that's a concern.

7         THE COURT:  I understand the point, Mr. Martin.  That's

8    precisely the benefit of seeing that statement ahead of time is

9    if there's a challenge you can raise that challenge.  Mr. Ertel,

10   it looked like you were going to --

11        MR. ERTEL:  I was going to say basically the same thing.

12   I think that's the appropriate process.  I think I said that,

13   that if they want to redact, we want to see the redaction and we

14   will go from there as long as we have an opportunity to reply to

15   their proposed redactions and respond.

16        THE COURT:  Let me be clear, I'm going to impose a

17   pretty tight schedule on these issues, one that provides

18   everyone an opportunity to address them, but it will be a

19   protracted schedule but it will be set forth in a written order.

20   Let me confirm, I believe we still have Mr. Olive, although his

21   camera may be turned off, but Mr. Asinc, anything that you would

22   you care to add?

23        MR. ASINC:  No, Your Honor.  It's obvious that I can't

24   comment or argue on something I haven't seen from the Government

25   yet.  If I could, I would be a rich man in the stock market.

74

1          THE COURT:  All right.

2          MR. OLIVE:  Your Honor --

3          THE COURT:  I believe that may be Mr. Olive.  Mr. Olive,

4    we do not have video from you.  It looks like that might be

5    turned off, but we can hear you.  Did you care to add anything?

6          MR. OLIVE:  No, but I don't understand the video issue.

7    Nothing is checked to turn it off.

8          THE COURT:  Well, you can continue to try to resolve

9    that, but we do have good audio with you.  We have Mr. Asinc

10   here and I believe that there is nothing that you care to add

11   with relation to those motions so we will move on.

12         That leaves the issue of the Franks motion, and I have

13   scheduled this for oral argument and evidentiary hearing.  I

14   understand the Government has one witness that they would like

15   to present, Detective Rodriguez; is that correct?

16         MS. GROOVER:  That is correct, Your Honor.

17         THE COURT:  And you-all have oral argument as well you

18   would like to make?

19         MS. GROOVER:  Yes, Your Honor, briefly.

20         THE COURT:  Mr. Martin, you served as the lead advocate

21   for the defendants.

22         MR. MARTIN:  I'm finished for the day.  I think Mr.

23   Ertel is going to --

24         THE COURT:  Mr. Ertel will address those.

25         Mr. Ertel, do you have any witnesses or evidence you

75

1   intend to present?

2       MR. ERTEL:  I have I think exhibits as we submitted to

3   The Court that will probably come in through the

4   cross-examination of Detective Rodriguez.  I don't think there

5   are any issues.  As a matter of fact, I think they are

6   duplicates.

7       THE COURT:  Well, I'm going to go ahead and take a

8   recess for lunch at this time.  I will ask everyone to be back

9   here in one hour and we will begin with the Government's

10  presentation at that time on the remaining motion, that is,

11  specifically the Franks motion that was filed by defendants.

12  That's Document Number 356.  I will just ask everyone to make

13  sure that you are here at 1:45 ready to go.  All right.

14      We will be in recess.

15      (Recess from 12:43 p.m. to 1:47 p.m.)

16      THE COURT:  Ms. Groover, Mr. Howard, ready with your

17  witness?

18      MS. GROOVER:  Yes, we are, Your Honor.

19      For the purposes of the record, I know that you have

20  scheduled this for an evidentiary hearing.  The Government does

21  maintain that Defense has not met their burden, but we are

22  prepared to proceed with the witnesses.  The Government calls

23  Rodriguez Roberto to the stand.

24

25

76

1              SERGEANT ROBERTO RODRIGUEZ,

2   having been first duly sworn, was examined and testified as

3   follows:

4         THE CLERK:  Thank you.  You may be seated.  Please state

5   your full name and spell your last name for the record.

6         THE WITNESS:  Roberto Rodriguez, last name is

7   R-o-d-r-i-g-u-e-z.

8                   DIRECT EXAMINATION

9   BY MS. GROOVER:

10  Q.    Are you employed, sir?

11  A.    Yes, ma'am, I am.

12  Q.    Where do you work?

13  A.    I work for the City of Garden City.

14  Q.    What are your duties, sir?

15  A.    Currently the sergeant, supervisor of the criminal

16  investigations division.

17  Q.    As a sergeant, what does it mean to supervise the criminal

18  investigations division?

19  A.    To supervise means I oversee the other detectives, assign

20  cases, proofread reports, proofread search warrants, arrest

21  warrants, and just make sure everybody is doing their job

22  thoroughly.

23  Q.    How long have you been a sergeant, sir?

24  A.    I've been a sergeant for about six months, but I was

25  supervising as a corporal for three years prior.

77

1   Q.   And prior to that what were you doing, sir?

2   A.   Before that I was a detective with the detective division.

3   Q.   And how long were you a detective with Garden City?

4   A.   I've been a detective since 2013.

5   Q.   And when did you begin your career with Garden City?

6   A.   The City hired me in 2009.  I officially became a sworn

7   police officer in 2010.

8   Q.   I want to take you back to August of 2017.  You were a

9   detective in the investigations division at that time?

10  A.   I was, yes, ma'am.

11  Q.   And did you have any other duties at that time?

12  A.   At that time, no.  I was strictly a -- I guess I would

13  have been one of the senior detectives but I was strictly a

14  detective.

15  Q.   Did you also have any responsibility with respect to crime

16  scene investigations?

17  A.   I was a -- at that time, I was, I believe, one of two

18  certified crime scene technicians with the City.

19  Q.   And what does that mean, to be a crime scene technician?

20       THE COURT:  Ms. Groover, Detective Rodriguez, speak a

21  little bit slower for the translator.

22       MS. GROOVER:  Thank you for the reminder, Your Honor.

23  Q.   (By Mr. Howard)  What does it mean to be a crime scene

24  technician, sir?

25  A.   I process, thoroughly process, all crime scenes.  That

78

1    includes collection of evidence, packaging of evidence, blood

2    stain reenactment as well all other -- anything associated with

3    the crime scene.

4    Q.    What was your typical schedule like back in August of

5    2017?

6    A.    As it is now, typically work from 8:00 to 4:00, Monday

7    through Friday unless you're on call or major incident occurs.

8    Q.    And what happens if you are on call or a major incident

9    occurs?

10   A.    At that time, we have a primary investigator, a secondary

11   investigator.  Primary investigator, their role would be to get

12   called out, assess the situation.  The secondary would be as an

13   as-needed basis depending on the severity of the incident, the

14   number, the size of the crime scene, witnesses that need to be

15   interviewed.  It all depends.

16   Q.    Okay.  Do you recall August the 18th of 2017?

17   A.    I do, yes, ma'am.

18   Q.    Was that a Friday?

19   A.    It was a Friday.

20   Q.    And prior to today, did you have an opportunity to go

21   back, review your notes, your time cards, your e-mails, your

22   messages to kind of recreate your schedule?

23   A.    Yes, ma'am.

24   Q.    And so tell us, walk us through your day on August the

25   18th of 2017.

79

1    A.    August the 18th I worked between 8:00 and 4:00.  I went

2    home, spent some time with my -- with my children and my

3    fiancée.  And then I got an unexpected phone call about 8:10

4    that evening.

5    Q.    What time did you wake up on August the 18th of 2017?

6    A.    About 6:30.

7    Q.    Was that normal time for you to wake up?

8    A.    Get the kids ready for school, breakfast, yes, ma'am.

9    Q.    And get to work by eight o'clock?

10   A.    Yes, ma'am.

11   Q.    And you worked your regular shift, went home about four

12   o'clock or so?

13   A.    Four o'clockish, yes, ma'am.

14   Q.    Did you have dinner that night?

15   A.    I did, yes, ma'am.

16   Q.    And what happened when you got a phone call about eight

17   o'clock at night, sir?

18   A.    About eight o'clock that evening, I got a phone call from

19   my newest detective.  That was at that time Detective Reyes.  He

20   advised he was on scene of a shooting investigation, and he

21   didn't think that his outcome was going -- he was going to make

22   it.  He thought it was going to possibly turn into a homicide

23   investigation.

24        At the time, I believe I was the only certified homicide

25   investigator, and I was the secondary on-call detective, so he

80

1    called me for two reasons, one, crime scene and, two, was to

2    walk him through the steps of a homicide investigation.

3    Q.    And this shooting was separate from the shooting involving

4    Mr. Montoya that we are all here today on; is that correct?

5    A.    Yes, ma'am.

6    Q.    So what did you do when you got the phone call?

7    A.    Told my wife I had to go to work.  She was not happy.

8    Went anyways.  It took me 15, 20, 25 minutes to get to the

9    actual crime scene itself.  When I got to the crime scene, at

10   that time, we were still investigating merely a shooting and

11   aggravated assault as at that time that decedent was still

12   alive.

13        So we continued processing as we typically would any

14   shooting investigation, canvassed the area, processed the crime

15   scene which at that time we had -- when I arrived on scene, we

16   had two separate crime scenes.  We had the scene where the

17   decedent had lied and we had the crime scene where the shell

18   casings and it appeared that the shooting occurred.  Again, I

19   was the crime scene technician at the time so I had to process

20   that scene.

21   Q.    Two separate --

22   A.    Two separate scenes.  I also had a very good rapport with

23   the community at the time, so people were coming to me,

24   providing me information and giving me witness statements as to

25   what actually transpired with the shooting.

1    It wasn't until about an hour, an hour and a half of being

2    on scene -- we had medical team working on him -- that we

3    received information that he had passed, and it turned into a

4    homicide investigation.

5    Q.    Approximately what time at night was this when it became a

6    homicide on August the 18th, 2018?

7    A.    Best rough guess, it was about nine o'clock that evening.

8    Q.    Did you go home?

9    A.    No.

10   Q.    What do you do, sir?

11   A.    So just like you see on TV, the first 48 hours you've got

12   to gather all leads you can within the first amount of time

13   possible, so the first thing we did was we tried to get in

14   contact with next of kin, after processing the crime scene, of

15   course.

16        We determined that the vehicle that he was driving was

17   stolen so we had to apply for a search warrant to get into the

18   vehicle to seize any items of evidentiary value inside that

19   vehicle.

20   Q.    I'm sorry.  I do it, too.  We will have to remind each

21   other to slow down.

22   A.    So we went, after we finished processing the crime scene,

23   we went back to our office, best guess about midnight.  And we

24   began typing search warrant and getting a game plan together as

25   to what we're going to do for the next couple of hours.

82

1   Q.   Did you have a judge that was on call for you?

2   A.   At that time we had Judge Tom Edenfield.  He has since

3   passed, but he was the judge in Garden City.

4   Q.   And how many search warrants were you working on at around

5   midnight so this would have been the next morning?

6   A.   Correct.  We were trying to get search warrants for the

7   vehicle, search warrants for the -- he had a personal interest

8   at the time, which would have been his girlfriend.  We

9   interviewed her and we applied for a search warrant for her

10  telephone as well, and I believe there was a third one for his

11  phone we were applying for as well.

12  Q.   So you were working on three separate search warrants?

13  A.   Yes, ma'am.

14  Q.   Do you present those to the judge in the middle of the

15  night?

16  A.   We did, yes, ma'am.

17  Q.   Describe what happened, how that came about for The Court.

18  A.   We tried calling the judge multiple times.  Basically the

19  time of night -- it was three o'clock in the morning -- he

20  didn't answer so I went to his house and I knocked on his front

21  door and he answered.  After he read the search warrants and

22  knew there was enough probable cause, he signed the search

23  warrants.

24  Q.   Once you got the search warrant signed, did you go home?

25  A.   No, ma'am, I did not.

83

1   Q.    What did you do next?

2   A.    We went back to the office, executed the search warrant

3   and began doing what we determined was victimology on the

4   victim.

5   Q.    What is victimology?

6   A.    That is when we break down the victim's life and try to

7   determine why he died and who would kill him.  With my

8   experience with homicide, homicide investigations, in shooting

9   investigations, it's common that predominantly, most of the

10  time, the offenders that committed the shootings know the

11  victims.  Very rarely is it a stranger-on-stranger crime.

12  Q.    So approximately what time do you begin victimology in

13  this homicide prior to Mr. Montoya's death?

14  A.    Probably about four o'clock in the morning, as other

15  investigators were out on the field notifying next of kin and

16  gathering information from them.

17  Q.    What do you do next?

18  A.    We just continued -- got a game plan together for what we

19  were going to do for the next day.  At that point I started to

20  feel extremely sluggish, as other investigators did as well.  We

21  had been at work since eight o'clock that morning and had been

22  16, 17, 18 hours had passed.  So we deemed that we were of no

23  use so we need to go home and get some rest about five o'clock

24  in the morning.

25  Q.    Did you have anything to eat from the time you were home

84

1   with dinner to the time you had to go back to work at eight

2   o'clock at night through 4:00 or 5:00 in the morning?

3   A.    We had dinner with the family, which is customary, which

4   is between 6:00 and 7:00, and then until five o'clock in the

5   morning, I survived on coffee and energy drinks.

6   Q.    When you went home, did you go to bed?

7   A.    No, ma'am.

8   Q.    What did you do when you got home?

9   A.    I went to my home office and I got my notepad and I

10  started writing down the things to do for the next day.

11  Q.    Why was that important to stop and take your notes?

12  A.    For a couple of reasons.  One of them is it's fresh in my

13  mind.  I wanted to write it down.  I didn't want to forget it,

14  and I used to live really close to the police department, so I

15  didn't get a chance to drive in a vehicle and decompress.  My

16  heart rate was still racing, so I just sat down and took notes.

17  Q.    Okay.  Was your family awake?

18  A.    They were not, no, ma'am.

19  Q.    Did you have anything to eat?

20  A.    No, ma'am.

21  Q.    Did you eventually go to bed?

22  A.    Yes, ma'am.

23  Q.    What time?

24  A.    I got to bed about 6:00 a.m. that morning.

25  Q.    And that would have been then on Saturday?

85

1   A.    Saturday.

2   Q.    August the 19th of 2017?

3   A.    Yes, ma'am.

4   Q.    Were you in a bed with your son?

5   A.    Yes, ma'am, at the time my one-year-old, my son and my

6   fiancée.

7   Q.    Does he have a time that he typically wakes up?

8   A.    9:00 a.m.

9   Q.    Every day?

10  A.    Yes, ma'am.

11  Q.    Did he wake up on at 9:00 a.m. on August the 19th?

12  A.    He woke up and he woke me up as well.

13  Q.    Approximately how many hours of sleep did you get?

14  A.    About three.

15  Q.    When you woke up at 9:00 a.m., what did you do next?

16  A.    I played with him for a little bit and I started going

17  back into taking notes.  I was very fortunate at the time that

18  the City had purchased me a laptop to be able to work from home,

19  and I just started typing, started typing as I normally would

20  from the house, investigative notes, my report as well as other

21  search warrants for various other items.

22  Q.    All related to the homicide that occurred on August the

23  18th?

24  A.    Yes, ma'am.

25  Q.    Do you take a shower, eat breakfast?

86

1    A.    I don't recall eating breakfast.  I do remember taking a

2    shower.  I don't normally -- as is right now, I do not eat

3    breakfast in the morning.

4    Q.    Okay.  So how long were you at your house typing, working

5    away that morning?

6    A.    Until about 11:00.

7    Q.    11:00 a.m.

8    A.    Yes, ma'am, 11:00 a.m.

9    Q.    What did you do at 11:00 a.m.?

10   A.    I took a shower and I got ready to go to work.

11   Q.    And did you go to work?

12   A.    I did.

13   Q.    What time did you leave your house?

14   A.    About 12:55ish that afternoon.

15   Q.    Where did you go?

16   A.    I drove to the Pilot gas station and I purchased two Red

17   Bulls and gas.

18   Q.    Why did you get Red Bulls?

19   A.    To be able to make it through the day.

20   Q.    Okay.  What happened next after you were filling gas?

21   A.    After I finished getting gas, I stayed there and I called

22   the secondary investigator, which at the time was the primary

23   investigator in that shooting, Detective Reyes, and I just asked

24   him how far he was because we had followups we had to do.  He

25   told me he was on his way in to work.

87

1  Q.    What kind of followups did you have to do?

2  A.    We had to go to at that time was the Tigers Den, which is

3  a bar over at Savannah State, which is where that decedent was

4  last seen before the shooting in Garden City.  So we were going

5  to go over and interview people and ascertain video surveillance

6  footage from that, from that facility.

7  Q.    Why was it important to immediately act on that

8  information and leads?

9  A.    We didn't know how long their camera system was going to

10  record for, it gets overwritten and things like that.

11  Q.    And so after you discussed with Detective Reyes how far

12  along he was, what did you do next?

13  A.    Almost instantly, when I hung up the phone, I saw multiple

14  lights and sirens, fire trucks, ambulance, police cars.  And

15  they were all going to the -- I mean, there's a trailer park

16  directly behind the Pilot gas station where I was going, and

17  from where I was at, I could see the lights and could see where

18  they stopped.

19        Just, again, just based on my tenure as a detective, I

20  figured that with that amount of police presence, ambulances and

21  fire trucks, something happened that I was probably going to get

22  called out to.

23  Q.    So what did you do?

24  A.    I drove to the area.

25  Q.    What did you see when you got there?

88

1   A.    I observed I believe the first responding officer or an
2   officer laying out yellow crime scene tape.  I spoke to the on-
3   duty supervisor, who was I believe Sergeant Nesmith at the time,
4   and he told me that it appears to be single 46, which in police
5   jargon that just means a deceased person.  I walked up to the
6   male.  Originally I thought his nose was broken so at first I
7   thought it was going to be a physical struggle that he died
8   from.
9   Q.    And what did you do next?
10  A.    I began doing what I typically would for crime scene.  I
11  examined the scene and I examined the body.
12  Q.    Approximately what time was it when you went to observe
13  later determined to be Mr. Montoya on the ground, sir?
14  A.    I believe it was about 1:30 in the afternoon, roughly.
15  Q.    1:30 in the afternoon on August the 19th?
16  A.    Yes, ma'am.
17  Q.    Of 2017?
18  A.    Yes, ma'am.
19  Q.    And you were coming off about two to three hours of sleep;
20  is that accurate?
21  A.    Yes, ma'am.
22  Q.    And just working another homicide investigation?
23  A.    Correct.
24  Q.    Without breakfast?
25  A.    Correct.

89

1   Q.    And did you have lunch then?

2   A.    No, ma'am.

3   Q.    You began processing the scene as a crime scene

4   technician?

5   A.    Yes, ma'am.

6   Q.    Tell The Court what you did, please.

7   A.    So the first thing -- so when we work homicides, we try to

8   work homicides two detectives at a minimum.

9   Q.    Why is that?

10  A.    For various reasons.  One you need a scribe, somebody

11  taking notes.  And then you just, people forget things.  You

12  might forget to ask an important question that Detective Number

13  2 remembers, or if you interview somebody who is a witness, we

14  don't know if, being so close in time as to when the incident

15  happened, they might be a suspect that may want to do harm to

16  you.  We just don't know.

17        So our policy is we try to work with two per case.  At

18  that -- this particular time, it was a total of three detectives

19  working that entire week, myself, Detective Reyes, Detective

20  White.

21        Detective White is a pastor and he does have his own

22  church.  He did come out for the initial homicide which had

23  occurred on the 17th -- on the day before, on the 18th of

24  August.

25  Q.    On the Friday?

90

1   A.   Correct, and he was well versed enough with this

2   investigation that I felt comfortable letting Detective Reyes

3   work the investigation and Detective White being the secondary.

4   Q.   Working the homicide investigation from Friday?

5   A.   The day before.  Yes.

6   Q.   The 18th?

7   A.   And then I would take the primary on August the 19th and

8   have my captain, Captain Papp, who had been -- who had about six

9   months' experience as a detective and had never worked a single

10   case in his 20-plus years as a police officer.

11   Q.   And prior to August of 2017, had you investigated other

12   homicides?

13   A.   I had.

14   Q.   Did you have the most homicide investigation experience

15   with Garden City at that time?

16   A.   As far as I know.

17   Q.   Were there any other reasons why you determined it was

18   necessary for you to stay with the second homicide involving Mr.

19   Montoya?

20   A.   Again, we had enough upward movement on the initial

21   incident and Detective Reyes was primary on that.  This one, all

22   parties involved were Spanish-speaking only, so I knew that I

23   had to be primary compared White who didn't speak any Spanish so

24   that had a dominant role as well.

25   Q.   What did you do while on scene?

91

1    A.    So I did what I normally do.  I start processing the crime

2    scene.  First thing I did was take pictures.  Pictures always

3    key on any investigation.  And I took photos on the scene as I

4    found it.

5         While processing the crime scene, I was approached by an

6    officer -- I can never remember which one it was at this time --

7    that somebody needed to speak to me.  I broke off what I was

8    doing and I made contact with this young lady.

9    Q.    Did you determine who it was?

10   A.    Yes, ma'am.

11   Q.    And did you speak with her?

12   A.    I did.

13   Q.    And what did you learn, sir?

14   A.    That the decedent was her brother.

15   Q.    Mr. Montoya's sister?

16   A.    Correct.

17   Q.    Was that an emotional experience?

18   A.    Yes, ma'am.

19   Q.    What did you do next?

20   A.    Detective White and Detective Reyes, I was -- I started

21   gathering facts at that moment that I deemed were detrimental --

22   or they were very important to this case.  It was very strong

23   facts, accusatory facts, so I knew that I had to change my role

24   as crime scene technician to primary investigator and start

25   doing detective work, so I requested, since they were both

92

1  working, I requested they process the crime scene while I

2  started doing interviews.

3  Q.    And what type of information were you receiving?

4  A.    I was receiving that they speculated that they knew who

5  had killed the decedent.

6  Q.    And who is "they"?  Who were you speaking to?

7  A.    Initially it was the sister, but that in turn turned into

8  the mother who as well turned into his wife.

9  Q.    So in approximately what kind of time period are we

10  talking about where you interviewed the three family members of

11  Mr. Montoya?

12  A.    I can't give specific timing at this time but it was -- it

13  was one behind the other, behind the other, so it looks like it

14  was within two hours' time.  I mean, I would venture it was

15  within an hour's time.  It was rapidly evolving.

16  Q.    Still on Saturday afternoon?

17  A.    Still Saturday afternoon, yes, ma'am.

18  Q.    Did you receive any additional documentation in your

19  investigation?

20  A.    I did, yes, ma'am.

21  Q.    What did you receive?

22  A.    I went back to the residence, the decedent's residence on

23  Village Drive, which is within walking distance of where he was

24  killed, and they provided me documents while inside of his

25  trailer as far as multiple letters, complaints.

93

1    Q.    And what type of information was Mr. Montoya's family

2    providing you?

3    A.    It was documentation showing he was -- what I would deem

4    as a whistleblower.  He was providing information as far as he

5    had filed a complaint against his boss with the Equal Employment

6    Opportunity Commission.

7    Q.    What kind of complaint?

8    A.    That he was -- it was -- I only can relate to human

9    trafficking.  He was -- he had illegals working there for less

10   than minimum wage and he was terminated because he had whistle-

11   blowed.

12   Q.    Okay.  Did you receive any type of letters from the

13   family?

14   A.    I did, yes, ma'am.

15   Q.    Tell The Court about that, please.

16   A.    It was four letters, which were notarized; they were

17   signed.  The letters were basically outlining what the EEOC

18   complaint was.  It was three independent individuals, three

19   different people, and the fourth letter was from Mr. -- the

20   decedent himself.

21   Q.    From Mr. Montoya?

22   A.    Correct.

23   Q.    Would the letters, did they have identities of who was the

24   purported writer of the letters?

25   A.    They had names and they also had telephone numbers.

94

1   Q.    Did you learn anything more about the letters from the

2   family?

3   A.    I don't recall at this time.

4   Q.    What did you do next?

5   A.    After all interviews were compiled on scene, with meaning

6   the wife, the mother, a fourth young lady -- I can't remember

7   her name.  She just referred to her as a Puerto Rican.

8   Q.    Is that Ms. Carmen Brown?

9   A.    Ms. Carmen Brown, yes, ma'am, and his sister, I went back

10  to the Garden City Police Department and I began doing

11  victimology.

12  Q.    And describe the victimology that you did for Mr. Montoya?

13  A.    I ran him through the multiple local reporting databases.

14  I didn't see anything of notoriety as far as arrest records,

15  prior police reports, were showing him in a negative fact.  None

16  of the reports had any information as to why he would be killed.

17        So then I went back to the letters themselves, and I made

18  phone calls to each one of the three in the letter as far as

19  trying to interview them, bring them in for an interview to be

20  able to validate what's on these letters.

21  Q.    Did you also call the EEOC?

22  A.    I did, yes, ma'am.  On Saturday, but unfortunately, it

23  being I guess a federal entity, nobody answered the phone on

24  Saturday.

25  Q.    Did anyone return your phone calls?

95

1    A.    One male did, yes, ma'am.

2    Q.    And who was that?

3    A.    Mr. Joel Reyes.

4    Q.    And what happened when you spoke with Mr. Reyes?

5    A.    At first I spoke to him and I told him to come by the

6    Garden City Police Department to talk to me.  I did not tell him

7    on the phone what had happened.  He was a little apprehensive at

8    first but he ended up coming and speaking to us.

9    Q.    Prior --

10   A.    We did --

11   Q.    I'm sorry.  Prior to speaking with Mr. Reyes did you find

12   any other information concerning your investigations of

13   significance to you?

14   A.    Yeah.  We -- we -- again, they had provided, the family

15   had provided -- they provided a name as to who they believed had

16   committed this crime.

17   Q.    And who was that?

18   A.    Mr. Pablo Rangel-Rubio.

19   Q.    And why did they believe Pablo Rangel-Rubio killed their

20   family member?

21   A.    He was -- he was the person that Mr. Eliud Montoya filed

22   the formal EEOC complaint as well filed the complaint with his

23   business as well as his place of employment.

24   Q.    He was his boss?

25   A.    He was his boss.

96

1    Q.    And he was the one saying he was hiring illegal aliens?

2    A.    Correct.

3    Q.    And not paying them correctly?

4    A.    Correct.

5    Q.    Did you have any contact information or any information

6    about Pablo Rangel besides his name?

7    A.    They provided me with that telephone number as well.

8    Q.    What did you do with that information?

9    A.    I ran that telephone number through the various databases,

10   which I'm able to run.  One of the databases is Phoenix, which

11   is the local reporting database.  I ran his name, first and last

12   name, but I did not get a return.  I ran his telephone number,

13   and I got a return as he was an emergency contact for two other

14   individuals.

15   Q.    Pablo was the emergency contact?

16   A.    For two males, yes, ma'am.

17   Q.    And did you find out who the two males were?

18   A.    I did, yes, ma'am.

19   Q.    Anything of interest?

20   A.    Yes, ma'am.  One of them, his name was Refugio.  He had

21   been arrested prior for possession of a firearm.

22   Q.    Did you know when the arrest, when he was -- the year of

23   the arrest?

24   A.    I believe it was -- if I'm not mistaken -- from my

25   recollection, 2014.

97

1   Q.   A couple years before?

2   A.   About two or three years prior.

3   Q.   Anything about that arrest that caught your attention?

4   A.   I was able to ascertain that police report using one of

5   the local reporting databases, which is LInX.  I was able to,

6   though I can't print from LInX, I'm able to read the actual

7   police reports themselves.  LInX is the Law Enforcement Exchange

8   Network, which is where local municipalities import their police

9   reports and you're able to view them.

10      I was able to utilize that case report number provided in

11  Phoenix and I was able to get the relevant facts surrounding

12  that arrest at that time.

13  Q.   And was this -- who was the arresting agency?

14  A.   Savannah Police Department.

15  Q.   And what did you learn about that arrest?

16  A.   That he was arrested with a .22-caliber handgun.

17  Q.   Was that of any significance to you?

18  A.   Yes, ma'am.

19  Q.   Why is that?

20  A.   When I examined the body during the crime scene --

21  Q.   Of Mr. Montoya?

22  A.   -- of Mr. Montoya, yes, ma'am, the holes on his person

23  appeared to be smaller, as it would have been made with a

24  smaller caliber handgun.

25  Q.   Something similar to a .22-caliber?

98

1    A.    Correct.

2    Q.    What did you do next?

3    A.    I printed their information to include their still images

4    from their booking database, and I just started compiling people

5    of interest.

6    Q.    And in the arrest report of Mr. Refugio, were you able to

7    determine if the firearm was ever seized?

8    A.    A firearm was seized, yes, ma'am.

9    Q.    Did you have information in that report what happened to

10   the firearm, if it was returned at all?

11   A.    No, ma'am.

12   Q.    You didn't have that in the report?

13   A.    Not at that time, no, ma'am.

14   Q.    What did you do next?

15   A.    I believe there -- I started -- I started -- which is

16   customary for me -- is when dealing with any homicide

17   investigation, you're going to do at least one search warrant,

18   any way you look at it.  It's going to be for tower pings; it's

19   going to be for telephone communications.  You're going to do

20   search warrants, so I type every one of my reports with your --

21   affiant in search warrant format and I started transcribing my

22   report that way.

23   Q.    Your police report?

24   A.    Yes.

25   Q.    Put it in a search warrant format?

99

1    A.    Correct.

2    Q.    And approximately what time was it now on the 19th of

3    August?

4    A.    Probably around 5:00, a little bit after 5:00.

5    Q.    And you're beginning to type your report?

6    A.    Yes, ma'am.

7    Q.    Do you ever eat?  Do you eat?

8    A.    I did.

9    Q.    How did you eat?

10   A.    So I -- my wife -- my fiancée at the time, she knew

11   that -- again I lived -- I was fortunate, I lived within a

12   minute walking distance from the police department.  She had

13   surprised me and brought myself -- and she knew Detective Reyes

14   hadn't eaten as well -- she brought us both dinner that night.

15   Q.    And approximately what time did she get there with food

16   for you guys?

17   A.    Between 5:00 and 6:00.

18   Q.    And eating, did you press pause for a moment to see your

19   family and eat?

20   A.    No.  You -- I ate while typing.

21   Q.    Okay.  While you were eating, when was the last time you

22   ate before that?

23   A.    That would have been the dinner the night prior, between

24   6:00 and 7:00 the night prior.

25   Q.    Before the first homicide?

100

1    A.    Yes, ma'am, 24 hours prior.

2    Q.    And it's still going off about the two to three hours of

3    sleep?

4    A.    Yes, ma'am.

5    Q.    And you don't sit down and take a moment to rest with your

6    fiancée?

7    A.    No, ma'am.

8    Q.    So what are you doing while you're eating?

9    A.    Typing.

10   Q.    What happens next?

11   A.    I was informed that Mr. Joel Reyes was at the Garden City

12   Police Department.

13         INTERPRETER DAVIS:   Interpreter would like

14   clarification, who was at the police department?

15         THE WITNESS:   Joel Reyes.

16   Q.    (By Ms. Groover)   Following up on the phone call where you

17   asked him to come in for an interview?

18   A.    Yes, ma'am.

19   Q.    And approximately what time do you know that Mr. Reyes got

20   to the station?

21   A.    Specifics, I don't remember.  I remember it started

22   getting -- it was starting to get dark outside, so I remember it

23   was around seven o'clock that evening.

24   Q.    And do you know approximately how long you spent

25   interviewing Mr. Reyes?

1   A.    I believe it was around an hour if I'm not mistaken, give

2   or take.

3   Q.    And does Mr. Reyes speak Spanish?

4   A.    He did, yes, ma'am.

5   Q.    Was that interview in Spanish?

6   A.    It was in Spanish.

7   Q.    You're fluent in Spanish as you previously testified?

8   A.    Yes.

9   Q.    Did you record this interview?

10  A.    It was audio- and video-recorded.

11  Q.    Prior to today did you have a chance to review the

12  recording?

13  A.    I have, yes, ma'am.

14  Q.    To your knowledge is it saved on a CD marked as

15  Government's Exhibit 5; is that correct?

16  A.    Yes, ma'am.

17  Q.    Prior to today, have you had a chance to watch that

18  recording?

19  A.    I have.

20  Q.    And is it a true and accurate recording of your entire

21  interview with Mr. Reyes?

22  A.    It is.

23        MS. GROOVER:  Government would move the admission of

24  Exhibit 5.

25        MR. ERTEL:  No objection.

102

1          THE COURT:  It's admitted.

2    Q.    (By Ms. Groover)  To your knowledge, later on, did

3    contractors through Homeland Security then prepare a transcript

4    of your interview with Mr. Reyes?

5    A.    Yes, ma'am, they did.

6    Q.    And prior to today did you have an opportunity to review

7    that transcript?

8    A.    I have.

9    Q.    Is that transcript both with Spanish on the left and

10   English on the right of that transcript?

11   A.    It is, yes, ma'am.

12   Q.    And it's been marked as Government's Exhibit 6.  Have you

13   had a chance to review Government's Exhibit 6, sir?

14   A.    I have, yes, ma'am.

15   Q.    And compare that to the actual audio recording, which is

16   Government's Exhibit 5?

17   A.    Yes, ma'am.

18   Q.    And while comparing, did you notice some edits that needed

19   to be fixed in the transcript?

20   A.    Yes, ma'am, I did.

21   Q.    And did you, in fact, make handwritten notes on the

22   transcript?

23   A.    I did, yes, ma'am.

24   Q.    And Exhibit 6 actually has your handwritten notes on it;

25   is that correct?

103

1  A.    Yes, ma'am.

2  Q.    And then have you had an opportunity to review the

3  transcript with your handwritten notes to the audio then of

4  Exhibit 5?

5  A.    Yes, ma'am, I have.

6  Q.    And with your edits, is Exhibit 6 a true and accurate

7  transcript of the interview that you conducted with Joel Reyes

8  on August the 18th of 2017?

9  A.    Yes, ma'am.

10 Q.    Excuse me, the 19th.

11 A.    The 19th, yes, ma'am.

12        MS. GROOVER:  Government would move for the admission of

13 Government Exhibit 6.

14        MR. ERTEL:  No objection.

15        THE COURT:  Exhibit 6 is admitted.

16 Q.    (By Ms. Groover)  What did Mr. Reyes talk to you about?

17 A.    So it was a bear with Mr. Reyes when he first started.  He

18 was extremely scared.  He starts asking me if -- he wanted to

19 know the relevant facts as to how he died.  He wanted to know

20 specifics, if it had anything to do with his employment.

21 Q.    Did he know Mr. Montoya?

22 A.    He did, yes, ma'am.  He referred to him as a good guy is

23 the way he referred to Mr. Montoya.  I guess the whole point of

24 the interview was to -- was to provide him with that written

25 statement and then just validate the information that was

1    written on that actual form itself.

2    Q.    And you said that he was scared.  What do you mean by that

3    and how did you know that?

4    A.    His mannerisms.  He was -- he was -- he was visibly

5    shaking, and then just the type of questions he was asking me,

6    so when I was asking, when I asked him specific questions, he

7    said he didn't want any trouble.  He didn't want any trouble.

8         That led me to believe that he was fearful for his life.

9    He had just found out that his friend had been killed and now

10   he's fearful that if he speaks to me retaliation is going to

11   come.

12   Q.    Did he also work with Mr. Montoya?

13   A.    He did during some point, yes, ma'am.

14   Q.    Did he talk to you about his employment?

15   A.    Yes, ma'am.

16   Q.    And what in general did he tell you?

17   A.    That -- from Mr. Joel?

18   Q.    Yes.

19   A.    That he, that he -- so I read the letter to him in

20   Spanish, and I asked him if what was said in the letter was true

21   and he said yes.  So we basically asked for specifics as to what

22   was written in the letter about himself.

23   Q.    Did he did speak -- did he read English at all?

24   A.    He could not.

25   Q.    Was this letter in English or Spanish?

105

1    A.    It was in English.

2    Q.    So did you read it word for word or did you summarize?

3    A.    I sum -- I did a summation, summarized it.

4    Q.    And he explained that it was true?

5    A.    Yes, ma'am.

6    Q.    Was there anything about the letter that he told you was

7    not true?

8    A.    The content of the letter, no.  The signature, yes.

9    Q.    Well, generally what kind of allegations and information

10    was in that letter?

11    A.    That was basically he talked about monetary compensation.

12    He's not properly being compensated for his wages and talks

13    about the social security numbers were purchased.  If I can

14    refer to the notes, it talks about how long he's been working

15    there, and then it specifies the name Pablo Rangel was specified

16    in the letter as well.

17            MS. GROOVER:  Your Honor, may I approach the witness?

18            THE COURT:  You may.

19    Q.    (By Ms. Groover) Sir, I'm handing you, for the record,

20    what's been marked as Government's Exhibit 12.  Can you take a

21    look at Exhibit 12 and tell me if you recognize that, sir?

22    A.    I do, yes, ma'am.

23    Q.    Is that a packet of the letters?

24    A.    Yes.

25    Q.    Can you describe for The Court generally what it is?

1    A.    It is a letter specifying individuals' names.  It's on the

2    very top they all say I believe it's "To Whom It May Concern."

3    They are all dated July 27th of 20 -- the first one is dated

4    July 27th of 2017, and they all specify it involves their

5    maltreatment by the business.

6    Q.    Are these the four letters that you received from Mrs.

7    Montoya on August the 19th of 2017?

8    A.    Yes, ma'am.

9    Q.    Are these true and accurate copies of the letters you

10   received from her?

11   A.    Yes, ma'am, they are.

12        MS. GROOVER:  Government would move for the admission of

13   Exhibit 12.

14        MR. ERTEL:  No objection.

15        THE COURT:  Admitted.

16   Q.    (By Ms. Groover)  Page 1 of Exhibit 12, is this one that

17   purportedly signed by Joel Reyes?

18   A.    Yes, ma'am, it is.

19        THE COURT:  Ms. Groover, do you have additional copies?

20        MS. GROOVER:  Yes, sir, I apologize.

21   Q.    (By Ms. Groover)  Is this the letter that you read or

22   summarized in Spanish to Mr. Reyes?

23   A.    Yes, ma'am.

24   Q.    In the recorded interview?

25   A.    Yes, ma'am.

1  Q.   Can you tell us what he told you about Mr. Pablo Rangel,

2  if anything?

3  A.   As far as the letter goes or what he explained to me?

4  Q.   What he explained to you.

5  A.   I guess he -- I guess he purchased --

6       THE COURT:  I believe we've lost the video connection

7  with Mr. Olive.  Mr. Asinc, cocounsel, is still present.  Do you

8  have any objection to proceeding with this witness at this

9  point?

10      MR. ASINC:  No, Your Honor, I have no objection at this

11  point to proceeding at this point.

12 Q.   (By Ms. Groover)  What did Mr. Reyes tell you in general

13  about Pablo Rangel-Rubio?

14 A.   He said that Pablo was a supervisor for the company, Wolf

15  Tree.  He said that I guess when he got hired on, he was hired

16  under an alias with proper social security numbers.  This is

17  important because Mr. Joel Reyes is an illegal alien and does

18  not have a social security number.

19 Q.   And did he explain how he was getting paid?

20 A.   Yes, ma'am.

21 Q.   Can you describe for The Court how he explained he was

22  getting paid?

23 A.   He would, from what he best described, was he got paid

24  $10.00 an hour.  Whether he worked 60 hours, he would get

25  $600.00.  Whether he worked 80 hours, he would get $800.00.  He

108

1    did not get paid overtime.  He would receive a check under his

2    alias; however, he would not see the check.  He would only

3    receive cash compensation for the work he did.

4    Q.    And did he explain to you who was paying him in cash?

5    A.    It was Pablo Rangel.

6    Q.    And did he explain to you how he was getting the

7    identities to work?

8    A.    Yes, ma'am.  We had a little bit of trouble going back and

9    forth on understanding that actual aspect.  I brought it up to

10   him two or three times before we finally were able to identify

11   how it was.

12        I asked him because the letter says it was for $1500.00,

13   he would pay $1500.00 for the social security numbers and the

14   identification; however, that money was taken out of his

15   paycheck.

16   Q.    Did he come out and say, no, he never paid $1500.00?

17   A.    He did.  He said he didn't -- did not physically pay

18   $1500.00.

19   Q.    But did you keep questioning him about how he got paid and

20   how he got -- how he paid for the social security numbers?

21   A.    Yes.

22   Q.    And what generally were you able to determine from Mr.

23   Reyes?

24   A.    That, because he was getting paid cash, he would not see

25   his physical paycheck.

109

1      THE COURT:  I will note for the record that Mr. Olive

2  has reconnected by video.

3      THE WITNESS:  So the money would come directly out of

4  his paycheck.  He would receive $10.00 compensation per hour.

5  Q.   (By Ms. Groover)  What happened if he would work overtime?

6  A.   He wouldn't get paid.  He would strictly get paid the

7  $10.00 an hour.

8  Q.   What happened if he would be entitled to a raise or a

9  promotion; would he get paid more?

10  A.   I think he said he complained one time and I think in the

11  report he said he got a 10-cent raise or 15-cent raise.

12      INTERPRETER DAVIS:  I'm sorry, can you repeat that last

13  answer?

14      THE WITNESS:  I believe he got a 10- or 15-cent raise.

15  Q.   (By Ms. Groover)  And did he ever explain who was taking

16  money off the top, if you will?

17  A.   He specified it was Pablo Rangel.

18  Q.   So to be clear, he did specifically deny paying $1500.00

19  to Pablo Rangel?

20  A.   Correct.

21  Q.   For the identity to work?

22  A.   He did not pay him in cash.  He was getting paid in cash

23  and the money was taken off of that.

24  Q.   But it says in this letter purportedly signed by him that

25  he paid $1500.00; is that correct?

110

1   A.    Correct.

2   Q.    Did you talk to him about this letter, whether he wrote

3   it?

4   A.    Correct.  He told me he did not write the letter.

5   However, everything in this letter is true and accurate.

6   Q.    So did he tell you who did write the letter?

7   A.    I don't remember if he was -- if he ever specified who it

8   was.  I think he speculated that it was Mr. Eliud.

9   Q.    Did he ever say if he signed this letter?

10  A.    He said he did not sign the letter.

11  Q.    And does he read English?

12  A.    He does not read English.

13  Q.    At some point during your interview, did he adopt the

14  letter as his own somehow?

15  A.    Yes, ma'am, he did.

16  Q.    Can you describe that for The Court?

17  A.    If I can find it in my conversation.

18  Q.    Direct your attention to Page 22 and 23 of Exhibit 6 and

19  see if that refreshes your recollection?

20  A.    I do, yes, ma'am.  Would you like me to read the statement

21  or you just want me to do a summary?

22  Q.    You can summarize it.

23  A.    He's saying that the letter was an agreement that they had

24  between them, meaning him and Mr. Eliud.

25  Q.    And did he also explain the situation about these letters?

1        MR. ERTEL:  One moment, let me know what pages?

2        MS. GROOVER:  Page 22 and 23.

3        MR. ERTEL:  Thank you.

4   Q.    (By Ms. Groover)  Did he also explain how these letters

5   came about?

6   A.    I don't recall.  I think he said it's because they were

7   trying to get Pablo out of the business.  That was the purpose

8   of the letters.

9   Q.    Did he indicate whether or not he was aware of other

10  people submitting letters?

11  A.    He was.

12  Q.    And did he indicate to you whether or not he was included

13  in that?

14  A.    I believe he was, yes, ma'am.  What was interesting about

15  that was we did not give him a chance to look at the other

16  letters; however, one of the other letters I believe that was

17  written by Mr. Reuben Ramirez Hernandez, he was able to specify

18  the facts on that one, that a tree limb had fallen on top of him

19  and he was ill-treated because of that.

20  Q.    So Mr. Reyes was aware that another person was ill-treated

21  because of the injury with a tree?

22  A.    Correct.

23  Q.    But he had not seen the letter?

24  A.    He had not seen the letter.

25  Q.    What if anything did that indicate to you about Mr. Reyes'

112

1    credibility?

2    A.    That he knew, he knew about this letter.  He knew about

3    the information associated to this as well as the other

4    complainants as well.

5    Q.    Did you talk to him at all about who he believed could

6    have harmed Mr. Montoya?

7    A.    At some point, we started talking about the Rangel family

8    and he -- I asked him at any point if he knew if Pablo could

9    have hurt him and he says no but he knows -- that he knows

10   people that can.

11   Q.    Okay, and the context of that statement, were you talking

12   about his family members at the time?

13   A.    Prior to that question, we were talking about the Rangel

14   family, and he was specifying how they are a large family.  They

15   have a large family in Mexico, and they have a large family in

16   Georgia as well.

17   Q.    Did you ask him whether or not he ever saw the Rangel

18   family with firearms before?

19   A.    I did.

20   Q.    And what did he tell you?

21   A.    Not that he can recall.

22   Q.    At some point, does he specifically say he's never seen

23   them with a firearm?

24   A.    Correct.

25   Q.    Did he also admit they may have them in their home?

113

1   A.    He said they could have them in their home, yes, ma'am.

2   Q.    Does he also provide a statement to the effect of he does

3   not believe that Mr. Pablo would hurt him but has someone who

4   would?

5   A.    Correct.

6   Q.    Referring to Mr. Montoya?

7   A.    Correct.

8   Q.    And the contents of your interview, it's documented in the

9   transcript; correct?

10  A.    Correct.

11  Q.    Based on your interview, about how long did the interview

12  last?

13  A.    Between 30 minutes to an hour.

14  Q.    He got there about seven o'clock or so?

15  A.    Yes, ma'am.

16  Q.    So about 7:30, eight o'clock it ends?

17  A.    As best as I can remember, yes, ma'am.

18  Q.    What do you do next after you interview Mr. Reyes?

19  A.    So we had his information.  I continued trying to get sort

20  of hold of other people in this letter through their telephone

21  numbers.  In fact, in the interview I asked Mr. Reyes for, if he

22  knew anybody else's telephone number, and he provided me a

23  number for I believe Juan Ramirez.  I can't remember.  I believe

24  it was a match the same number on the actual form itself.

25  Q.    And were you able to get in touch with him?

114

1    A.    Not that evening, no, ma'am.

2    Q.    What did you do next?

3    A.    Started typing a search warrant for Pablo's residence.

4    Q.    Why did you do that, sir?

5    A.    We had every one of these allegations.  We had the

6    letters.  We had Joel's statement.  We had the EEOC complaint.

7    We had the -- Refugio, him being arrested with a small caliber

8    firearm.  We felt we had enough probable cause to get a search

9    warrant for his residence.

10   Q.    You started working on a search warrant for 271 Milton

11   Rahn Road; is that correct?

12   A.    Yes, ma'am.

13   Q.    What time of day was that?

14   A.    So I had started typing prior.  I continued at about eight

15   o'clock, all while making phone calls to the various federal

16   agencies for assistance.

17   Q.    Why were you calling federal agencies for assistance?

18   A.    Two-fold, first one being the fact that these letters are

19   pretty damning as far as possibility for human trafficking.  In

20   the interview with Joel Reyes, he says he has a large family

21   that stays with him in Effingham County, as well as when I

22   called Effingham, which is where Milton Rahn Road is at, the

23   police were aware of that residence for prior gun discharge in

24   the area.

25   Q.    Did you speak with someone in particular who advised you

1  of that?

2  A.    Yes, ma'am.

3  Q.    Who did you speak with?

4  A.    Detective Timmy Dickey with the Effingham County Sheriff's

5  Department.

6  Q.    And what specifically did he tell you about the shots in

7  the area?

8  A.    It was -- they have gotten calls for dispatch for multiple

9  gunfire in the area.

10       MR. ERTEL:  I'm going to object to this.  There is

11  nothing in the affidavit about it so it has no relevance to

12  what -- to the probable cause in the case, no mention of it in

13  the affidavit.

14       THE COURT:  Respond, Ms. Groover.

15       MS. GROOVER:  It goes to what he was doing in his

16  investigation and the concerns he was taking and the steps he

17  was taking in obtaining and executing a search warrant, Your

18  Honor.  I believe it is relevant.

19       THE COURT:  Due to the allegations of reckless

20  disregard, I'm going to overrule the objection and allow him to

21  answer the question.

22       THE WITNESS:  So they had multiple gun discharges in the

23  area.  He says they have ridden out there before and it is a

24  very large --

25       THE COURT:  One moment.  For the record we're having an

1    issue with the headsets.

2            MR. ERTEL:  Okay, it's resolved.

3            THE WITNESS:  It is a very large -- they refer to at

4    this time as a country area.  It is a dirt road that leads one

5    way in and one way out.  It's not good for -- his basic words is

6    if a car drives down there, we're going to get burned, which

7    means we're going to get caught doing surveillance.

8    Q.    (By Ms. Groover)  So what do you do next?

9    A.    Call the FBI.  FBI tells me, "Can't do nothing for you;

10   call Homeland Security," which is how HSI was involved in this

11   case.  I ended up calling the sergeant -- I cannot remember his

12   name -- from the Effingham County Sheriff's Department as to the

13   proper channels in applying for a search warrant in their

14   jurisdiction.

15   Q.    Were you planning on getting a search warrant that night?

16   A.    I was.

17   Q.    August the 19th of 2017?

18   A.    A search warrant was typed up that night ready to go.  My

19   captain says "Stop."

20   Q.    Approximately what time was this when you were told to

21   stop?

22   A.    It was between 9:00 and 10:00 p.m.

23   Q.    Why did your captain tell you to stop?

24   A.    He said in my face he could see I was tired and he didn't

25   want me to make the wrong decision by having to continue pushing

1    forward when I'm coming off of three hours of sleep.

2    Q.    And another homicide investigation the night before?

3    A.    Correct.

4    Q.    So do you make the decision to not obtain the search

5    warrant that night?

6    A.    Yes, ma'am.

7    Q.    What did you do next?  Do you go home and go to bed?

8    A.    I ended up clocking out that evening about 11:00 p.m.

9    However, I did not leave until almost midnight.

10   Q.    So you indicated that you were told to kind of stand down

11   on presenting the warrant about nine or ten o'clock night but

12   didn't leave until midnight.  What were you doing in the

13   meantime, sir?

14   A.    I was getting a game plan ready for tomorrow.

15   Q.    What do you mean by that?

16   A.    Again, it's what I deem a high-stress situation.  I wanted

17   to make sure we had all people in the right place at the right

18   time, so I had to get, just for logistics purposes, I wanted to

19   make sure we had enough people.  We had to call some Garden City

20   officers in to be there in the morning with us, staging area.

21   There were multiple things that I had to get done before signing

22   and executing the search warrant.

23   Q.    Were you also able to secure an appointment time with the

24   judge to obtain the warrant?

25   A.    Yes, ma'am.

1   Q.    Tell The Court about that.

2   A.    The sergeant from Effingham was able to get her to meet

3   with me at the Effingham County Sheriff's Department complex at

4   11:00 a.m. on August the 20th.

5   Q.    Is that a Sunday?

6   A.    It is a Sunday, yes, ma'am.

7   Q.    So that night, you secured an appointment for the next

8   morning?

9   A.    Yes, ma'am.

10  Q.    Had you ever been to meet with that magistrate before?

11  A.    That's the first time I had been to Effingham, that side

12  of Effingham.

13  Q.    Did you need assistance from the Effingham County

14  officers?

15  A.    Yes, ma'am.

16  Q.    And what specifically did they help you out with?

17  A.    So from my experience, certain judges like things a

18  certain way.  I know our judge was specific on what he liked on

19  our search warrants, so I called them and I found out

20  specificity on what to put on the actual verbiage, scope, things

21  to be done as part of the search warrant.

22      I didn't want to drive all the way to Effingham to have a

23  grammatical error and have to drive 45 minutes back to Garden

24  City just to fix a grammatical error, so again I had to get the

25  logistics of how to properly make, annotate changes from a

119

1   search warrant in Garden City by not being in Garden City while

2   in Effingham County.

3   Q.   Did they have a specific form to use or was it just like a

4   Word document that you could pull up on your computer anywhere?

5   A.   Ours is a specific form that comes in with our computer

6   software.

7   Q.   Did Effingham County also have computer software?

8   A.   They did, yes, ma'am.

9   Q.   Did you have that software on your computer?

10  A.   Did not.

11  Q.   How far away is Effingham County from your home base, your

12  Garden City Police Department and your home office?

13  A.   It's about 45 minutes.

14  Q.   So your report, your affidavit that you're typing, are you

15  typing that in your software or like in a Word document?

16  A.   Both.   So I type everything into a Word document and I

17  copy everything and place it into the actual template that is

18  done already in the actual software.

19  Q.   So you didn't have the software for Effingham County;

20  correct?

21  A.   I did not.

22  Q.   So how did you get your report to the right format?

23  A.   We had to purchase Adobe, some form of the Adobe to be

24  able to change the initial verbiage, little minute things.

25  Q.   Did you purchase it that night or the next morning?

120

A.    We purchased it the next morning when it was -- there
was -- the whole purpose of going to Effingham County, I was to
meet with the sergeant at seven o'clock that morning and go over
the particulars on the search warrant, the logistics, and just
anything that needed to be changed in the search warrant to get
it done before we meet with the judge.

Q.    So let's back up and finish your evening on Saturday, the
night that Mr. Montoya was killed?

A.    Yes, ma'am.

Q.    How long did you stay at the office?

A.    I believe about midnight.

Q.    Where do you go?

A.    I went home.

Q.    And did you get to go to bed?

A.    I wish.  No, ma'am.  It was -- again, I had been running
on caffeine, so I laid down and I could feel my heart, I could
feel every beat coming out of my heart, so I stood up and I
started -- just again, I have a computer.  I was able to type
for about 30 minutes and then the coffee and the caffeine start
going away, and I was able to lay down and go to sleep.

Q.    Finally crashed?

A.    Yes, ma'am.

Q.    What time did you wake up?

A.    Between 5:30 and 6:00.

Q.    Did you eat breakfast?

1  A.    No, ma'am.

2  Q.    So the last time you ate in about two days was just the

3  one meal that your fiancée brought you?

4  A.    Yes, ma'am.

5  Q.    You got up at 5:30 a.m.  What did you do next?

6  A.    I took a shower, got in my unmarked CID vehicle, and I

7  drove to Effingham County.

8  Q.    Approximately how long a drive was it again?

9  A.    About 45 minutes.

10  Q.    You left about 6:00 a.m. or so or what time?

11  A.    About 6:00 a.m. because I did wait for them to get there

12  and open the doors for me.

13  Q.    And you were meeting them at 7:00?

14  A.    At 7:00.

15  Q.    What happened when you got there at 7:00 a.m.?

16  A.    I let the sergeant proofread the search warrant.  He read

17  the verbiage.  He didn't see any significant errors.  He did

18  advise that on their search warrants that Judge Rhonda Sexton,

19  she likes particularity as far as on the scope, she likes, the

20  area to be searched, she likes driving directions, so we had to

21  add that from Mapquest, and he also said, based on the fact we

22  were unable to do a drive-by by the residence, he said the best

23  thing to do was to get a Google area map and attach it as

24  exhibits to the search warrant.

25  Q.    So you are spending time making sure you have the right

122

1    format that the judge typically likes to see?

2    A.    Correct.

3    Q.    Okay, and besides this sergeant from Effingham County, did

4    you have anybody else review the warrant?

5    A.    I believe -- yes, Captain Papp, who is our CID commander.

6    Q.    With Garden City?

7    A.    With Garden City, since he was my immediate supervisor, or

8    because my supervisor was on vacation, he proofread the search

9    warrant.

10    Q.    And the people who read the search warrant, were they

11    familiar with all the facts in the investigation like you were?

12    A.    Yes, through oral testimony that I provided them.

13    Q.    Did you update Captain Papp, things like that, about the

14    case, as you're developing facts?

15    A.    Correct.  Captain Papp was my -- what I would call him as

16    secondary lead in this investigation.

17    Q.    Does he speak Spanish?

18    A.    He does not.

19    Q.    So was he aware of your interview with Joel Reyes?

20    A.    Yes, ma'am.  He saw some of it through our two-way mirror

21    and then I just provided him with a summary of what the

22    interview was about.

23    Q.    But he couldn't understand it?

24    A.    No, ma'am, he could not.

25    Q.    He was basing it off your summary?

123

A.    Correct.

Q.    And the same thing with the sergeant from Effingham County.  Was he familiar generally with the facts of your investigation?

A.    Just what I provided in summary, yes, ma'am.

Q.    That you orally provided to him?

A.    Correct.

Q.    After you had several people review it, what do you do next?

A.    We -- I'm waiting for my officers to get there.  I make the corrections in the actual search warrants.

Q.    What corrections were you making?

A.    Where I added the exhibits and I added the actual, the Mapquest directions of the location.

Q.    So you complied with the judge's preferences?

A.    Correct.  That took -- that took about an hour and a half to do.  It came to the point we had to realize we had to either -- we tried printing it from our officers that we had there from Garden City's computers and their printers in their vehicle; however, their printers, they printed thermal prints, thermal imaging, which is -- I did not deem that that was satisfactory to provide to a judge.  So we ended up getting Adobe -- I don't remember what form of Adobe it was -- where we were able to copy and paste the narrative into an actual Adobe document.

124

1    Q.    What did you do next?

2    A.    We waited for the FBI and HSI to get there, and we just do

3    a briefing as to the particulars, the search warrants, the

4    locations.  We had the Google map, and we started advising which

5    agents were going to go where and which officers were going to

6    go where, make sure we had where the nearest trauma hospital was

7    at, as well as we had a trauma officer with each unit.

8    Q.    You were executing your operation plan?

9    A.    Correct.

10   Q.    Staging it?

11   A.    Yes.

12   Q.    Were you assigning teams?

13   A.    Yes, ma'am, we were.

14   Q.    Was it your understanding that there were multiple

15   buildings on this property that you were about to search?

16   A.    The information that I got with the prior officers'

17   experience and having driven through there with the gun

18   discharge calls was three, three structures.

19   Q.    Had you ever personally been out there?

20   A.    Not before the search warrant, no, ma'am.

21   Q.    Okay.  So you knew you needed at least three search

22   warrant teams; correct?

23   A.    Yes, ma'am.

24   Q.    In addition to potential victims and trauma, things like

25   that?

125

1    A.    Correct.

2    Q.    What did you do next?

3    A.    After we finished this, it was roughly about 10:30.  I

4    waited for Judge, the judge to arrive, which is about 11:00,

5    11:00 a.m.

6    Q.    That was your appointment time?

7    A.    Yes, ma'am.

8    Q.    Do you believe you got there right about the appointment

9    time?

10   A.    It was right about the appointment time, yes, ma'am.

11   Q.    Tell The Court about your appointment with the judge.  How

12   did that go?

13   A.    As was customary at that time, I got -- same thing I've

14   got here, I bring a binder with me with all the relevant

15   information pertaining to a case, and in this particular

16   incident, I would have brought every one of these documents.  I

17   brought the EEOC complaint.  I brought the search warrant itself

18   and I provided her with oral testimony as to the surrounding

19   facts of this case.

20         MR. ERTEL:  I didn't hear what you just said.

21   Q.    (By Ms. Groover)  Could you repeat your answer, please,

22   provided --

23   A.    I provided oral testimony, yes, ma'am.

24   Q.    At the time under Georgia law, were you allowed to

25   supplement affidavits with oral testimony?

126

1    A.    Yes, ma'am, we were.

2    Q.    And was that interaction recorded at all?

3    A.    It was not.

4    Q.    Are they now recorded?

5    A.    If they are to be done, yes, but it's not customary for us

6    to do it that way anymore.

7    Q.    You've since changed the practices?

8    A.    We have since changed the practices.

9    Q.    But at the time, provided oral testimony that was not

10   recorded?

11   A.    Correct.

12   Q.    Explain the process then how it was that you provide oral

13   testimony to The Court at this particular search warrant.

14   A.    I outlined the facts of the case.  I start off with the

15   beginning and I get to the point where we are right now, and so

16   I say on --

17   Q.    Let me stop you for just a moment.  Are you placed under

18   oath prior to doing this?

19   A.    Yes, ma'am, I am.

20   Q.    The judge placed you under oath?

21   A.    Correct.

22   Q.    And then after you're placed under oath, what do you do?

23   A.    I give her a summation of actually what, how we got to

24   where we are right now, from A to Z.  That included the dispatch

25   time, the officers' arrival, my facts of what I saw to include

1   the fact that there was -- the individual was deceased, the fact

2   that it appeared he had been shot with a small-caliber firearm,

3   the fact that we had three of these sworn statements and the

4   verbiage of each one of these sworn statements, the interview

5   with Joel Reyes, the complaints.  We provided the -- provided

6   her a still image of Refugio and the other individual that we

7   believed was going to be inside the residence.  We also informed

8   her Refugio's prior arrest with a .22-caliber firearm.

9   Q.    Do you recall if she had any questions, any specific

10  questions that she asked?

11  A.    I don't recall.

12  Q.    Do you recall if she had any concerns at all about the

13  proposed search warrant?

14  A.    No, ma'am.

15  Q.    If she would have had questions, what's typically the

16  practice would have been?

17  A.    If she would have had a question with the search warrant

18  itself, as far as for lack of probable cause, we would leave,

19  and we would retype another search warrant with the relevant

20  facts.

21  Q.    Do you recall anything like that happening in this case?

22  A.    I've never had that happen in any case.

23  Q.    So is it fair to say she did not have any concerns with

24  the probable cause in the warrants?

25  A.    Correct.

1  Q.   And her conclusions would have been based off the four

2  corners of the documents and your testimony under oath?

3  A.   Yes, ma'am.

4  Q.   And do you recall what time the warrant was actually

5  signed?

6  A.   I believe it was shy of 11:30, 11:23 in the morning.

7  Q.   I believe before you should be Government Exhibit 7.  Is

8  that a true and accurate copy of the search warrant that was

9  signed?

10 A.   Yes, ma'am.

11      MS. GROOVER:  Government would move for the admission of

12 Exhibit 7.

13      MR. ERTEL:  No objection.

14      THE COURT:  It's admitted.

15 Q.   (By Ms. Groover)  Is it fair to say that if your

16 appointment was 11:00, signed at 11:23, you were meeting with

17 the judge for approximately 23 minutes?

18 A.   Yes, ma'am.

19 Q.   This was in August of 2017?

20 A.   It was.

21 Q.   Years later, did you have an opportunity to go back and

22 review your warrant and your entire investigation?

23 A.   Yes, ma'am.

24 Q.   Including the edited transcript that you provided of Joel

25 Reyes?

1    A.    Yes, ma'am.

2    Q.    And did you happen to notice that there were a few areas

3    where you could have been more clear, included something more or

4    perhaps explained something better?

5    A.    Yes, ma'am.

6    Q.    Also noticed a few errors and misstatements, quite

7    frankly?

8    A.    Correct.

9    Q.    Are you aware that the Defense has filed a motion

10   outlining some of those concerns that they have?

11   A.    Yes, ma'am.

12   Q.    Have you had a chance to review that motion?

13   A.    I did.

14   Q.    I'd like to go through every one of those with you.  Your

15   Honor, may I have just a moment to grab the motion?

16        THE COURT:  Yes.

17   Q.    (By Ms. Groover)  Thank you, I apologize.

18        Referring to the transcript on Page -- which is Government

19   Exhibit 6, one of the -- one of the allegations in the motion

20   is that you misrepresented that Joel Reyes submitted a document

21   that was, quote, accusing Pablo of fraud.  Were you aware of

22   that, sir, aware of that accusation?

23   A.    As far as the accusation, yes, ma'am.

24   Q.    And have you had a chance to review the transcript of your

25   interview with Joel Reyes?

130

1    A.    I have.

2    Q.    And referring specifically to Page 22 and 23 of the

3    transcript, can you describe for The Court what it is about your

4    interview with Mr. Reyes where you believe he was accusing Pablo

5    of fraud?

6    A.    So the fact that he agreed to this -- the information on

7    the affidavit as well as him agreeing to the information on

8    there was true and accurate.

9    Q.    And when you're saying about the information is true and

10   accurate, at that time of the interview, were you referring to

11   Page 1 of Government's Exhibit 12?

12   A.    Page 1?

13   Q.    Page 1 of Government's Exhibit 12, the letter.

14   A.    Yes, ma'am.  Yes, ma'am, I apologize.

15   Q.    And so the fraudulent activity would have been what in

16   general were you referring to, sir?

17   A.    The social securities, the fact that he was providing

18   social security numbers to the employees.

19   Q.    And did Mr. Reyes as outlined in Page 22 and 23 of the

20   transcript adopt this statement as his own?

21   A.    He did.

22   Q.    But he admitted he didn't write it; correct?

23   A.    Correct.

24   Q.    And he didn't sign it; correct?

25   A.    Correct.

131

1    Q.    But he eventually adopted this; is that fair?

2    A.    It is.

3    Q.    So is that what you meant, that he submitted a document

4    accusing Pablo of fraud?

5    A.    I did.

6    Q.    Were you aware that he didn't actually submit the document

7    himself?

8    A.    Correct.

9    Q.    When you say "submitted the document," would it have been

10   better to say "a document was submitted on his behalf"?

11   A.    His behalf, yes, ma'am.

12   Q.    Early on in your interview with Mr. Reyes, does he also

13   say that, you know, he was afraid; he doesn't want any trouble

14   because Mr. Montoya was murdered?

15   A.    Yes, ma'am.

16   Q.    In fact, that's on Page 15 of the transcript; is that

17   correct?

18   A.    Yes, ma'am.

19   Q.    And in your affidavit, do you specifically say that his

20   letter, this letter, his letter, that he had signed the letter?

21   A.    Yes, ma'am.

22   Q.    Have you had a chance to go back and review the affidavit

23   and notice any typos?

24   A.    I did, yes, ma'am.

25   Q.    Specifically referring to Exhibit 7 -- they are numbered

132

1    at the bottom -- of Page 3 of 4 of the affidavit, excuse me,

2    affidavit section of Exhibit 7, Page 3 of 4?

3    A.    Yes, ma'am.

4    Q.    Can you -- specifically Paragraph 6?

5    A.    Yes, ma'am.

6    Q.    Is there anything about that you notice there are typos

7    in?

8    A.    Yes, ma'am.

9    Q.    Can you describe that for The Court, please?

10   A.    The specific sentence is, "In the interview, Joel advised

11   everything in his signed document to be true," and it should

12   have been --

13         INTERPRETER GONZALES:  Your Honor, the interpreter would

14   like the witness to please slow down.

15         THE WITNESS:  "In the interview, Joel advised everything

16   written in his signed document to be true," and it should have

17   read "Joel advised everything written in this signed document to

18   be truthful."

19   Q.    (By Ms. Groover)  Okay.  So you acknowledge that should

20   not read "his signed document"?

21   A.    Yes.

22   Q.    Because he did specifically tell you he didn't sign it?

23   A.    Yes.

24   Q.    And he doesn't speak English?

25   A.    Correct.

133

1   Q.   Or read English?

2   A.   Yes.

3   Q.   So you agree that when the affidavit says he signed the

4   document, that is a misstatement?

5   A.   Correct.

6   Q.   But in your -- does that change your analysis of the

7   probable cause, sir?

8   A.   No, ma'am.

9   Q.   Why not?

10  A.   Because the information on the actual document is, his --

11  his words is exactly what happened.

12  Q.   And at times, at the beginning of your interview, though,

13  he does kind of deny having anything to do with this; is that

14  fair?

15  A.   Yes, ma'am.

16  Q.   And that's referring back to Page 15 where he is saying he

17  doesn't want any trouble; he's afraid of immigration?

18  A.   Yes, ma'am.

19  Q.   Why don't you disclose that information in the affidavit,

20  that at first he was denying but then later on ultimately

21  adopted the statement as his own?

22  A.   I don't know.  I don't know.

23  Q.   Is it fair to say you were summarizing the ultimate end

24  game of the interview, conclusions?

25  A.   Correct.

134

1    Q.    Do you agree it would have been better to include that

2    information?

3    A.    Yes, ma'am.

4    Q.    Did you ever intentionally try to deceive the judge by not

5    including that information?

6    A.    No, ma'am.  I didn't think that that was relevant.  It's

7    common during interviews that people change their stories.  It

8    starts off one thing.  And then as more they open up and they

9    feel more comfortable, then that's when the truth comes out.

10   Q.    And did you feel that was the situation with Mr. Reyes?

11   A.    Yes, ma'am, from -- I mean, even from when the interview

12   begins with he talks about he's referring to he doesn't want the

13   same thing to happen to him, so that right there lets me know

14   he's very fearful to even be here talking to me, and we have to

15   explain to him that this is between us.  We explain that this is

16   between us.  We're not going to inform on him.  We're not

17   immigration.  "We're not here to arrest you; we're here to solve

18   a homicide."

19   Q.    And the premise of that being Mr. Montoya was complaining

20   and he was killed; is that correct?

21   A.    Correct.

22   Q.    So is it a reasonable fear for a witness to not want to

23   get involved then?

24   A.    Correct.

25   Q.    So did that seem unusual to you or did that affect his

135

1    credibility to you because he was initially denying it?

2    A.    No, ma'am.  Not the slightest bit.

3    Q.    There's another misstatement that, about the $1500.00?

4    A.    Yes, ma'am.

5    Q.    You agree that Joel Reyes denied paying specifically

6    $1500.00 for the identities, if you will?

7    A.    Correct.

8    Q.    But did he nevertheless tell you that he was paying Pablo

9    for the identity and the opportunity to work?

10   A.    Correct.

11   Q.    Describe for The Court what he told you.

12   A.    That is where he -- and I broke it down because, again, I

13   was having some miscommunications with him as far as the whole

14   $1500.00.

15   Q.    Let me stop you for just a moment.  For the record is this

16   conversation, when you were having the miscommunication, is it

17   outlined on Pages 10 and 11 and Page 16 and then 21 and 22 of

18   Exhibit 6?

19   A.    Correct.

20   Q.    With those pages in mind, describe for The Court the

21   communication you were initially having with Mr. Reyes about

22   this payment structure.

23   A.    At first, he said he -- he didn't pay for any, any money.

24   He says that none of that happened.  Again, that was early on in

25   the interview and things changed.  The more he felt more

136

1    comfortable, the more he began to open up to us.

2         And then I asked him specifically about the money

3    exchanging.  I don't know if he was having a hard time

4    understanding me, so I asked him one way, and then I gave it to

5    him what I would describe as a laymen's term.  I asked him if

6    you got paid this amount of money and this amount of money,

7    well, how much would you get back, and that's when he broke it

8    down.  He said, "Well, if I worked 60 hours, I get paid $600.00;

9    if I work 80 hours, I get paid $800.00."

10        I said, "What about overtime?"

11        He says, "There is no overtime; I got paid $10.00 an hour

12   no matter what it is."

13        Then I said, "Well, what did your paychecks look like?"

14        He said he did not get a paycheck.  He said that they take

15   their money, they would take their cut and they would give him

16   the $600.00, the $800.00 in cash, so he would only receive cash.

17   Q.   And did he explain who "they" was?

18   A.   He paid Mr. Pablo Rangel.

19   Q.   Okay.  What did you understand that to be in context with

20   his $1500.00 that's outlined in the letter?

21   A.   That he was paying for -- the money out of his checking

22   account, out of his actual physical check.  He didn't physically

23   provide them with $1500.00 in cash.  It was coming out of his

24   check.

25   Q.   Okay, but he did, in fact, deny paying $1500.00?

137

1   A.    He denied giving him $1500.00.

2   Q.    Because he didn't?

3   A.    Correct.

4   Q.    Do you agree, well, it would have been better to explain

5   that entire conversation in detail in the affidavit for the

6   magistrate?

7   A.    Thinking about it now, yes, ma'am, it would have been.

8   Q.    And did you intend to deceive or lie at all to the

9   magistrate by not explaining that or not putting that in there,

10  that he denied paying $1500.00?

11  A.    No, ma'am.

12  Q.    In your mind, did it change the fact that there was

13  probable cause for these warrants?

14  A.    No, ma'am.

15  Q.    There's also information, Defendants claiming that you

16  misrepresented that Joel Reyes had warned Montoya to leave Pablo

17  alone since he was going to have him killed.

18        Do you recall reading that in the motion?

19  A.    I did read that.

20        INTERPRETER DAVIS:  Could you repeat that last question?

21  Q.    (By Ms. Groover)  You recall in the motion it says that

22  you misrepresented that Reyes had warned Montoya to leave Pablo

23  alone since he was going to have him killed?

24  A.    Yes, ma'am.

25  Q.    Do you recall that misrepresentation allegation?

138

```
1    A.    Yes, ma'am, I do.
2    Q.    Direct your attention to Page 15 and 16 in the transcript
3    of Exhibit 6.  Based on your interview with Mr. Reyes and
4    directing your attention to Page 15 and 16, can you describe for
5    The Court what Mr. Reyes told you about warning Mr. Montoya
6    because he believed Pablo would have him killed?
7    A.    I believe it's the last paragraph, "So this is where the
8    problems stem from; I was told by the general, so at the end I
9    was told by Eliud he had, Mister -- Mister -- do you want to
10   send a letter; I told him I don't want trouble for you, for
11   because he would tell me" -- it says "unintelligible" -- "that
12   it was possibly they fired him and all that; I told him Mister,
13   stop doing that because I know that there could be problems."
14   Q.    Continuing to the next page, what -- did the conversation
15   continue at?
16   A.    I asked him, "Do you think that?"  He says, "Because the
17   Rangels are big; that family is big here."
18         I said, "The Rangels?"
19         He says, "The Rangels."
20         I said, "They are?"
21         His response was, "I mean, he has nephews and he has
22   brothers and he has family in Texas also, I think."
23         "Who do you think killed him, could have killed him?"
24         "Maybe not the man because he looks -- he looks --"
25         I said, "Who, Pablo?"
```

1    His response is, "Yes, the heart one does not -- does not

2  know in each person," and then it says -- where it says, I say

3  "so" and then it says "voices overlap."

4    He responds, "But he could have sent somebody; it could

5  have been -- I feel bad but what" --

6    And I said, "But whether he could kill someone it could be

7  because" --

8    "Well, yes, yes, I feel bad."

9    "But do you know who could have been" and it says "voices

10  overlap."

11  Q.   So based on that conversation that's documented on Page 15

12  and 16, what did you take that to mean?

13  A.   Again, it was a summary that I felt that leave him alone

14  because these are bad people.

15  Q.   And that, did you take that to understand that Joel Reyes

16  was explaining that Pablo would not kill him but would have

17  someone do it?

18  A.   Correct.

19  Q.   And you pled in the affidavit you believe his family

20  member?

21  A.   Correct.

22  Q.   But he doesn't specifically say family, does he?

23  A.   No, but, again, we're talking, the way that I interpreted

24  it was we were talking about the Rangels and then all of a

25  sudden he discloses that statement.  So it's -- I took it as he

140

1    was describing as the Rangel family.

2    Q.    You understood it to be someone in his family?

3    A.    Correct.

4    Q.    And does he mentions, Joel Reyes mentions a nephew; is

5    that correct?

6    A.    Correct.

7    Q.    And is Refugio a nephew?

8    A.    He is, yes, ma'am.

9    Q.    And Refugio was the individual who had the arrest in 2014

10   for the .22-caliber firearm?

11   A.    Yes, ma'am.

12   Q.    Also in the affidavit, Defense highlights that with

13   respect to referring to the EEOC complaint, you mentioned that

14   there's a previous EEOC complaint.  Are you aware of that

15   portion in your affidavit?

16   A.    I am, yes, ma'am.

17   Q.    And can you tell The Court what you meant by "previous

18   EEOC complaint"?

19   A.    I guess in the early-on facts of the actual affidavit

20   itself, I put in there the specific as to the EEOC complaint,

21   and then later on the statement is it was the aforementioned,

22   which should have been the previous-stated EEOC complaint.

23   Q.    So when you used the word "previous EEOC complaint," were

24   you referring to a separate complaint filed before the one that

25   Mrs. Montoya handed you?

141

1   A.   No, ma'am, I was referring to it, that sole one that was

2   provided.

3   Q.   You understand how that could be interpreted as a separate

4   EEOC complaint?

5   A.   Correct.

6   Q.   Was it your intention to mislead the judge or trick the

7   judge into thinking there are multiple EEOC complaints by using

8   the word "previous"?

9   A.   No.  I see that, yes, ma'am.

10  Q.   Defense has also highlighted some potential omissions in

11  this affidavit, specifically that, you know, Mr. Reyes denied

12  signing and denied writing the letter, which is Page 1 of

13  Exhibit 12.  Why did you leave that out?

14  A.   It was, I guess, just a clerical error.  That's where

15  the "this" and the "his" were came into, it was "this document"

16  and it was provided orally to the judge at the time.

17  Q.   And with respect to as outlined on Page 22 and 23, do you

18  feel that Mr. Reyes ultimately was adopting the statement?

19  A.   Correct.  He took it as -- as this was an agreement

20  between myself and Mr. Eliud.

21  Q.   And as you previously explained, Mr. Reyes did first kind

22  of deny some things and you believed he was scared; is that

23  correct?

24  A.   Yes, ma'am.

25  Q.   And, again, you left the fact that he was changing his

1    statement out in the affidavit.  Why did you do that, sir?

2    A.    Again, I didn't think that the relevance of it at the time

3    was important.  Again, in the first, the very first page of me

4    talking to him, I mean, I asked him, his response to the first

5    question I asked him is, "The problem is I don't want to talk

6    too much or too little; right; how do you say this does not --

7    does not affect me also."

8         He's basically say he doesn't want this to affect him as

9    well.  I said, "Yes" and then, "Do you know how it happened, if

10   it was an assault that could have been done or depends, let's

11   say, depending on the problem that could have happened at the

12   company," so he's explaining to me that he's not -- he knows

13   what -- what happened, and he doesn't want it to happen to him

14   as well.

15   Q.    Okay, and did you leave that out in an attempt to trick or

16   deceive or be dishonest to the magistrate?

17   A.    No, ma'am.

18   Q.    And does it change your opinion with respect to probable

19   cause about that Mr. Reyes initially denied and then kind of

20   came around?

21   A.    Absolutely not.

22   Q.    At the time, did you see it as relevant?

23   A.    No, not relevant at all.

24   Q.    You also do not explain in the affidavit that Mr. Reyes

25   could not read, read the letter because it was written in

143

1    English?

2    A.    Correct.

3    Q.    Why didn't you put that in the affidavit?

4    A.    Again, I didn't think the relevance of it.  I surmised it,

5    his summary of him, from English to Spanish and he advised that

6    that information was true and accurate as to what actually

7    happened.

8    Q.    And then ultimately adopting the statement as his own?

9    A.    Correct.

10   Q.    Did you not put the fact that Mr. Reyes didn't read or

11   speak English in there to trick or to deceive or misstate on

12   purposes for the judge?

13   A.    No, ma'am.

14   Q.    And did it affect your determination of probable cause or

15   was it relevant to you at the time?

16   A.    No, ma'am.

17   Q.    Joel Reyes does tell you that he's never seen the Rangels

18   with a gun; is that correct?

19   A.    Correct.

20   Q.    But you don't put that in the affidavit; correct?

21   A.    Correct.

22   Q.    Why did you not put that in the affidavit, sir?

23   A.    Because we had a report that put Refugio with the firearm.

24   We didn't think that the fact that they didn't have possession

25   of firearms that he would have witnessed was relevant.  He did

144

1    state that there could have been firearms in their house.

2    Q.    Is that documented on Page 17 of Exhibit 6 of the

3    transcript?

4    A.    Page 17.  Yes, ma'am.

5    Q.    So he is -- he does not know if he has -- they have guns

6    in their house; is that correct?

7    A.    Correct, he doesn't know.

8    Q.    You agree it would have been better to let The Court know

9    that he did specifically say he's never seen them with a gun but

10   may have them in their house?

11   A.    Correct.

12   Q.    Did you leave that out in an attempt to mislead or trick

13   or deceive The Court in any way?

14   A.    No, ma'am.

15   Q.    Did it change your determination with respect to the

16   probable cause, if he's never seen him with a gun?

17   A.    No, ma'am.

18   Q.    Why is that, sir?

19   A.    Again, because we saw Refugio, we had a report documenting

20   his nephew, who he is -- was informed lives in the same compound

21   with him, had been arrested in possession of a .22-caliber

22   handgun.

23   Q.    Now specifically with respect to that arrest, you did

24   leave out that Refugio, when he got arrested with that .22-

25   caliber gun, it was seized and it was seized at the time of the

1    arrest?

2    A.    Correct.

3    Q.    Did you at the time when you were writing your affidavit

4    and were providing it to The Court, did you have any idea where

5    that gun was?

6    A.    No, ma'am.

7    Q.    Can you describe the process in Garden City when someone

8    is arrested and a firearm is seized for The Court?

9    A.    Any firearm that is seized subsequent to an arrest has to

10   be run through Etrace, which is -- it's monitored by the ATF.

11   It's all gun purchases are kept in a file based on serial

12   number.  We send the Etrace and we get -- we get the individual

13   who purchased the firearm's information.

14        We then call that individual and let them know their

15   firearm was seized subsequent to an investigation and they are

16   more than welcome to come pick up their firearm.

17        If we can't get ahold of somebody to come pick up the

18   firearm and that is put on paper, after a significant amount of

19   time, the gun is either put in for destruction order or a

20   judge's signature is authorized to auction the firearms.

21   Q.    So you don't keep it in evidence in Garden City forever

22   and forever?

23   A.    No, ma'am.  We don't like to keep things in evidence if we

24   don't have to.

25   Q.    You either return it somehow or it gets disposed of?

146

1  A.    Correct.

2  Q.    So were you familiar with what the Savannah Police

3  Department's procedures were when they seized firearm?

4  A.    I believe it was the same as ours.  We normally adopt

5  things from them.

6  Q.    And so the fact that a weapon was seized in 2014 and then

7  you're looking at 2017 incident, did you have any idea at that

8  time that the gun would still be property in evidence?

9  A.    No, ma'am.

10 Q.    Did you ever have the opportunity over the weekend to pick

11 up a phone and even find out where the gun was?

12 A.    I don't believe Savannah Property works on weekends so we

13 wouldn't have got any information on the weekends anyways.

14 Q.    Did you leave out the fact that the gun was seized in the

15 affidavit in a way to deceive or trick or mislead the magistrate

16 in any way?

17 A.    No, ma'am.

18 Q.    And, in fact, why did you put that in the affidavit that

19 Refugio was arrested with a .22-caliber firearm?  What was the

20 purpose of that in your mind?

21 A.    That he is an illegal alien in possession of a firearm; he

22 has access to guns.

23 Q.    And that's relevant to the probable cause with respect to

24 family members living on the property with access to guns?

25 A.    Correct.  Small-caliber guns on top of that.

147

1    Q.    Would it have changed your determination of probable cause

2    if you knew, even though you didn't, if you knew the gun was

3    still in property in evidence at the time?

4    A.    No, ma'am.

5          MS. GROOVER:  May I have just a moment, Your Honor?

6          THE COURT:  You may.

7    Q.    (By Ms. Groover)  Just briefly, Your Honor, referring back

8    to Exhibit 12, Page 1, or the letter that Mr. Montoya had, it

9    explained that he was terminated or suspended?

10   A.    The letter, I believe it says he was suspended.

11   Q.    And did you previously say that he was terminated?

12   A.    I believe -- not Mr. Montoya.  Joel Reyes was terminated.

13   Q.    Okay.

14   A.    Mr. Montoya was suspended for three days.

15   Q.    And did you put any of that information in your affidavit?

16   A.    The fact he was suspended is in the affidavit, yes, ma'am.

17         MS. GROOVER:  Okay, thank you.

18         No further questions, Your Honor.

19         THE COURT:  Mr. Ertel, cross-examination.

20                          CROSS-EXAMINATION

21   BY MR. ERTEL:

22   Q.    Thank you, Your Honor.

23         Detective or Sergeant?

24   A.    Detective Sergeant.

25   Q.    Detective Sergeant Rodriguez, you testified that you gave,

148

1    I believe you said, oral testimony to the magistrate on, I

2    guess, it's August 20th, 2017; correct?

3    A.    Yes, sir.

4    Q.    But -- and that testimony, that oral testimony, was

5    only -- well, other than testimony about how you obtained the

6    Google Maps and the location of the residence, you told the

7    magistrate nothing other than what's in the four corners of the

8    affidavit?

9    A.    As far as -- I did provide more information, yes, sir.

10   Q.    Do you remember testifying in front of Judge Smith in

11   another suppression hearing for Hipolito Martinez?

12   A.    Years ago, yes, sir.  I don't know the specific date.

13        MR. ERTEL:  If I may approach, Your Honor.

14        THE COURT:  You may.

15   Q.    (By Mr. Ertel)  I'm going to give you your own copy of

16   Defense Exhibit Number 5.  I think you have a copy of it.

17   A.    Thank you, sir.

18   Q.    And I will turn your attention particularly to Page 33.

19   Take a look at the beginning and make sure that is your

20   testimony from the -- from that hearing?

21   A.    Yes, sir.

22   Q.    And if you look on Page 33, Line 3.  You will see The

23   Court asks you, "Did the term 275 Milton Rahn Road ever come up

24   about any issues -- well, are there any other addresses there,"

25   well, I'm sorry.  Here, I'm sorry, Line 9.

1    Ms. Groover asked you, "Was there any other additional

2    testimony that you provided to the magistrate that is not in the

3    warrant," and your answer was?

4    A.    "No, ma'am."

5    Q.    So there was no other information provided to the

6    magistrate other than what's in the affidavit?

7    A.    I would have to review, but I believe on that specific

8    question was asking specific to the address.  I'm not sure if it

9    was as far as the actual narrative itself.  So I have to review

10   the --

11   Q.    Go ahead and review it.

12   A.    Okay.  Yes, sir, on Page 31 Line Number 9, "In the course

13   of reading of the affidavit, she asked" -- "In the course of

14   reading of the affidavit, she asked you questions and you

15   started volunteering information; she asked me, before she swore

16   me in, she asked me if I had oral testimony and at that point

17   she said she had to swear me in; that's when I advised her the

18   search warrant, I gave her the circumstances surrounding the

19   search warrant as well as the verbiage in the search warrant

20   prior to her reading it."

21   Q.    Okay.  So only the information in the search warrant?

22   A.    Circumstances surrounding the search warrant, which I

23   provided her, I gave her brief facts, the summary of the

24   investigation from A to Z.

25   Q.    Okay.  So...

1  A.    That is on Page 31.

2  Q.    I see that, and you will see on Page 32, The Court, "What

3  exactly -- and you may have already brought this out, what was

4  exactly told to the magistrate that's not in this affidavit,"

5  and Ms. Groover asked you a series of questions and at the end

6  of those series of questions, on Page 33, "Was there any other

7  additional testimony that you provided to the magistrate that is

8  not in the warrant"?

9  A.    Correct.

10  Q.    "No, ma'am"?

11  A.    Again, on Page 32, it's -- it's -- we're talking about the

12  residence, I believe, and we're talking about the scope itself

13  because again, "with the matching," "yes, ma'am," "was the

14  description that was on the warrant" --

15        INTERPRETER DAVIS:  The interpreter needs you to slow

16  down reading.  Thank you, please.

17        THE WITNESS:  "And that description that was on the

18  warrant came from other law enforcement officers; yes, ma'am;

19  and that it was your intention to search every single trailer,

20  camper, home, dwelling on the property; yes, ma'am; which is why

21  the description says multiple dwellings, yes, ma'am."

22  Q.    (By Mr. Ertel)  Take me -- I'm sorry.

23  A.    "You further explained and you described these trailers,

24  campers, dwellings to the best you could from other officers'

25  observations; yes, ma'am; but notwithstanding the limited

151

1   description, it was your intention that this was told to you,

2   the magistrate, under oath, that you were seeking a warrant to

3   search all the dwellings; yes, ma'am; did the term 275 Milton

4   Rahn Road come up with any issue about, well, are there other

5   addresses there; did that come up during your discussion with

6   the judge; I don't recall; all right, was there any additional

7   testimony that you provided the magistrate that's not in the

8   warrant."  I took that specific as to the actual scope itself

9   because that was where the question came from.

10  Q.    Let's look back to the page before and look at the judge's

11  specific question, starts on Line 5 of Page 32.  "What

12  exactly -- and you may have already brought this out -- what was

13  exactly told to the magistrate that is not in this affidavit,"

14  and then Ms. Groover asks you a series of questions and at the

15  end of those questions, she asked, "Was there any other

16  additional testimony you provided to the magistrate that is not

17  in the warrant; no, ma'am."  Correct?

18  A.    Correct, correct.

19  Q.    Now, you'll agree with me that your opinion as to whether

20  there is probable cause is really of no merit here?

21  A.    Irrelevant.

22  Q.    It's what the magistrate did?

23  A.    Yes.

24  Q.    So whether you thought you had probable cause without

25  Refugio's information, is immaterial to this; right?

1    A.    Correct.

2    Q.    Let's talk about Refugio for a moment.  You've been in law

3    enforcement since 2009; correct?

4    A.    Sworn since 2010, so about 11 years.

5    Q.    You're aware that when evidence is seized, being a

6    detective and a law enforcement officer, when evidence or items

7    are seized that are in evidence that they stay in evidence until

8    they are no longer needed; right?

9    A.    No, sir.

10   Q.    So if they were going to prosecute Refugio Ramirez for

11   possessing a weapon, they are going to have a weapon?

12   A.    The weapon or photographs themselves, one or the other.

13   Q.    And you're aware I believe you testified in another matter

14   that Refugio also had warrants for his arrest?

15   A.    He did.

16   Q.    And you're aware that one of those warrants was for

17   failure to appear?

18   A.    I -- I believe, yes, sir.

19   Q.    And that failure to appear was for the possession of a

20   weapon?

21   A.    Yes, sir.

22        MR. ERTEL:  Your Honor, I'm sorry, I don't have a lot of

23   copies of these.  I've just got these and Judge, I would mark

24   that as Defendants' Exhibit Number 9.

25        THE COURT:  Before you move to that one, Mr. Ertel, I

1  think the transcript in the previous proceeding, you addressed

2  it but I don't think it was ever tendered or admitted --

3       MR. ERTEL:  I was going to ask you to take judicial

4  notice of it or we can make it as an exhibit, and I have it as

5  Defendants' Exhibit Number 5, I believe.

6       THE COURT:  Any objection?

7       MS. GROOVER:  No, Your Honor.

8       THE COURT:  It's admitted.  I will also note for the

9  record that that is in Case Number 4:17-CR-217, Document Number

10  49, on the electronic docket, a copy of that transcript as well.

11       MR. ERTEL:  If I may approach.

12       THE COURT:  You may.

13  Q.   (By Mr. Ertel)  Let me show you what I've marked as

14  Defendants' Exhibit Number 9, and take a look at that and see

15  if that confirms that Refugio had the failure to appear for

16  this carrying a concealed weapon?

17  A.   He did.

18       MR. ERTEL:  Move for admission of Defendants' Exhibit

19  Number 9.

20       MS. GROOVER:  No objection.  I would note it has

21  personally identifying information so perhaps seal it or redact

22  portions of it.

23       THE COURT:  Any objection to that going in under seal,

24  Mr. Ertel?

25       MR. ERTEL:  No, that's fine.

154

1       THE COURT:  It will be admitted under seal and that is

2   Defendants' Exhibit Number 9.  And I will just caution anyone

3   from discussing any of the personally identifiable information.

4       MR. ERTEL:  We won't be discussing it.

5       THE COURT:  Do you have an additional copy of that, sir?

6       MR. ERTEL:  I don't.  I can give you the original of

7   that, Judge.

8       THE COURT:  Ms. Mixon, can you please --

9   Q.   (By Mr. Ertel)  Let's talk a little bit about the day

10  before or the 17th.  That was the other homicide?

11  A.   Yes, sir.

12  Q.   Did you say that Detective Reyes was the secondary?

13  A.   He -- he was primary.  He was primary, so I was going to

14  guide him through working and solving a homicide.

15  Q.   And I may have gotten this -- so just clarify it for me.

16  What was Detective White -- was it Detective White, what was his

17  role in the first homicide, the 17th?

18  A.   So because of his -- he's a pastor.  We called him in

19  there as a -- just another detective, but he can also do the

20  next-of-kin notification.  He would be able -- he's more -- he

21  was probably the most qualified to handle that.

22  Q.   And the August 17th homicide, were you the affiant on the

23  search warrant in those search warrants?

24  A.   I don't recall.  I don't recall.

25  Q.   So if you are not the affiant, it would probably be

155

1    Detective Reyes who was preparing those?

2    A.    It would be one of us two, yes, sir.

3    Q.    You talked about when you got to the -- let me shift gears

4    now to August 19th?

5    A.    Yes, sir.

6    Q.    On Old Dean Forest Road?

7    A.    Yes.

8    Q.    You got to the scene.  You began working as a crime scene

9    tech?

10   A.    Correct, I was.

11   Q.    You were processing the crime scene, and then

12   information -- you used the term "facts"?

13        THE COURT:  One moment, the defendant is having trouble

14   hearing through the headset.

15        INTERPRETER DAVIS:  I beg your pardon, Your Honor.  It

16   appears to be this unit that's causing trouble so we will try to

17   do it with just one unit for the rest of the hearing.

18        THE COURT:  It appears to be working.  Go ahead, Mr.

19   Ertel.

20   Q.    (By Mr. Ertel)  Thank you.

21        On direct, you said, as you were processing the crime

22   scene you got some facts, and I think you called them

23   accusatory facts?

24   A.    Correct.

25   Q.    And that caused you to shift roles?

156

1    A.    Correct.

2    Q.    And the accusatory facts came from, I believe you said,

3    Mr. Montoya's sister, her mother or his mother, I'm sorry, or

4    his wife or was it just those two at the time?

5    A.    So it ended up being four individuals.  It was Mr.

6    Montoya, his wife, his sister, his mother and then the fourth

7    young lady who referred to herself as Puerto Rican.

8    Q.    Carmen Brown?

9    A.    Carmen Brown.

10   Q.    And those accusatory facts, you said that they speculated

11   as to who did the killing?

12   A.    As to -- as to I guess more of the why.  Why.

13   Q.    They speculated as to why?

14   A.    The reason.  Correct.

15   Q.    And they speculated that it was Pablo?

16   A.    Correct.

17   Q.    But they weren't there?

18   A.    Correct.

19   Q.    They didn't see it?

20   A.    Correct.

21   Q.    Nobody told them that?

22   A.    Correct.

23   Q.    So you would agree with me speculation is not fact?

24   A.    Correct, my apologies.

25   Q.    So you also testified that they provided you documents;

1  correct?

2  A.    Yes, sir.  Yes, sir.

3  Q.    And I think that -- is that Exhibit 12?

4  A.    Yes, sir.

5  Q.    And you said that it says that there were illegals working

6  there?

7  A.    Correct.

8  Q.    And that they were being paid less than minimum wage?

9  Those are your words from direct.

10        Can you take a look on there and see if it says on there

11  anywhere that they were being paid less than minimum wage?

12  A.    It's not on Mr. Reyes' form.

13  Q.    Pardon me?

14  A.    It's not on Mr. Reyes' form.

15  Q.    No doubt they were not getting paid their full wages but

16  there's nowhere on this -- any of those --

17  A.    Correct.

18  Q.    But it's nowhere it says less than minimum wage?

19  A.    Correct.

20  Q.    In cases like this, you agree with me that wording and the

21  context is critical when you're giving affidavits to judges to

22  determine if you are going to be able to go into somebody's

23  house and search?

24  A.    I don't think that that was actually spoken of in my

25  affidavit.

158

1   Q.   No, I know.  But I'm just saying you would agree that
2   words are important and being precise?
3   A.   Correct.
4   Q.   I think you testified on direct that you were aware that
5   Refugio Ramirez was an undocumented alien?
6   A.   I believe so, yes, sir.
7   Q.   And you're aware that, of course, federal law would
8   prohibit Garden City Police Department from releasing a weapon
9   to an undocumented alien?
10  A.   Correct.
11  Q.   Okay.
12  A.   Yes, sir.
13  Q.   So even if that gun was released by Garden City, it was
14  not released back to Refugio?
15  A.   It would have been released back to the owner or the
16  owner's representative.
17  Q.   Are you aware now that the gun that was seized from
18  Refugio Ramirez in 2014 is still in the possession of Chatham
19  County Police Department?
20  A.   No, sir.
21  Q.   I don't know if you have a copy of it.  This is a
22  stipulation between the Government and the Defense.  And if we
23  can admit it into evidence and I can read it for The Court.
24       Well, "United States of America by David Estes, Acting
25  United States Attorney, and Tania Groover and Christopher

1  Howard, Assistant United States Attorneys for the Southern

2  District of Georgia, jointly with Defendant Pablo Rangel-Rubio,

3  Jeff Ertel, J. Wes Bryant and W. Dow Bonds, counsel for Mr.

4  Rangel-Rubio, hereby agree and stipulate to the following facts,

5  which may be entered into the record as if proven by competent

6  evidence without further proof being offered.  December 23rd,

7  2014, officers from Savannah Police Department arrested Refugio

8  Ramirez" --

9            INTERPRETER DAVIS:  I'm sorry, the interpreter --

10 Q.   (By Mr. Ertel)  I'm sorry.  "Arrested Refugio Ramirez.  At

11 the time of the arrest the officers found a listed -- a firearm

12 listed as a Davis Industries, Inc. DM pistol derringer .22,

13 Serial Number 244582, and ammunition.  The firearm and

14 ammunition were logged into the property room as evidence at the

15 Savannah Police Department.  As of June 9th, 2021 the Davis

16 Industries DM pistol derringer .22 Serial Number 244582 remains

17 in the custody of the Savannah Police Department.  So stipulated

18 and agreed," and signed by Mr. Howard, Ms. Groover, myself and

19 Mr. Bonds, so are you now aware that the pistol --

20           THE COURT:  Let me make note the copy that I have is not

21 signed.

22           MR. ERTEL:  The original is.

23           THE COURT:  I've got a signed copy --

24           MR. ERTEL:  Judge, this is the signed copy, the original

25 signed, so move that, Defendants' Exhibit 6 into evidence.

160

```
 1        THE COURT:  Any objection, Ms. Groover?
 2        MS. GROOVER:  No, Your Honor.
 3   Q.    (By Mr. Ertel)  So you're aware that the gun is still in
 4   the possession of Savannah Police Department?
 5   A.    Yes, sir.
 6   Q.    So let me talk about when Mr. Reyes came to Garden City
 7   Police Department.  That was -- I'm not going to hold you to the
 8   exact -- sometime between six and seven o'clock at night on 19th
 9   of August 2017.  He was put in an interview room?
10   A.    He was.
11   Q.    And is that automatically recorded?
12   A.    It does not.  You have to manually turn it on.
13   Q.    But you or somebody turned it on in this case?
14   A.    Yes, sir.
15   Q.    And we know it was recorded because the Government has
16   introduced it as evidence.  You had access to that recording
17   immediately after the interview?  You could go review it?
18   A.    Yes, sir, we could have.
19   Q.    As a matter of fact, I think you did for some parts of
20   preparing your affidavit?
21   A.    I don't recall reviewing the actual video itself
22   afterwards.  I don't recall.
23   Q.    Yeah.
24   A.    I know we definitely took notes and it's customary to
25   review.  I just don't recall at this time.
```

1    Q.    See if -- take a look at Defendants' Exhibit Number 5 on

2    Page 26 at the bottom and see if that may refresh your

3    recollection as to whether you may have gone back to review --

4    as a matter of fact I think it's the last, starting at Line 21.

5        In particular, I guess there's some verbiage change and I

6    think it has to do with the address to be -- to be fair, in the

7    warrant, and you say at least on Paragraph 24, "but the more I

8    read into the interview with Joel and then the interview I did

9    with Effingham."  Is that indicating you went back and reviewed

10   the tape of the interview?

11   A.    Again, I don't recall.

12   Q.    You don't recall?

13   A.    It's customary, especially with two of us being in there,

14   we take notes, so it could have been I reviewed the note-taking

15   that we took or the video evidence.  I don't remember.

16   Q.    But whether you did or didn't, you had the opportunity?

17   A.    We did, yes.

18   Q.    So you could have gone back to find out exactly what Joel

19   Reyes said?

20   A.    Yes.

21   Q.    And instead of inferring things or interpreting them, you

22   could have been -- you could have reported with 100 percent

23   accuracy what Joel Reyes said; correct?

24   A.    Could have, yes, sir.

25   Q.    And I think you've admitted this, I think, but I'm going

162

1   to go over back over it.

2       In your affidavit, search warrant affidavit, you say that

3   Mr. Reyes says everything in his signed statement was true,

4   okay, and now I believe you said that "his" should be "this"?

5   A.   Yes.

6   Q.   But "everything in his" or "this signed statement" wasn't

7   true; right?

8   A.   Well, it was true, yes, sir.

9   Q.   He never -- he said "I never paid him $1500.00"?

10  A.   He didn't ever physically pay him $1500.00, but the

11  money -- he still paid him the money.  It was not physically

12  $1500.00 given to him.  It was $1500.00 given to him from the

13  back end of his check.

14  Q.   And that's your reconciliation of the discrepancy.  That's

15  how you reconciled the discrepancy between what he told you and

16  what actually happened?

17  A.   At the time, yes, sir.  At the time.

18  Q.   And just to be clear, the allegations are that Pablo

19  underpaid everybody, all of the illegals?

20  A.   All the illegal aliens, yes.

21  Q.   And he paid them all a hundred dollars a day?

22  A.   I don't know about a day.

23  Q.   I think -- well --

24  A.   He paid them $10.00 a day for whatever hours they worked.

25  Q.   Ten --

163

1   A.    $10.00 an hour for whatever specific hours they worked.

2   Q.    So he paid them all $10.00 an hour?

3   A.    Not -- not specific, Joel said I guess, in the interview I

4   believe he said some people did make more than other people but

5   he made $10.00 an hour.

6   Q.    To the -- not to the degree of how much but he -- the

7   allegations are that Pablo underpaid all of the undocumented

8   workers?

9   A.    Correct.

10  Q.    Not that each of those and that -- strike that.  And he

11  underpaid them from the beginning to the end?

12  A.    I don't -- I don't believe so.  I believe that -- again,

13  if we're just referring to the search warrant itself, then yes,

14  that is correct.

15  Q.    So the interview lasted approximately an hour.  So I would

16  say, given seven o'clock, it's over by eight o'clock.  You met

17  the magistrate at 11 o'clock the next day so everything Mr.

18  Reyes had told you was still pretty fresh in your mind?

19  A.    Correct.

20  Q.    You would admit that -- well, you wouldn't.  You would

21  agree with me that at the time you wrote your affidavit the only

22  person who gave you firsthand knowledge about any illegal

23  activity at all concerning Mr. Rangel-Rubio was Joel Reyes?

24  A.    And Eliud's statement in his notebook with the --

25  Q.    The only person who --

164

1    A.    Verbalized it to me?

2    Q.    The only person that gave you firsthand knowledge?

3    A.    At that point would have been Joel Reyes.

4    Q.    And you referenced the, whether it's "this signed

5    statement" or "his," in your affidavit for the search warrant;

6    right?

7    A.    Correct.

8    Q.    And you didn't tell the magistrate that he at first

9    disavowed it; correct?

10   A.    Correct.

11   Q.    And you didn't tell the magistrate that he said "I never

12   signed it"?

13   A.    Correct.

14   Q.    And he never came off the fact that he never signed it?

15   A.    Never came off it.

16   Q.    He also never came off the fact that he didn't write that?

17   A.    Correct, he never came off that.

18   Q.    He never came off the fact that "I can't even read that; I

19   don't read English"?

20   A.    Correct.

21   Q.    But you didn't tell the magistrate those facts about the

22   only person who gave you firsthand knowledge of illegal

23   activity?

24   A.    Correct.  I told her that his statement was that

25   everything written in this document to be true.

165

1    Q.    With the exception of -- oh, you didn't tell her that

2    either; that's right.

3          You talked about Mr. Reyes, that he was fearful.  Did you

4    ever ask him if he was fearful?

5    A.    I don't recall if I specifically asked him during the

6    interview.  I don't remember.

7    Q.    So from what he told you, you inferred that he was

8    fearful?

9    A.    And from his manifestations, his demeanor.

10   Q.    But he didn't say "I'm afraid I'm going to get killed; I'm

11   afraid somebody is going to kill me"?

12   A.    Again, it was just a statement he made that, to me, was a

13   little damning.

14   Q.    He never said "I'm afraid they are going to kill me"?

15   A.    He never --

16   Q.    "I'm afraid they are going to harm me"?

17   A.    He never used those specific words, no, sir.

18   Q.    And you said he eventually adopted the statement as his

19   own?

20   A.    Correct.

21   Q.    And Ms. Groover, I think, referred us to Pages 22 and 23.

22   I think, where does he adopt it?  His statement?  Where --

23   A.    It's on Page -- on Page, the very bottom of 22 into 23, I

24   can read it out loud.

25   Q.    Go ahead.  Please read it --

166

1  A.    "So like right now there are," it says "pause, letter that

2  supposedly were signed for the company; I mean, there were

3  people who signed.  In fact, my -- my -- he also asked for

4  mine."

5          THE COURT:  Detective, when you're reading I'm going to

6  ask you to slow down.

7          THE WITNESS:  My apologies, Judge.

8          THE COURT:  If you will start over, please.

9          THE WITNESS:  "So like right now there are letter

10  (pause) letter that supposedly were signed for the company.  I

11  mean, there were people who signed, in fact, my -- my -- my, he

12  also asked for mine; I did not send a letter; someone signed it

13  but um, yes, it was suddenly an agreement between us."

14  Q.    (By Mr. Ertel)  You didn't move to clarify that?

15  A.    No, sir.

16  Q.    You just inferred that, "yes, there was suddenly agreement

17  between us" was him adopting the statement?

18  A.    Correct.

19  Q.    Did you tell the magistrate that you inferred that he said

20  "adopted the statement" and said everything was true?

21  A.    I don't recall I said -- because I believe I asked him at

22  another time if everything written in this statement was true

23  and he said yes.

24  Q.    Did you tell the magistrate at any time that you were

25  drawing inferences from what Mr. Reyes had told you?

167

1    A.    I wouldn't use "inferences" as to what I was gathering.  I

2    was gathering --

3    Q.    Let's talk about the $1500.00.

4    A.    Okay.

5    Q.    He said he didn't pay him $1500.00.  You inferred that he

6    was making -- the $1500.00 came from other sources?

7    A.    That was my interpretation.  That's the way I interpreted

8    it.

9    Q.    "Interpretation," I will use the term "interpretation."

10   That was your interpretation of what he said.  He didn't

11   actually say it; you interpreted it?

12   A.    Correct.

13   Q.    So like these people do exact interpretations.  Your

14   interpretation wasn't exact?

15   A.    Between two Spanish speakers in that room, we both

16   interpreted the same thing.

17   Q.    They interpret things exactly.  Did you interpret things

18   exactly for the magistrate?

19   A.    At that time, what I -- what I was assessing, yes, that

20   was I gathered.

21   Q.    I'm not saying what you were assessing.  Did you interpret

22   exactly what was said?

23   A.    Yes, that the money came out of --

24   Q.    Where does he say he paid Pablo $1500.00 for

25   identification?

1    A.    On his sworn statement, he said the money came out of the

2    $1500.00.  Again, he didn't write the letter.

3    Q.    Where did he say in his interview, 45-minute to an hour

4    interview, that he paid Pablo $1500.00 for identification?

5    A.    It was not -- it was not the specific dollar amount.  It

6    was more of the money came out of his paycheck.

7    Q.    Where did he say "I told him that Pablo was going to have

8    him killed"?  Where in his statement does he say that?

9    A.    I don't know if the word "killed" was specifically

10   mentioned.  I can't find it, sir.  What was the question again?

11   Q.    Where does he say -- let's use your words from Exhibit 7,

12   where you say in your affidavit, "your affiant asked if Joel was

13   surprised Eliud was dead; Joel advised he was not; he stated he

14   told Eliud to leave Pablo" --

15        INTERPRETER GONZALES:  Could you --

16   Q.    (By Mr. Ertel)  I will start over.

17        "Your affiant asked Joel if he was surprised Eliud was

18   dead; Joel advised he was not; he stated he told Eliud to leave

19   Pablo alone since he was going to have him killed."

20        Where does he say that in his interview?

21   A.    I don't see it, sir.

22   Q.    Pardon me?

23   A.    I don't see it.

24   Q.    Because he didn't say that; right?

25   A.    I can't find it in the transcript, no, sir.

169

1   Q.    You may have inferred that's what he meant but he never

2   said it; correct?

3   A.    Maybe.  I can't find it in my paperwork.

4   Q.    Okay.  On direct, you talked a little bit about reports of

5   multiple gunshots near the property?

6   A.    Gun discharges.

7   Q.    Discharges, thank you.  Did you pull any reports to

8   confirm that?

9   A.    I did not know.  Those are not -- those are Effingham

10  County and I don't know what -- I don't believe they do

11  documentation for gun discharge.

12  Q.    Pardon me?

13  A.    I don't know if Effingham County does reports for gun

14  discharges in the area.

15  Q.    Would it surprise you, when we requested any information

16  about reports for that property, there were none?

17  A.    Again, I don't know if they annotate reports for gun

18  discharge.  Some agencies do.  Some agencies don't, and that

19  information came specific from Timmy Dickey from the Effingham

20  County Sheriff's Department.

21  Q.    Okay.  We talked a little bit about the fact that Mr.

22  Reyes had at first denied any involvement, then or denied the

23  letter, I'm sorry, not denied involvement, denied the letter and

24  then gradually changed over time and you said it was common for

25  people to change their stories?

170

1  A.    Yes, sir.

2  Q.    And you determined that it wasn't important to tell the

3  magistrate that he changed his story over time because people

4  often do it?

5  A.    It's typical, yes, sir.

6  Q.    So I think Ms. Groover asked you and I believe it's at the

7  bottom of 22 and onto Page 23 -- no, that's not it.  Let me find

8  it.

9        Part of the reason that you thought that Mr. or you talk

10  about the problems that Mr. Reyes was talking about were that he

11  could be killed or somebody could be killed -- strike that.

12  Never mind.  I won't ask that question.

13        Just cleaning up a moment, Judge.  Almost done, I think.

14        I think we talked about you saying in Government Exhibit 7

15  that Mr. Reyes said that Pablo may have family that could kill

16  somebody?

17  A.    Correct.

18  Q.    And you say he doesn't -- I think you said he doesn't

19  really say "family."  That's the way you interpreted it?

20  A.    We were talking about the Rangels and then we went to a

21  specific question, and when he says he could have sent somebody

22  so we're talking about the Rangels and he specifically answers

23  "He could have sent somebody."

24  Q.    But he didn't say family.  He didn't say he could have

25  sent -- somebody in his family could have done it.  As a matter

1    of fact, I think you say, "That's the way I interpreted it"?

2    A.    That's the way I interpreted it.

3    Q.    But you didn't tell the magistrate that you were

4    interpreting things that he said?

5    A.    No, sir.

6    Q.    You represented that that's what he said?

7    A.    Correct.

8    Q.    In your search warrant affidavit, you said "I believe the

9    victims are shot -- the victim was shot three times" as you knew

10   on --

11   A.    Preliminary.

12   Q.    We know later it was five or six?

13   A.    I don't know the specifics.  I just know at the time it

14   was not as much as we -- the number was significantly less than

15   we anticipated.

16   Q.    And the derringer that was seized from Refugio in 2014,

17   you know that derringers are commonly one- or two-shot guns?

18   A.    I'm not -- I'm not a gun enthusiast.  I don't know the

19   specifics about how many guns, how many rounds a firearm would

20   hold or not.

21   Q.    And to be clear, the gun that was seized from Refugio in

22   2014 that you knew either was still in the custody of Chatham

23   County, destroyed or returned to someone other than him; those

24   are the only three options?

25   A.    To the owner or agent of Mr. --

172

1    Q.    So you knew or had reason to believe Refugio didn't have

2    that gun?

3    A.    No, I did not.  It could reasonably be he could have had

4    that gun if it was out -- if it was on the streets, it's a good

5    chance he could because the gun was never reported stolen, so he

6    took possession of that firearm some way or another.

7    Q.    But we have already agreed it would have been illegal to

8    return that gun to him because he's an undocumented alien?

9    A.    We as law enforcement could not give it back to him;

10   however, that firearm was never reported into the database as

11   stolen so some way he legally obtained that firearm which one

12   could speculate was given to him by the purchaser.  It was not

13   taken by -- it was not entered as a stolen gun, so the way that

14   I interpreted it is if one person is in possession of a gun that

15   is not stolen, there's a good possibly that gun was legally

16   given to him and could easily be given to him as well.

17   Q.    I think we may have covered this, but just out of an

18   abundance of caution, you asked him:  "Have you ever seen Pablo

19   with a gun"?

20   A.    That was specifically asked.

21   Q.    And he told you no and Mr. Reyes had worked with Pablo for

22   a number of years?

23   A.    Yes.  I believe he worked for three years.

24   Q.    He also worked for Pablo's relatives who also were working

25   for the tree company?

173

1   A.   Some of them.  He did have a substantial amount of

2   relatives who worked for the company.

3   Q.   You also asked him if he had ever seen any of Pablo's

4   family with a gun?

5   A.   On their person, yes.

6   Q.   And he said he had not?

7   A.   He did not.

8   Q.   And you never told that to the magistrate?

9   A.   No, because we had his nephew in possession of a firearm.

10  Q.   In 2014?

11  A.   Three years prior, yes, sir.

12  Q.   But you decided not to tell the magistrate that Mr. Reyes,

13  who worked with the Rangels for a number of years, had never

14  seen them with guns?  You made that decision?

15  A.   It was deemed that it was not relevant.

16  Q.   You deemed it was not relevant?

17  A.   Correct.

18  Q.   And we've already determined that the person that the

19  relevancy goes to is the magistrate?

20  A.   Correct.  The way that means, Refugio, who was also an

21  employee of the business who had been in possession of a firearm

22  prior and he had never seen him with one, but yet he had been

23  arrested with one.

24  Q.   At the time you filled out your affidavit and the time you

25  met with the magistrate, you had not yet contacted Ruben

174

1   Ramirez?

2   A.    Yes, we had.  We had attempted to get in contact --

3   Q.    No, actually made contact.

4   A.    No, we had not.  We were unable to get in contact with

5   either one of these individuals.

6   Q.    So you did not have -- but you already knew that Mr.

7   Reyes' statement was not his statement; it was authored by

8   somebody else?

9   A.    It was his statement but he did not write it.

10  Q.    It was authored by somebody else?

11  A.    Correct.

12  Q.    It was signed by somebody else?

13  A.    Correct.

14  Q.    So you couldn't verify at the time you met with the

15  magistrate, by the time you met with the magistrate on August

16  20th of 2017, you did not confirm if Ruben Ramirez had written

17  that statement?

18  A.    Ruben, no.  The only information I had was that Mr. Joel

19  advised he came to an agreement about this statement --

20        INTERPRETER GONZALES:  Interpreter requests could the

21  witness please slow down.

22        THE WITNESS:  He agreed about the agreement on his

23  statement and then he also provided, I guess, some of the

24  relevant facts as far as Ruben Ramirez's statement goes, so I

25  guess it assisted in, I mean, the validity of it.

175

1   Q.    (By Mr. Ertel)  So they all worked together?

2   A.    Correct.

3   Q.    And he's likely to know when Ruben Ramirez was injured?

4   A.    Correct.

5   Q.    And they all talk?

6   A.    Correct.

7   Q.    So he's going to know of that?

8   A.    But he won't -- but I don't think he would have known the

9   relevant facts that were in his statement.

10  Q.    You don't think?

11  A.    One way -- correct.

12  Q.    But you still at that time hadn't verified --

13  A.    We were unable to get in contact with either one.

14  Q.    Neither one?

15  A.    We attempted to, but we were unable to.

16        MR. ERTEL:  For the purposes of being complete, I'm just

17  going to, I'd like to introduce, if I may approach, Your Honor.

18        THE COURT:  You may.

19  Q.    (By Mr. Ertel)  Let me show you what's been marked as

20  Defendants' Number 7 for identification?

21  A.    Yes, sir.

22  Q.    Take a look at that and see if that -- if you know what

23  that is.

24  A.    This is the police report where Mr. Refugio Ramirez was

25  arrested.

176

1    Q.    Could you speak in the microphone?

2    A.    My apologies.  This is the police report that we were

3    talking about with Refugio Ramirez -- Refugio Ramirez's arrest

4    with the .22-caliber firearm.

5           MR. ERTEL:  And that's -- Judge, I move for the

6    admission of the Defendants' Exhibit 7.

7           MS. GROOVER:  No objection, but with respect to the

8    personal identifying information, we would ask that it remain

9    under seal.

10          MR. ERTEL:  I have no objection to that.

11          THE COURT:  It's admitted under seal.

12          MR. ERTEL:  Thank you, Judge.

13   Q.    (By Mr. Ertel)  Let me clarify, you did not know it was a

14   derringer?

15   A.    No, no.  I did not -- I'm not well versed with how many

16   rounds of ammunition it carries.

17          MR. ERTEL:  That's what I thought.  I just had to

18   clarify.  Judge, I think that's all the questions I have right

19   now, for good.

20          THE COURT:  Ms. Groover, any redirect?

21          MS. GROOVER:  Two very brief questions.

22          THE COURT:  Very brief.

23                       REDIRECT EXAMINATION

24   BY MS. GROOVER:

25   Q.    You were asked on cross-examination to find in the

177

1    transcript where Joel Reyes referred to --

2           INTERPRETER GONZALES:  Interpreter would ask you the

3    please slow down.

4    Q.   (By Ms. Groover)  You were asked to find in the transcript

5    the conversation about where Joel Reyes talked about Pablo

6    talked about having Mr. Montoya killed.  I direct your

7    attention to Pages 15 and 16 in Government's Exhibit 6 and ask

8    if that refreshes your recollection?

9    A.   It does, yes, ma'am.

10   Q.   And what exactly did he tell you?

11   A.   "So that is where the problems stemmed from; I was told by

12   the general, so at the end I was told by Eliud, he said Mister,

13   do you want to send a letter; I told him I don't want trouble

14   for you or because he should tell me" -- it says

15   "unintelligible" -- "that it was possible they fired him and all

16   that, I told him, Mister, stop doing that because I know that

17   there could be problems," and then it said, "Did you do that,"

18   and then he goes into "Because Rangels are big, that family is

19   big here, the Rangels, the Rangels," and it continues on.

20   Q.   Is that the portion of the conversation where you

21   interpreted that --

22   A.   Correct.

23   Q.   -- as explained in your affidavit?

24   A.   Correct, and it goes on to "I asked him if he thought that

25   Pablo could kill them"; he said, "No, he could have sent

178

1    somebody."

2    Q.    And then also referring your attention to the transcript,

3    which I believe is Defense Exhibit 5, of your previous testimony

4    before Judge Smith in the matter concerning Mr. Hipolito

5    Martinez Martinez, the question was whether or not you provided

6    any additional information to the magistrate.  I direct your

7    attention to Page 31.

8         Prior to you being asked the question by The Court, did

9    you explain that you did, in fact, summarize your case in so

10   many words?

11   A.    Correct.

12   Q.    Under oath?

13   A.    Correct.

14        MS. GROOVER:  Thank you.  I have no further questions,

15   Your Honor.

16        MR. ERTEL:  Judge, I only have -- if I may just briefly

17   as to something that was just covered.

18        THE COURT:  Very briefly, Mr. Ertel.

19        MR. ERTEL:  Yes.

20                     RE-CROSS-EXAMINATION

21   BY MR. ERTEL:

22   Q.    Do you remember testifying in front of Judge Smith?

23   A.    The specifics, it was a while ago.

24   Q.    And do you remember being asked this question.  Look at

25   Page 22 at the bottom beginning on Line 22.

1    "And what specifically did he tell you about the murder

2    suspect?"

3        Your answer was, "He said that the murder suspect had

4    problems with the victim; specifically he said that if he didn't

5    back off pressuring the fact that the suspect was an illegal

6    alien, I guess picking on the actual the illegal aliens as well

7    as pressuring them for money" --

8            THE COURT:  Mr. Ertel.

9    Q.    (By Mr. Ertel)  I'm sorry.  "Picking on the actual, the

10   illegal aliens as well pressuring them for money, he was

11   actually going to have him killed.  Those were his exact

12   words."

13       Did you tell Judge Smith that those were his exact words?

14   A.    Yes.

15   Q.    And they are not his exact words?

16   A.    I don't -- I don't know the specifics.  I know Mr. Joel

17   Reyes was interviewed multiple times.  I don't know which

18   statement that could have came from.

19   Q.    The next one was in May of 2019.  This hearing is December

20   of 2017.

21   A.    No, no, Joel Reyes was interviewed several days -- he was

22   interviewed a second time.  I don't know the specifics of that

23   interview.

24   Q.    Okay, so those were his exact words?

25   A.    As far as I can remember, sir.  I can't -- I didn't go

180

1    over my notes from, if it came from that interview, I didn't go

2    over those specific notes.

3    Q.    But that's your testimony to Judge Smith, "Those were his

4    exact words"?

5    A.    As far -- I mean, I can't -- I don't know.

6          MR. ERTEL:  That's it.  That's all I have, Your Honor.

7          THE COURT:  All right.  Thank you.  You can step down.

8          THE WITNESS:  Thank you, Judge.

9          Judge, I've got these documents here.

10         THE COURT:  You can leave them there.

11         MR. ASINC:  Judge, one housekeeping matter, I just make

12   a motion out of an abundance of caution that all the exhibits to

13   include the stipulation that Mr. Ertel has introduced on behalf

14   of Pablo be introduced on behalf of our client as well, Juan

15   Rangel-Rubio.

16         THE COURT:  I assume there's no objection to that.

17         MS. GROOVER:  There's no objection.  I think they are

18   joint motions.

19         MR. ERTEL:  It's a joint motion.

20         THE COURT:  Ms. Groover, I understand that's the

21   Government's only witness.

22         MS. GROOVER:  That's correct.

23         THE COURT:  Any additional documentary evidence?

24         MS. GROOVER:  No, sir.

25         THE COURT:  Mr. Ertel, I understand you have no

181

```
1   witnesses; correct?
2           MR. ERTEL:  No witnesses, Your Honor.
3           THE COURT:  You-all have both requested oral argument.
4   I will note again that the briefing is extensive.  I've reviewed
5   all the briefing.
6           Let me ask Mr. Ertel, there was a request related to the
7   earlier motion about an opportunity for supplemental briefing in
8   light of the transcript.  Is that the same request that you
9   would make for this motion as well?
10          MR. ERTEL:  Yes, Your Honor.
11          THE COURT:  Ms. Groover, Defendants are asking for an
12  opportunity to brief this issue up.  I'm going to take up a
13  schedule for that in just a moment, but do you have any oral
14  argument you would like to present today?
15          MS. GROOVER:  I do.
16          THE COURT:  We've been going for quite a long time.
17  We're going to take a ten minutes for a comfort break, and then
18  I will take up the supplemental briefing schedule as well.  We
19  will be in recess.
20          (Recess from 4:15 p.m. to 4:32 p.m.)
21          THE COURT:  Ms. Groover, are you prepared to make your
22  argument?
23          MS. GROOVER:  Yes, Your Honor.  Thank you.
24          There's no evidence that the witness, the affiant had
25  any deliberate falsity in this particular case.  No, instead
```

182

1   what we have is an investigator that showed up and went to work.

2   The day before the murder, he was coming off of two to three

3   hours' sleep and no food and working from a separate murder the

4   day before.  He worked fast to get his investigation moving to

5   preserve evidence and then to try to solve these murders.  That

6   was his goal.

7       Looking back three years later reviewing the affidavit

8   with a fine-tooth comb, we can see a few misstatements and

9   omissions from a man who was working back-to-back homicides with

10  one goal to mind, try to resolve these cases and preserve his

11  evidence.

12      The only explanation for these few misstatements and

13  omissions is that he was very, very busy working these

14  homicides.  He wasn't trying to deceive The Court.  Not even

15  trying to -- he wasn't trying to lie to The Court at all and

16  hide the evidence.  He was trying to quickly summarize a rapidly

17  moving investigation and quickly preserve the evidence by

18  getting a warrant.

19      He didn't leave anything out that was important, that

20  was material to probable cause in his mind.  I recognize that's

21  The Court's decision, but at the time of his investigation he

22  felt he was putting what he needed to put in there and nothing

23  was left out that was important to him.

24      There was zero evidence that he was trying to deceive

25  the judge, and that is significant because, quite frankly, he

1   accomplished a lot in a very short amount of time with a little

2   bit of sleep, and it was important to note that, based on what

3   was apparent by his work ethic, what he was trying to do is he

4   was trying to solve these crimes and present evidence to get

5   his -- preserve his warrants and not deceive The Court at all.

6          This is simple negligence and innocent mistakes.  This

7   is the very situation why the Supreme Court allows negligence or

8   innocent mistakes in these types of situations.

9          The defendant offers three offers of proof, the unedited

10  transcript of Joel Reyes, the fact that the firearm remains in

11  Property in evidence and there is only one EEOC complaint.

12         First, with respect to the EEOC complaint, that's just a

13  poor choice of words.  He was referring to the previous EEOC

14  complaint in the affidavit, and when you read the affidavit in

15  its entirety, that's what he meant by it.  Yes, he could have

16  used better terminology, but it wasn't to somehow deceive The

17  Court and suggest that were multiple complaints being made.

18         But when you read the edited transcript in its entirety,

19  you can surmise, as Detective Rodriguez did, that Reyes was an

20  employee who submitted the letter by way of adoption.

21         If you look at Page 7 of the transcript, Detective

22  Rodriguez asked, "This is all true; right?"  And Reyes

23  responded, "Yes, that is there" -- "Yes that is there is true,"

24  and Reyes adds, "The signature is -- was not mine."

25         The next page begins with "This letter was made by

1  whom?"  And Reyes responds, "Eliud, no, he made this for sure,

2  this."

3       Detective Rodriguez referred to the letter and

4  clarified, "This?"  And Reyes responds, "Hm, yes, since," excuse

5  me, "and, hm, since I did not sign he did not tell me about the

6  letter."

7       So there, "this," there are several of these letters.

8  Reyes later goes on to explain, "So like right now there are

9  letters," and there was a pause, "a letter that -- that

10  supposedly were signed for the company; I mean they were people

11  who signed including my, my; he also asked for my; I did not

12  send the letter; someone signed it, but, yes, it was suddenly an

13  agreement between us."

14       It's important in that conversation, it's an important

15  word that was missing from the initial transcript, the unedited

16  transcript, the "including me."  You can also hear it in the

17  audio and you can read it in the Spanish of the transcript,

18  "inclusio," and so when -- "including me" means he was adopting

19  the statement, and that is what the witness testified that he

20  took that to be, and also when you put the "T" next to the "his"

21  in Exhibit 7 on Page 3 of 4 in Paragraph 6 of the affidavit,

22  then from reading the transcripts from Page 7 and 8 and

23  correcting the typo to make it "this letter," it is clear that

24  he's referring to this letter, from the conversation where they

25  kept pointing "this letter," "this letter."  It should have been

1   said "this," not "his," a typo from a man who was working two

2   homicides with two to three hours of sleep.

3          The facts that he relied on upon the edited transcript

4   in his entirety is correct.  Joel Reyes did not sign the letter

5   but he adopted it as his own and absolutely that information

6   should have been in the affidavit, and he should have been very

7   clear with The Court exactly what was said and what was signed

8   and what was not signed, but it's not material to probable cause

9   because he did, in fact, adopt the general statement.

10         Rodriguez was allowed to summarize the interview in the

11   affidavit.

12         Another misstatement that should have been corrected and

13   should have been fixed is the fact that Reyes did deny paying

14   the $1500.00, but it is important to note the Reyes does

15   acknowledge paying Pablo for the use of the social security

16   number.  Regardless of how that $1500.00 was paid or any

17   confusion in Detective Rodriguez's mind with that conversation,

18   that financial arrangement should have been clarified, no doubt,

19   in that affidavit, but again, it's not material to the issue of

20   probable cause.

21         It is immaterial if some illegal aliens paid Pablo

22   $1500.00 and others did not but all to use identities to work.

23   What matters is that Pablo is hiring illegal aliens for the

24   company, and then at the end of the day, Detective Rodriguez

25   took it to mean as Mr. Montoya would be killed because of the

1    complaint.

2         Other than the payment issue and the not signing, the

3    entire edited transcript gives the reader a clear understanding

4    that Reyes was an employee who adopted the letter to the EEOC in

5    support of Mr. Montoya's complaint and that Reyes believed that

6    Pablo would have Montoya killed and he had family that could do

7    it.

8         It is true that Reyes, another important

9    misunderstanding and misstatement, it's true Reyes never saw

10   family members with a gun and it was omitted from the affidavit,

11   and absolutely that should have been in there.  It should have

12   been in there.  There is no evidence that he was deceiving and

13   trying to trick the judge by not putting it in there because, as

14   he further testified and indicated in the transcript, Reyes does

15   say, "But there could be guns in the house," and that was also

16   omitted, though.  It's important to note that was also omitted,

17   when he acknowledges there could be guns in the house.

18        I think an evidence of trickery and deceit would be if

19   the affiant puts in there that could be evidence of guns in the

20   house but leaves out the fact that he never saw them with them.

21   Both of the statements about the guns are left off, and he

22   testified, because, again, although it's not his determination,

23   in his mind, that wasn't relevant.  The relevance was that he

24   had family members who could kill him and that there was a

25   family member that he was aware that was arrested with a .22-

1    caliber firearm.

2         So in his mind, it's not material to PC, so he was not

3    trying to deceive it.  In this situation, it's not material to

4    probable cause because there was evidence that still supported

5    probable cause.  You had an extremely busy detective who was

6    trying to solve two murders without any sleep.  Nothing to

7    intentionally deceive The Court.

8         And finally there is no evidence that Detective

9    Rodriguez had actual knowledge that the gun seized in 2014 was

10   still in evidence, and he testified, based on Garden City's

11   procedures, that it's possible the gun could be gone, given to

12   someone who could lawfully possess it and then get back in the

13   arms of the illegal alien, so it was a possibility, and at the

14   time on the weekends, in the evenings, he was not able to

15   confirm and he did not know, in fact, where the gun, if the gun

16   was, in fact, still in Property evidence, but again it's not

17   material to the probable cause, that Pablo was a suspect, had

18   family that lives on the property, that had access at one point

19   to a small-caliber weapon.

20        You could take out all of the inaccuracies and look at

21   the four corners of the warrant and there would still be

22   probable cause because there is remaining strong facts that are

23   outlined in the affidavit that establish probable cause to

24   search this residence, if you take out all of the misstatements

25   and omissions, again that were not intentional.

1        First, Defendants do not challenge the veracity of

2   making the statements to Pablo that his family members -- excuse

3   me, that family members are accusing Pablo as being the murderer

4   in this case.  They don't challenge that.  So that is

5   information that is leading the detective to narrow in on Pablo.

6        The affidavit recounts Mr. Montoya's wife also

7   identified Pablo as a person likely to have murdered Mr.

8   Montoya, and she corroborates that, the information provided by

9   the mother and the sister.

10       They explain the difficulties that Mr. Montoya had with

11  his boss, Mr. Pablo Rangel-Rubio, and explain the problems

12  became so serious that Mr. Montoya went to a federal agency, the

13  EEOC, and filed a complaint.  That is not challenged.

14       What's also not challenged is that Mr. Montoya was

15  acting as a whistleblower, exposing Pablo's scheme to employ

16  illegal aliens, his scheme to syphon pay from employees, his

17  scheme to unlawfully use the identities of others.

18       These witnesses and documents reflect motive, motive and

19  more motive.  The defendants also do not challenge facts in the

20  affidavit that the Pablo Rangel-Rubio's role in Mr. Montoya's

21  murder comes from a crime scene, which reflected that the murder

22  was not a robbery gone wrong but rather would suggest that it

23  was, in fact, an employee complaint relationship.

24       Mr. Montoya's vehicle had not been stolen.  His phone

25  and his wallet were not taken, and nothing appeared missing, all

1  of which suggests that the killing served a purpose other than

2  to obtain the valuables.  It corroborated what the witnesses

3  were telling Detective Rodriguez.  This is not challenged at all

4  by the defendants.

5       Also they do not challenge Joel Reyes' statement

6  acknowledging that Pablo Rangel-Rubio hired illegal aliens.

7  They do not challenge Joel Reyes' statement that Mr. Montoya's

8  whistle-blowing activity and they do not challenge that Reyes

9  lacks -- that he lacked surprise that he was dead.

10      Specifically they do not challenge that Refugio lived at

11 Pablo's estate, was known to previously possess a small caliber

12 firearm consistent with that used in the murder and worked with

13 the whistleblower, Mr. Montoya, and further they do not

14 challenge that the defendant, that his uncle, Pablo was the

15 target of the blown whistle and that Refugio had an outstanding

16 warrant for his arrest, showing his prior illegal propensity had

17 not been abated.

18      All of this is strong evidence supporting probable cause

19 for this warrant that is not challenged when you take out of the

20 misstatements or omissions.  They do not have evidence of intent

21 to deceive The Court on purpose.

22      We respectfully submit that the defendants have not met

23 their burden of showing that these misstatements or omissions

24 were intentional or reckless, let alone material to the probable

25 cause, and we would respectfully ask that the motion be denied,

190

1    Your Honor.

2         THE COURT:  Ms. Groover, before you sit down, a few

3    questions.  There is one challenge that you may not have

4    addressed.

5         On Page 3 of 4 on the affidavit, in the sixth paragraph

6    down starting with the words, "At 1900 hours," the second to

7    last sentence, Detective Rodriguez states in his affidavit,

8    "He," Joel Reyes, "stated he told the victim, Mr. Montoya, to

9    leave Pablo alone," and that I believe is, that first portion of

10   that sentence is supported by the interview transcript, that he

11   told him there may be trouble, something to that nature, but

12   then the second part of this sentence, "since he," Pablo, "was

13   going to have him," Reyes, "killed."  I've read the transcript a

14   couple of times and I can't find any basis for that second part

15   of that sentence.

16        MS. GROOVER:  I do agree that that's not in the

17   transcript, and so that does seem to be something that is

18   another assumption, and so... but even taking that part out,

19   Your Honor, it is accurate -- I don't believe it would affect

20   the probable cause.  "Joel Reyes does advise he doesn't think

21   Pablo could kill him but he had family who could, who could kill

22   him," and that is what is significant because it loops back into

23   the fact that Pablo had a family member who was arrested with a

24   .22-caliber firearm that was similar to the murder weapon and

25   still had propensity to use, to do that.

1          THE COURT:  I understand all the sort of other

2     arguments, but the next sentence is dealing with a slightly

3     different issue, which is Reyes' beliefs about who could have

4     done this.  The preceding sentence that I pointed you to is

5     about what Reyes advised Mr. Montoya of before anything

6     happened, and here, my question is focused on this.

7          I understand your arguments about probable cause

8     generally, but that statement alone, would you agree that it's

9     at least a material fact --

10         MS. GROOVER:  Yes.

11         THE COURT:  -- for the magistrate judge.  Would that

12    statement alone compared with the transcript not get the

13    defendants at least at the point of obtaining a Franks hearing

14    on the issue?

15         MS. GROOVER:  Yes, Your Honor, I can see the argument,

16    and having the hearing, I do agree it's important to have the

17    hearing.

18         THE COURT:  Here's my one other question, Ms. Groover.

19    There was a lot of discussion about Detective Rodriguez's oral

20    testimony to the magistrate and there was some back-and-forth

21    references to the prior hearings before Judge Smith.

22         The question is a succinct one.  What testimony, outside

23    of what's in the affidavit, what oral testimony and what

24    specific facts does the Government contend that I'm supposed to

25    consider from oral testimony?

1        MS. GROOVER:  Unfortunately, Your Honor, I don't think

2   the specifics are known.  As was testified today, it was just in

3   general he explained his investigation like he explained his

4   investigation to us here, and he outlined that that's his

5   typical practice, and so unfortunately I don't believe we know

6   exactly what was said.

7        As I recall, that was also the same problem that was

8   addressed in that hearing as well, is that unfortunately under

9   Georgia law, it was authorized to give oral testimony and

10  unfortunately it was not preserved what exactly it was.

11       THE COURT:  Let me just make sure I understand your

12  position.  If we don't know the specifics, I can't speculate

13  about what circumstances of the investigation.  We're just left

14  with the evidentiary presentation here, what's in the affidavit,

15  other documentary evidence that we have, but I can't pull some

16  fact that may or may not have been discussed.  Would you agree

17  with that?

18       MS. GROOVER:  I absolutely agree with that.  There is no

19  evidence before you that says exactly what clarifications if any

20  were made to the judge.

21       THE COURT:  Thank you, Ms. Groover.

22       MS. GROOVER:  Thank you.

23       THE COURT:  Mr. Ertel, we discussed whether y'all would

24  like to present argument or not.  You're not compelled to.

25       MR. ERTEL:  I will do it in the brief, Judge.  I don't

193

1    want to bore you with the same things twice.

2         THE COURT:  Let's talk about the briefing and the

3    transcripts.  First let me confirm first, Mr. Martin, Mr. Ertel,

4    Mr. Olive and Mr. Asinc, I want to confirm you-all are

5    requesting transcripts of both days of full proceedings;

6    correct?

7         MR. ERTEL:  Correct, Your Honor.

8         MR. ASINC:  That's correct, Your Honor.

9         THE COURT:  I ask y'all to coordinate with the court

10   reporters, plural, Ms. Gilbert and Ms. Root, to obtain that.

11   While I don't know the timeframe for exactly when that will be

12   provided, I can set a briefing schedule off whatever date the

13   transcripts, complete transcripts, are available to defense

14   counsel, and so what I will do is set a schedule that will

15   require supplemental briefs to be submitted within 21 days of

16   provision of the transcripts and then allow 14 days from that

17   date for any responsive briefing, and again, you're not

18   obligated to use all that time.  I encourage you to get them in

19   expeditiously, but that will be the schedule.  That is anchored

20   on an uncertain date in the future.  But it will still be that

21   21 and 14 days.

22        MR. MARTIN:  Will you also allow us to respond if

23   necessary to their response?

24        THE COURT:  We're not going to have three rounds of

25   briefing, Mr. Martin.  I will ask y'all to try to brief

1    everything up you have in the course of your opening briefs.

2         MR. MARTIN:  All right, fine.

3         MR. ERTEL:  Judge, just so you know -- I don't know that

4    it's going to be an issue -- I've got a probably a week-and-a-

5    half-long trial starting August 2nd.  I think we will

6    probably -- it's going to come close.

7         THE COURT:  If you need to modify that, file a written

8    motion after you-all confer and propose a schedule at that

9    point.  Let's wait to modify it until we see what happens with

10   the trial, what happens with the transcripts.

11        Let me confirm with all defendants' counsel, y'all are

12   making this request in order to prepare your briefs to

13   adequately defend your clients in this case.  I want to confirm

14   that y'all agree that that time should be excluded from any

15   Speedy Trial calculation, confirming this case is still

16   designated as complex and so it's likely all tolled anyway, but

17   I want to confirm you would agree this time should be --

18        MR. ERTEL:  On behalf of Pablo Rangel-Rubio, yes, Your

19   Honor, we agree all time should be excluded from the Speedy

20   Trial calculation.

21        THE COURT:  Mr. Martin?

22        MR. MARTIN:  Yes, we agree on behalf for Mr.

23   Perez-Bravo.

24        THE COURT:  Mr. Asinc?

25        MR. ASINC:  Juan Rangel-Rubio also agrees, Judge.

195

1           THE COURT:  Thank you very much.  Mr. Olive, I think you

2    might have chimed in.  You agree as well?

3           MR. OLIVE:  I do.

4           THE COURT:  All right.

5           Ms. Groover, Mr. Howard, anything further to address

6    from the Government at this time?

7           MS. GROOVER:  Nothing from us.

8           THE COURT:  Defense, first Mr. Ertel?

9           MR. ERTEL:  No, Judge, thank you for the opportunity.

10          THE COURT:  Mr. Martin?

11          MR. MARTIN:  No, sir.

12          THE COURT:  Mr. Asinc, Mr. Olive?

13          MR. ASINC:  No, Your Honor.

14          THE COURT:  That will conclude these proceedings.  Again

15   coordinate with the court reporters on obtaining those

16   transcripts.  Stick to that briefing schedule.

17          If there is a request for a modification, I will

18   encourage you to try to keep it as short as possible.

19          MR. ERTEL:  I will try to get it done.  I would like to

20   take some time off after that trial, so I would like to get it

21   done beforehand.

22          THE COURT:  That will conclude our proceedings and we

23   will be adjourned.

24          (Proceeding concluded at 4:53 p.m.)

25

196

1                              CERTIFICATION

2

3          I certify that the foregoing is a true and correct

4    transcript of the stenographic record of the above-mentioned

5    matter.

6

7

9    _____        06/26/2021

10   Debra Gilbert, Court Reporter          Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25